# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                     BKY Case No.:  11-43816

Steven Bruce Hoyt,                                                    Chapter 11

                Debtor.

## NOTICE OF HEARING AND MOTION FOR RELIEF FROM AUTOMATIC STAY

TO:      ENTITIES SPECIFIED IN LOCAL RULE 9013-3.

1.      Commerce Bank ("**Bank**"), by its attorneys, moves the Court for the relief requested below and gives notice of hearing.

2.      The Court will hold a hearing on this motion at 10:30 a.m. on July 5, 2011, before Chief Judge Gregory F. Kishel, in Courtroom 2A, U.S. Courthouse, 316 North Robert Street, St. Paul, MN 55101, or as soon thereafter as counsel can be heard.

3.      Any response to this Motion must be filed and served by delivery no later than  June 30, 2011 which is five (5) days before the time and date set for the hearing (including Saturday, Sunday, and holidays).  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§157 and 1334, Fd. R. Bankr. P. No. 5005 and Local Rule 1070-1.  This is a core proceeding.  This case was commenced as a Chapter 11 case on May 31, 2011 and is now pending in this Court.

5.      This motion arises under 11 U.S.C. §362 and Federal Rules of Bankruptcy Procedure 4001, and is filed under Federal Rules of Bankruptcy Procedure 9014 and Local Rules 1201-1215. This motion is brought under 11 U.S.C. §362(d)(1) and (2).

## RELIEF REQUESTED

6.     The Bank moves for an Order modifying the automatic stay to allow the Bank to foreclose its lien and assert its sale rights against the Debtor's interest in 288,295.436 units of IRET Properties, a North Dakota limited partnership (the "**IRET Units**").

## BACKGROUND

7.     On March 3, 2008, the Debtor borrowed $12.5 million dollars from the Bank evidenced by a Promissory Note (a copy of which is attached as Exhibit 1) and other documents (the "**Loan**"). The Debtor used the proceeds of the Loan to acquire all of the ownership units in WCSC Minneapolis Industrial Investor LLC ("**WCSC**"). WCSC owns 71.8% and StoneArch II, LLC owns 28.9% of another entity, StoneArch II/WCSE Minneapolis Industries LLC, which, through various layers of downstream entities, owns 4 separate pools of real estate development projects.

8.     The Loan is secured, in part, by the IRET Units, which are convertible into shares of IRET, Inc., a publicly traded company. The IRET Units, if converted into tradable shares, had a value of $9.30 per share, or $2,681,147.55, as of June 6, 2011.

9.     The Debtor is in default under the payment terms of the Loan. The Loan initially matured, by its terms, on May 3, 2010. Subsequently, the Bank and the Debtor entered into loan extension agreements which extended the maturity date of the Loan to February 3, 2011. The Debtor failed to pay the Loan when it matured, as extended, on February 3, 2011, and accordingly is in default thereof.

10. The principal balance owed under the Loan, as of February 3, 2011, was $12,500,000.00, plus accrued and unpaid interest and late charges of $692,760.41. Per diem interest accrues at the rate of $2,083.32 per day. In addition, the Debtor is liable to the Bank for certain other fees, charges, and attorneys' fees, which the Bank estimates to be approximately $45,000.00. The Debtor accordingly owes $13,383,476.49 to the Bank under the Loan as of June 1, 2011, after crediting the dividend payments received as described in paragraph 14 below.

11. The Bank had scheduled a foreclosure sale of the IRET Units to take place on June 3, 2011. The Debtor filed his petition in this case three days prior to the foreclosure sale date.

12. The Bank holds a security interest in the IRET Units under Security Agreements dated March 3, 2008 and January 25, 2010, copies of which are attached hereto as Exhibits 2 and 3. The Bank has perfected its security interest in the IRET Units by filings made in the Office of the Minnesota Secretary of State on June 3, 2008 and January 26, 2010, as Document Nos. 200810866199 and 201018882796, copies are attached hereto as Exhibits 4 and 5.

## THE BASIS FOR THE RELIEF REQUESTED

13. It is indisputable that the amount owed to the Bank far exceeds the value of the IRET Units. It is indisputable that the Debtor is in default by failing to pay the Loan at its extended maturity date. It is further indisputable that the IRET Units have a converted value as represented by the shares of IRET Inc. of $9.27 as of June 9, 2011. The shares have lost value since May 31, 2011 (the petition date), at which time the shares were valued at $9.69 per share. The Bank is at risk for further depreciation of the value of the IRET Units. Exhibit 6 attached hereto is a print-out of the recent price history of the IRET, Inc. shares.

14.     The IRET Units have historically generated quarterly dividends.  The Bank had notified the IRET Properties of the exercise of its rights in the IRET Units in December, 2010, and Bank has received the quarterly dividend distributions pursuant to its lien rights in January and May, 2011 of $48,589.68 and $49,442.68, respectively.  The next quarterly dividend is due to be distributed in the first half of July, 2011.  Dividend distributions are at the sole discretion of the partnership, are not guaranteed, and are conditioned on and subject to the continued successful operation of the partnership.

15.     Cause exists for modifying the automatic stay because the IRET Units have lost, and may very well continue to lose, value due to deteriorating general stock market conditions. The Bank has been offered no adequate protection from the risk of further deterioration in the value of the IRET Units.

In addition, no equity exists in the IRET Units.  The shares are not necessary for a reorganization of the Debtor.  The Debtor is an individual, and is not a typical Chapter 11 Debtor having an operating business and employees.  The Debtor merely owns interests in a myriad of entities, most of which own real estate projects.  The Debtor's reorganization presumably depends on a long-term revival of the value of those real estate projects and the general real estate market.

The other collateral held by the Bank consists of an interest in WCSC and Stone Arch II, LLC, which indirectly own real estate projects in 4 separate pools.  Three of the pools, according to the Debtor, cannot be sold for at least 3 years.  The Bank should not be subjected to a market deterioration risk on the IRET Units for 3 years, while it waits for the Debtor to complete a liquidation of the pools.

16. The Debtor's Schedule J reflects that his only expenses are personal living expenses related to two high value homes and an attendant expensive lifestyle. The Debtor should not be allowed to utilize the IRET Units and dividends to pay extremely large house mortgage payments and related expenses of owning and maintaining two luxury homes, a luxury automobile, and an enviable lifestyle. Nor should the Debtor be allowed to utilize the IRET Units as a means of paying other parties which do not have a security interest in that asset. The Bank is entitled to the benefit of its bargain when the Loan was made, i.e. the right to realize on its collateral if the Loan is not repaid according to its terms.

17. The Bank hereby gives notice that, if necessary, at any hearing on this matter, it may call employees of the Bank, the Debtor, and other persons, as witnesses to testify on any issues in this Motion.

18. The Bank requests immediate stay relief pursuant to 11 U.S.C. §§362(d)(1) and (2).

19. This Motion is supported by the Memorandum which is filed herewith.

**WHEREFORE**, the Bank, by its undersigned attorneys, moves the Court as follows:

1. For an Order which modifies the automatic stay under 11 U.S.C. §362(a) to allow the Bank to foreclose its rights in the IRET Units, and the dividends generated therefrom, to take all steps and actions to convert the IRET Units into tradable securities, and to sell and apply the proceeds thereof to the indebtedness owed by the Debtor under the Loan.

2. For such other and further relief as may be just and equitable.

**LEONARD, O'BRIEN**
**SPENCER, GALE & SAYRE, LTD.**

/e/  Matthew R. Burton

Dated: June 16, 2011             By_____
                                 Brian F. Leonard, #62236
                                 Matthew R. Burton, #210018
                                 Attorneys for Commerce Bank
                                 100 South Fifth Street, Suite 2500
                                 Minneapolis, Minnesota  55402-1234
                                 (612) 332-1030

## VERIFICATION

I, Al Hilgers, a Senior Vice President of Commerce Bank, the moving party named in the foregoing notice of hearing and motion, declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: June _10_, 2011

_____
Al Hilgers

439799

$12,500,000.00
**PROMISSORY NOTE**
given by
**STEVEN B. HOYT**
to
**COMMERCE BANK**

Dated: March 3, 2008

At: Minneapolis, Minnesota

1.　**FOR VALUE RECEIVED**, the undersigned, **Steven B. Hoyt**, a Minnesota resident ("**Borrower**"), hereby agrees and promises to pay to the order of **Commerce Bank**, a Minnesota banking corporation, its endorsees, successors and assigns ("**Lender**"), at its office at 7650 Edinborough Way, Suite 150, Edina, Minnesota, 55435, or at such other place as Lender may, from time to time, designate in writing, the principal sum of Twelve Million Five Hundred Thousand Dollars ($12,500,000.00), or, if less, the aggregate unpaid principal amount of all advances made by Lender to Borrower pursuant to that certain Loan Agreement between Lender and Borrower dated as of the date hereof (together with any amendment or modification thereto, the "**Loan Agreement**"); together with interest on the unpaid principal balance at the rates provided for herein, payable in lawful money of the United States of America which shall be legal tender for public and private debts at the time of payment.

2.　The outstanding principal balance hereof shall bear interest at an annual floating rate of interest equal to one-half percent (0.50%) plus the Index Rate (as hereinafter defined); provided however and notwithstanding anything to the contrary provided herein, the rate of interest payable under this Note shall never be less that six percent (6.00%) per annum (the "**Minimum Interest Rate**"). As used herein, "**Index Rate**" means the rate publicly announced in *The Wall Street Journal* as *The Wall Street Journal* Prime Rate. A change in the Index Rate shall be deemed to occur as of the date of announcement of such change by *The Wall Street Journal*, and the interest rate payable under this Note shall be adjusted as of that date. If publication of *The Wall Street Journal* Prime Rate is discontinued, Lender shall select a new reasonably comparable index rate. Lender's internal records of applicable interest rates shall be determinative in the absence of manifest error. The interest rate determined in accordance with the foregoing is referred to herein as the "**Regular Rate**." Interest shall be computed on the basis of 360 days per year, but charged for the actual number of days principal is unpaid. All agreements between Borrower and Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use, forbearance, loaning or detention of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. If from any circumstances whatsoever, fulfillment of any provisions hereof or any Loan Document (as hereinafter defined) at any time given shall exceed the maximum permissible under applicable law, then the obligation to be fulfilled shall automatically be reduced to an amount which complies with applicable law, and if from any circumstances Lender should ever receive as interest an amount which would exceed the maximum lawful rate of interest permitted under applicable law, such amount which would be in

- 1 -


EXHIBIT

excess of such lawful rate of interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Lender and shall also be binding upon and available to any subsequent holder of this Note.

3.     Borrower shall make monthly payments of accrued interest beginning on April 10, 2008 and continuing on the same date of each month thereafter until March 3, 2010 (the "**Maturity Date**"), at which time the entire unpaid principal balance of this Note together with all accrued but unpaid interest thereon shall be due payable in full.   All payments shall be applied, at the option of Lender, first to costs of collection, second to late charges, if any, third to interest at the rate then in effect under the terms hereof and fourth to principal (and, with respect to prepayments, to installments of principal in the inverse order of their maturity), provided however, that if any advance made by Lender as the result of a default on the part of Borrower under the terms of this Note or Loan Document is not repaid on demand, any monies received, at the option of Lender, may first be applied to repay such advances, plus interest thereon at the Default Rate, and the balance, if any, shall be applied in accordance with the provisions hereof.

4.     Borrower shall pay to Lender a late charge of five percent (5.0%) of any monthly payment of interest not received by Lender within ten (10) days after the payment is due. The late charge shall apply individually to all payments past due with no daily adjustment and shall be used to defray the costs of Lender incident to collecting such late payment. This provision shall not be deemed to excuse a late payment or be deemed a waiver of any other rights Lender may have including the right to declare the entire unpaid principal and interest immediately due and payable.

5.     Upon the occurrence of an Event of Default (as hereinafter defined) the interest rate shall thereafter increase and shall be payable on the whole of the unpaid principal balance at a rate equal to five percent (5.0%) per annum in excess of the Regular Rate (hereinafter referred to as the "**Default Rate**"), which Default Rate shall be effective as of the date of the occurrence of such Event of Default. The increase in the interest rate upon the occurrence of an Event of Default shall be applicable whether or not Lender has exercised its option to accelerate the maturity of this Note and declared the entire unpaid principal indebtedness to be due and payable. The Default Rate shall continue until such Event of Default is cured or the payment in full of all indebtedness evidenced by this Note.

6.     This Note is issued pursuant to the Loan Agreement and is secured by all of the Loan Documents (as defined in the Loan Agreement) referenced in the Loan Agreement. Reference is hereby made to the Loan Agreement and other Loan Documents (which are incorporated herein by reference as fully and with the same effect as if set forth herein at length) for a more complete description of the collateral securing this Note, a statement of the covenants and agreements made with respect thereto, a statement of the rights and remedies afforded thereby and all other matters contained therein.

7.     Time is of the essence of this Note and each of the provisions hereof.

8. The occurrence of an Event of Default (as defined in any of the Loan Documents), shall constitute an Event of Default hereunder, and the entire unpaid principal balance together with accrued interest at the Default Rate, together with any reasonable attorneys' fees incurred by Lender in collecting or enforcing payment thereof, whether suit be brought or not, and all other sums due hereunder or under the Loan Documents shall become, without notice, immediately due and payable at the option of Lender. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or of any other remedy under this Note. A waiver on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on a future occasion. Lender may extend the time of payment of interest and/or principal of this Note without notice to or consent of any party liable hereon and without releasing such party.

9. Borrower, endorsers, sureties, and any guarantor, surety or endorser hereby severally waive demand, presentment, notice of nonpayment, protest, notice of protest, notice of dishonor and diligence in collection and agrees that without any notice Lender hereof may take and/or release additional security herefor or Lender hereof may, from time to time, release any part or parts of the security for this Note with or without consideration, and that in any such case Borrower and any guarantor, surety or endorser shall remain liable to pay the unpaid balance of the indebtedness evidenced hereby as so additionally secured, extended, renewed or modified and notwithstanding any such release.

10. The remedies of Lender, as provided herein and in the Loan Documents, shall be cumulative and concurrent and may be pursued singly, successively or together, at the sole discretion of Lender, and may be exercised as often as occasion therefor shall occur. Lender may, in its discretion, waive any default hereunder and its consequences and rescind any declaration of acceleration of principal; provided, however, that no action or inaction by Lender shall be deemed a waiver of any of Lender's rights or remedies unless Lender specifically agrees in writing that such action or inaction shall constitute a waiver of its rights or remedies. Any waiver shall only apply to the particular instance for which it was agreed. No delay in exercising and no failure in exercising any right or remedy hereunder or afforded by law shall be a waiver of or preclude the exercise of any right or remedy hereunder or provided by law, whether on such occasion or any future occasion, nor shall such delay be construed as a waiver of any default or acquiescence therein. The exercise or the beginning of the exercise of one right or remedy shall not be deemed a waiver of the right to exercise at the same time or thereafter any other right or remedy.

12. This Note may be prepaid, in whole or in part, at any time, without penalty or premium.

13. Borrower agrees that if, and as often as, Lender retains legal counsel to collect, defend or enforce any of Lender's rights under this Note, the Loan Agreement or any Loan Document, Borrower will pay to Lender all reasonable attorneys' fees incurred by Lender and all court costs (including reasonable attorneys' fees and court costs prior to trial and on appeal, or in any bankruptcy proceeding), whether suit be brought or not, and other expenses incurred in connection therewith.

14. This Note may be assigned by Lender from time to time by an endorsement hereon or by other writing; provided that notice of such assignment shall be given in writing to Borrower. The

obligations of Borrower hereunder may not be assigned by Borrower without the written consent thereto by Lender.

15. It is intended that this Note is made with reference to and shall be governed by and construed in accordance with the laws of the State of Minnesota. Borrower hereby irrevocably agrees that any legal action or proceedings against it with respect to this Note may be brought at Lender's option in the courts of the State of Minnesota, or in any United States District Court in the State of Minnesota, and by the execution and delivery of this Agreement, Borrower hereby irrevocably submits to the jurisdiction of each such court and hereby irrevocably waives any and all objections that Borrower may have as to jurisdiction or venue in any of such courts. Borrower acknowledges that it has received sufficient consideration for any inconvenience which may be caused by any legal action brought in the State of Minnesota, and agrees that the enforcement of the provisions of this section against Borrower would not be unreasonable or unfair under all the circumstances of the loan evidenced by this Note.

16. This Note and the Loan Documents contain the entire agreement of the parties regarding the Loan. Without limiting the generality of the foregoing, this Note and the Loan Documents supersede any term sheet, loan application or commitment letter issued by Lender or submitted by Borrower in connection with the Loan.

17. LENDER BY ITS ACCEPTANCE HEREOF AND BORROWER HEREBY VOLUNTARILY, KNOWINGLY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING UNDER THIS NOTE OR CONCERNING THE INDEBTEDNESS EVIDENCED HEREBY AND/OR ANY COLLATERAL SECURING SUCH INDEBTEDNESS, REGARDLESS OF WHETHER SUCH ACTION OR PROCEEDING CONCERNS ANY CONTRACTUAL OR TORTIOUS OR OTHER CLAIM. BORROWER ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO LENDER IN EXTENDING CREDIT TO BORROWER, THAT LENDER WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT BORROWER HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER.

**IT IS HEREBY CERTIFIED AND RECITED** that all conditions, acts and things required to exist, to happen and to be performed precedent to or in the issuance of this Note do exist, have happened and have been performed in regular and due form as required by law.

[Signature Page Follows.]

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed by authorized representative, all on the date and year first above written.

By: _____
           Steven B. Hoyt

376048v2

# PLEDGE AND SECURITY AGREEMENT
### (IRET Properties Limited Partnership Units)

THIS PLEDGE AND SECURITY AGREEMENT (together with all amendments, restatements and other modifications, this "**Agreement**"), is dated as of March 3, 2008, by **Steven B. Hoyt**, a Minnesota resident ("**Pledgor**") and **Commerce Bank**, a Minnesota banking corporation ("**Lender**").

### BACKGROUND

A.    Lender has agreed to make a loan in an amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000.00) (the "**Loan**") to Pledgor pursuant to that certain Loan Agreement by and between Pledgor and Lender dated March 3, 2008 (together with all amendments, restatements and other modifications, the "**Loan Agreement**"), which is incorporated herein by this reference, and as evidenced by that certain Promissory Note from Pledgor to the order of Lender dated March 3, 2008 in the principal amount of the Loan (together with all amendments, restatements and other modifications, the "**Note**"), which is incorporated herein by this reference.

B.    Pledgor is a limited partner of and owns 222,932.862 of limited partnership units, in IRET Properties, a North Dakota Limited Partnership (the "**Issuer**"), referenced in IRET Properties Certificate No. 1636 ("**Certificate No. 1636**"), and 47,158.534 limited partnership units of Issuer referenced in IRET Properties Certificate No. 1637 ("**Certificate No. 1637**") (Certificate No. 1636 and Certificate No. 1637 are sometimes referred to herein as the "**Certificates**"), and as more particularly described on Schedule I attached hereto.

C.    It is a condition precedent to the obligation of Lender to make the Loan to Pledgor that Pledgor shall have executed and delivered this Agreement to Lender.

NOW, THEREFORE, based upon the foregoing background, which the parties agree to be true and correct, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree:

1.    <u>Certain Definitions</u>.  Unless otherwise defined herein or the context otherwise requires, each term defined in either the Loan Agreement or in the UCC is used in this Agreement with the same meaning; provided that, if the definition given to such term in the Loan Agreement conflicts with the definition given to such term in the UCC, the Loan Agreement definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail.  As used herein, the following terms have the meanings indicated:

"<u>Certificate of Limited Partnership</u>" means the certificate of limited partnership of Issuer as currently in effect, in the form delivered to Lender herewith.

"<u>Collateral</u>" has the meaning specified in Section 2.

"<u>Event of Default</u>" means any default under any Loan Document which is not cured within any applicable grace or cure period.

**EXHIBIT**

tabbies

2

"Governmental Authority" means any federal, state, county, municipal, parish, provincial or other government, or any department, commission, board, court, agency, committee, whether of the United States of America or any other country, or any instrumentality of any of them, or any other political subdivision thereof.

"Loan Documents" means collectively the Loan Agreement, the Note, this Agreement and any other loan or security document executed by the Pledgor, or any guarantor or accommodation pledgor, in connection with the Loan, together with all amendments, restatements and other modifications thereto.

"Material Adverse Effect" means if the business prospects, operations or financial condition of a person, entity or property has changed in a manner which could materially impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

"Organizational Documents" means the Certificate of Limited Partnership, the Partnership Agreement, and any other agreements affecting the rights, limitations, preferences or obligations of Pledgor with respect to any of the foregoing or with respect to the Partnership Interests or otherwise, in each case, as the same may be amended or modified from time to time in accordance with any of the Loan Documents.

"Partnership Agreement" means the limited partnership agreement of Issuer dated January 31, 1997, as currently in effect, in the form delivered to Lender herewith.

"Partnership Interests" has the meaning specified in Section 2.

"Transfer" means any sale, exchange, transfer, lease, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition.

"UCC" means at any time the Uniform Commercial Code as in effect in the State of Minnesota; provided, that if, by reason of mandatory provisions of law, the validity or perfection of Lender's security interest in the Collateral or any part thereof is governed by the Uniform Commercial Code or other similar law as in effect in a jurisdiction other than Minnesota, "UCC" means the Uniform Commercial Code or such similar law as in effect in such other jurisdiction for purposes of the provisions hereof relating to such validity or perfection.

2.    Collateral; General Terms

(a)    Security Interest. As security for the payment and performance of all obligations of the Pledgor to Lender under the Loan Agreement, the Note, and all other Loan Documents (as defined in the Loan Agreement) with or in favor of Lender, Pledgor hereby grants Lender a continuing first-priority security interest in, lien on and right of set-off against, and hereby assigns to Lender as security, all of Pledgor's right, title and interest, in and to the following property and interests in property (save insofar as otherwise expressly excluded by the terms of this Agreement), whether now owned or hereafter acquired or existing and wherever located (collectively, the "Collateral"):

(i)     all of Pledgor's right, title and interest in and to Pledgor's partnership interests and partnership units of, in and to Issuer as set forth in the Certificates and on Schedule I and all of Pledgor's equity and other interests in, to and of Issuer relating thereto, including, for the avoidance of doubt, all voting, management, and exchange rights connected therewith or related thereto (collectively, the "**Partnership Interests**"), together with all instruments of transfer in respect of such interests, executed in blank, all cash, securities, dividends, proceeds and other property whether constituting investment property, accounts, documents, general intangibles and/or instruments or otherwise at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any and all of the Partnership Interests or arising from or in respect of, or constituting any and all of the Partnership Interests;

(ii)     to the extent not included in clause (i) above, any and all rights and remedies of Pledgor under any of the Organizational Documents, as applicable, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inuring to the benefit of, Pledgor;

(iii)     all securities hereafter delivered to Lender in substitution or exchange for or in addition to any and all of the Collateral, all certificates and instruments representing or evidencing such securities or any and all of the Collateral and all cash, securities, dividends, proceeds and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral;

(iv)     all books and records (including credit files, computer programs, printouts and other computer materials and records) of Pledgor pertaining to any of the Collateral;

(v)     all of Pledgor's right, title and interest in and to the profits and losses of Issuer, and Pledgor's right as a limited partner of Issuer to receive distributions of the assets of Issuer upon complete or partial liquidation or otherwise; and

(vi)     all cash and non-cash proceeds and products of the Collateral, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed when Collateral or proceeds are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

(b)     <u>Pledgor Remains Liable</u>.  Anything herein to the contrary notwithstanding, (i) Pledgor shall remain liable under the Organizational Documents to the extent set forth therein and shall perform all of his duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of his duties or obligations under any of the Organizational Documents; and (iii) Lender shall not have any obligation or liability under any of the Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or

enforce any claim for payment assigned hereunder; provided that, upon foreclosure thereof, Lender and any other transferee of the Collateral shall take the same subject to the Organizational Documents.

3. Representations and Warranties. Pledgor represents and warrants the following to Lender:

(a) Formation; Good Standing. Pledgor is a resident of the State of Minnesota, with his principal homestead residence located in Minnesota.

(b) Authorization; Binding Effect. Pledgor has the power and authority to execute and deliver this Agreement and to perform his obligations hereunder, and all such action has been duly and validly authorized by all necessary action on his part. This Agreement has been duly and validly executed and delivered by Pledgor and constitutes the legal, valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights.

(c) No Consents. Except as required for perfection of the security interest in the Collateral as described herein, no permits, licenses, franchises, approvals, authorizations, qualifications or consents of, or registrations or filings with, governmental authorities, Issuer, the general partner of Issuer, or any other person or entity are required in connection with the execution or delivery by Pledgor of, or the performance by Pledgor of its obligations under, this Agreement, except such as have been obtained or made and are in full force and effect.

(d) No Conflict. To the knowledge of Pledgor, the execution and delivery of, and the performance by Pledgor of his obligations under this Agreement do not and will not result in a breach or constitute a violation of, conflict with, or constitute a default under any of the Organizational Documents of Issuer, or any law, regulation, order or judgment applicable to Pledgor or any agreement or instrument to which Pledgor is a party or by which Pledgor or any of his property is bound.

(e) No Material Litigation. There are no actions, suits, proceedings or claims pending or, to the knowledge of Pledgor, threatened against or affecting Pledgor or any of his property which, individually or in the aggregate, could reasonably be expected to lead to or cause a Material Adverse Effect.

(f) Title to Collateral. Pledgor is the sole owner of all of the Collateral, beneficially and of record, free and clear of any liens other than the liens created hereunder and under the other Loan Documents. The Collateral is not subject to any option to purchase, right of first refusal or similar rights of any kind and no exchange rights pertaining thereto have or will be exercised by Pledgor without the prior written consent of Lender. Further, the limited partnership units referenced in the Certificates are subject only to the restrictions provided in Section 9.02 of the Partnership Agreement and in the Thresher Square Contribution Agreement and the Plymouth Contribution Agreement (as hereinafter defined). The "contracts between Mr. Hoyt and the Partnership" referenced in the Consent to Pledge of Partnership Interest delivered to the Lender herewith (the "**Issuer's Consent**") are (i) the Agreement for Contribution of Property

dated June 14, 2001, by and between WPT I, LLC, a Delaware limited liability company ("**WPT**") and the Issuer, as amended by that certain First Amendment to Agreement for Contribution of Property by and between WPT and the Issuer dated December 5, 2001 (collectively, the "**Thresher Square Contribution Agreement**"), which Thresher Square Contribution Agreement is applicable to the limited partnership units referenced in Certificate No. 1636; and (ii) the Agreement for Contribution of Property dated January 8, 2001, by and among the Pledgor and the other individuals and entities identified therein and the Issuer (the "**Plymouth Contribution Agreement**'), which Plymouth Contribution Agreement is applicable to Certificate No. 1637.

(g) <u>Perfection</u>. Upon (i) the execution and delivery of this Agreement, and (ii) the filing of UCC financing statements naming Pledgor as the debtor and Lender as the secured party in the offices set forth on Schedule II attached hereto and made part hereof, or such other jurisdictions as Lender shall reasonably request and require, Lender will have a valid, perfected, continuing, first-priority security interest in or lien on the Collateral. All instruments of transfer are duly executed and give the Lender the authority they purport to confer. The grant and perfection of the security interests in the Partnership Interests and other Collateral for the benefit of Lender, in accordance with the terms hereof are not made in violation of the registration requirements of the Securities Act of 1933 (the "**Securities Act**"), any applicable provisions of other federal securities laws, state securities or "blue sky" laws, foreign securities law, or applicable general corporation law or any other applicable law.

(h) <u>Residency</u>. Pledgor maintains his primary homestead residence in the State of Minnesota.

(i) <u>Certification of Partnership Interests</u>. The Issuer has not "opted in" to have such interests treated as securities under Article 8 of the UCC and the Partnership Interests have not been certificated as a security under Article 8 of the UCC.

4. <u>Covenants</u>. Pledgor covenants and agrees with Lender as set forth below:

(a) <u>Protection of Collateral</u>. Pledgor will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any lien on the Collateral other than as permitted by the Loan Documents, and if Pledgor fails to do so, Lender may, but shall be under no obligation to, without waiving or releasing any obligation or liability of Pledgor hereunder or any Event of Default, at any time thereafter make such payment or any part thereof, obtain such discharge or otherwise defend Pledgor's title to the Collateral.

(b) <u>Change in Pledgor Residency</u>. Pledgor shall not relocate his primary homestead residency to a State other than Minnesota without first notifying Lender by giving at least 30 days prior written notice.

(c) <u>Payment of Taxes</u>. Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, and all stamp, excise, sale or other taxes which may be payable or determined to be payable with respect to any of the

Collateral upon the exchange thereof to publicly traded securities or otherwise or in connection with any of the transactions contemplated by this Agreement.

(d) <u>Further Assurance; Preservation and Perfection of Security Interest</u>. At his own expense, Pledgor shall do, and insofar as he is able, cause Issuer to do, all such acts, and shall execute and deliver to Lender all such financing statements, certificates, instruments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as Lender may reasonably request from time to time in order to give full effect to this Agreement, and for the purpose of effectively perfecting, maintaining and preserving Lender's security interest and the benefits intended to be granted to Lender hereunder. To the extent permitted by applicable law, Pledgor hereby authorizes Lender to execute and file, in the name of Pledgor or otherwise, UCC financing statements, including continuation statements or other documentation, which Lender in its reasonable discretion may deem necessary or appropriate for the purpose specified above.

(e) <u>Preservation of Related Collateral</u>. Pledgor will not allow any default for which he is responsible to occur under and in respect of the Collateral, and shall fully perform or cause to be performed when due all of his obligations with respect to the Collateral.

(f) <u>Papers; Records and Files</u>.

(i) <u>Maintenance</u>. Pledgor shall acquire and shall assemble, maintain and have available a complete file relating to the Collateral, including all statements and other information delivered to Pledgor pursuant to the Organizational Documents. Pledgor shall maintain all such papers, records and files not in the possession of Lender in good and complete condition and shall preserve them against loss.

(ii) <u>Lender's Rights of Inspection</u>. Upon reasonable advance notice from Lender and during regular business hours, Pledgor shall make any or all such papers, records or files available to Lender in order that Lender may examine any such papers, records and files, either by its employees or by agents or contractors, or both, and make copies of all or any portion thereof.

(g) <u>Additional Liens; Amendments to Organizational Documents</u>. Pledgor shall not:

(i) exchange, sell, assign, pledge, grant any lien on, Transfer, dispose of or otherwise encumber the Collateral or any part thereof, including entering into any lock-up or any other arrangement with respect to the Collateral;

(ii) subject to the terms of this Agreement, take any action to prevent Issuer from issuing any securities in exchange for the Partnership Interests;

(iii) cause or permit further informational certification of the Partnership Interests subject to this Agreement;

(iv)     cause or permit Issuer to "opt in" under Article 8 of the UCC causing the UCC general intangible collateral type of the Partnership Interests to transform into securities; or

(v)     cause or permit amendment, modification or other material change to the Organizational Documents.

(h)     <u>Maintain Business of Issuer</u>.  Pledgor shall, insofar as he is able, cause Issuer to take the actions and achieve the objectives listed in this Agreement and Pledgor agrees that Pledgor will not take any action, or refuse to grant any consents, which would interfere with or impede the ability of Issuer to take such actions or achieve such objectives.

(i)     <u>Books and Records; Discussion; Consents</u>.

(i)     Pledgor shall, and insofar as he is able, cause Issuer to keep and maintain on a fiscal year basis proper books and records in accordance with the requirements set forth in the Loan Agreement. Lender and its authorized representatives shall have the right upon written notice to Issuer and Pledgor at reasonable times and upon reasonable notice to examine the foregoing books and records and to make such copies or extracts thereof as Lender may require.

(ii)     Pledgor shall, and insofar as he is able, cause Issuer to promptly after written request by Lender, furnish or cause to be furnished to Lender, in such manner and in such detail as may be requested by Lender, such additional information as may be reasonably requested by Lender with respect to each of Pledgor and Issuer.

(j)     <u>Notices</u>.  Pledgor shall, and insofar as he is able, cause Issuer to, as appropriate, promptly give Lender written notice of:

(i)     any default or event of default under any contractual obligation of Issuer that could be reasonably expected to result in a Material Adverse Effect, or any litigation, investigation or proceeding which may exist at any time between Issuer and any Governmental Authority or any other person, which, if not cured or if adversely determined, as the case may be, could reasonably be expected to result in a Material Adverse Effect; and

(ii)     of a change in the business, operations, property or financial or other condition or prospects of Pledgor or Issuer which could result in a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement setting forth details of the occurrence referred to therein and stating what action the applicable person proposes to take, if any, with respect thereto.

(k).     <u>Additional Consents</u>.  Pledgor shall, and insofar as he is able, cause Issuer to, (i) consent to (A) the pledge by Pledgor to Lender of the Partnership Interests, and (B) the Transfer of the Partnership Interests and the right of Lender to exercise all voting, management and exchange rights appurtenant or relating to the Partnership Interests in each case, by or in lieu of, foreclosure of the pledge (it being agreed that Lender may, in its sole discretion, foreclose solely on the voting, management or exchange rights) and (ii) acknowledge and agree that the pledge by Pledgor to Lender of the Partnership Interests and the foreclosure of the Partnership

Interests by Lender or other transfer of the Partnership Interests in lieu of foreclosure, shall not constitute an unpermitted transfer under any of the Organizational Documents.

5.    Rights of Pledgor.  Notwithstanding any other provision of this Agreement to the contrary, Pledgor shall be entitled until an Event of Default to exercise any and all voting and other consensual rights pertaining to the related Partnership Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement or the other Loan Documents.

6.    Remedies.

        (a)    Should any Event of Default occur and be continuing, Lender is hereby authorized and empowered, at its election, to do any of the following by way of example but without limitation and without liability except to account for money and other property actually received by it, but Lender shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to so or delay in so doing:

                (i)    to transfer and register in its or its nominee's name the whole or any part of the Collateral, including by means of the completion of the instruments of transfer delivered herewith, if any;

                (ii)    to exercise all voting, management and exchange rights with respect to the Collateral;

                (iii)    to demand, sue for, collect, receive and give acquittance for any and all cash distributions or monies due or to become due upon or by virtue thereof, and to settle, prosecute or defend any action or proceeding with respect thereto;

                (iv)    to sell in one or more sales (public or private) the whole or any part of the Collateral or otherwise to transfer or assign the same, in each case, however, to the extent permitted and in the manner provided in the UCC;

                (v)    to receive and retain all distributions with respect to the Collateral;

                (vi)    to otherwise enforce and act with respect to the Collateral or the Proceeds as though Lender were the outright owner thereof;

                (vii)    to exercise all other rights and remedies available under law or in equity; and

                (viii)    upon the exercise by Lender of any right, privilege or option pertaining to the Partnership Interests, and in connection therewith, to deposit and deliver any and all of the Partnership Interests with any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine.  Lender is hereby granted a power of attorney to effect the aforesaid registration in the name of the Lender or its nominee of the Partnership Interests.

        (b)    In the event of any disposition of the Collateral as provided in subsection (a)(iv), Lender shall give to Pledgor at least 10 Business Days prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition is to be made. Pledgor hereby acknowledges that 10 Business Days prior written notice of such sale or sales shall be reasonable notice.  Except as otherwise expressly provided in the Loan Documents or the UCC, Lender may enforce its rights hereunder

without any other notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law or otherwise (all of which are hereby expressly waived by Pledgor, to the fullest extent permitted by law). Lender may buy any part or all of the Collateral at any public sale conducted in accordance with the UCC and as set forth herein.

(c)     Pledgor recognizes that Lender may be unable to effect a public sale of the Collateral or any part thereof by reason of certain prohibitions contained in the Securities Act and other applicable laws, but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers and may otherwise be required to impose additional limitations on sales as a result thereof. Pledgor agrees that any such private sales may be at prices and other terms less favorable to the seller than if sold at public sales and that such private sales shall not by reason thereof be deemed not to have been made in a commercially reasonable manner. Pledgor agrees to use its best efforts to cause Issuer to execute and deliver all such instruments and documents and to do or cause to be done all such other acts and things as may be necessary or, in the opinion of Lender, advisable (i) to cause the Collateral, or any part thereof, to be exempt from registration under the provisions of the Securities Act; (ii) to amend such instruments and documents which, in the opinion of Lender, are necessary or advisable to meet the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto; and (iii) to make any sales of any portion or all of the Collateral pursuant to this Section valid and binding and in compliance with any and all applicable laws, provided that nothing herein shall require the Partnership Interests to be registered under the Securities Act or other similar laws. Pledgor further agrees to use its best efforts to cause Issuer to comply with the provisions of the state securities or "blue sky" laws of any jurisdiction which the Lender shall designate, to the extent that any such laws apply.

7.     <u>Pledgor's Duties Upon an Event of Default</u>.  Pledgor understand, acknowledges and agrees that Lender may not be able to fully exercise the exchange rights applicable to the Partnership Interests granted to Lender pursuant to this Agreement without Pledgor's cooperation and assistance and that if Lender is unable to exercise such exchange rights, Lender will not have an adequate remedy to liquidate the Collateral.  Accordingly, Pledgor irrevocably agrees with Lender that following an Event of Default Pledgor shall, upon Lender's request, exercise, to the extent permitted by the Partnership Agreement and as applicable by the Thresher Square Contribution Agreement and the Plymouth Contribution Agreement, Pledgor's "Exchange Right" (as defined in the Partnership Agreement), or otherwise, to cause the Partnership Interests to be redeemed for a cash payment or exchanged for unrestricted "IRET Shares" (as defined in the Partnership Agreement), and shall direct the Issuer to deliver such cash payment or IRET Shares directly to Lender as proceeds of the Partnership Interests and which, upon receipt by Lender, shall be applied to the Loan or held by Lender as Collateral and sold by Lender in accordance with the terms of this Agreement.  Pledgor further agrees that if Pledgor fails to comply with his obligations to Lender under this Section 7, Lender shall be entitled to obtain an order of specific performance of Pledgor's obligations under this Section 7 without posting bond or any other security, and Pledgor waives any defense or objection thereto and agrees to pay or reimburse Lender for all costs and expenses incurred by Lender, including reasonable attorneys' fees, in obtaining and enforcing any such order of specific performance.

8.     <u>Limitation on Duties Regarding Collateral</u>.  Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if any, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Lender deals with similar partnership interests and other similar property for its own account.  Neither Lender nor any of its directors, officers, partners, members, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or

shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise.

9. _Prejudgment Remedy Provision_. In the event of any legal action between Pledgor and Lender hereunder, Pledgor expressly waives, to the extent permitted by law, any and all rights Pledgor may have under the law as now constituted or hereafter amended that may constitute a limitation on prejudgment remedies, and Lender may invoke any prejudgment remedy available to it, including self help, garnishment, attachment, foreign attachments and request, with respect to the Collateral, to enforce the provisions of this Agreement.

10. _Application of Proceeds_. Except as otherwise provided herein or in the other Loan Documents, Lender shall apply any proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable out-of-pocket costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Loan, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any provision of law, including Section 9-615 of the UCC, need Lender account for the surplus, if any, to Pledgor.

11. _Appointment of Lender as Pledgor's Lawful Attorney_. Pledgor irrevocably designates, makes, constitutes and appoints Lender (and all persons designated by Lender) as his true and lawful proxy and attorney-in-fact (coupled with an interest) upon the occurrence and continuance of an Event of Default to take the following actions:

(a) at such time or times hereafter as Lender or its agent in its sole discretion may determine, in Pledgor's or Lender's name, to endorse Pledgor's name on any checks, notes, drafts, instruments, documents or any other payment relating to the Collateral and/or proceeds which come into the possession of Lender or come under Lender's control;

(b) to the extent permitted by law, to sign Pledgor's name on any documents necessary or desirable for the purpose of maintaining or achieving the perfection of a security interest in the Collateral; and

(c) to the extent permitted by law, to sign Pledgor's name to any document necessary or appropriate in order to permit Lender to fully exercise its rights here under this Agreement.

12. _Reimbursement_. All reasonable sums expended by Lender in connection with the exercise of any right or remedy provided for herein or in connection with preserving the Collateral and Lender's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral, shall be and shall remain the obligation of Pledgor. At the option of Lender, all such sums may be paid from the Collateral or may be advanced by Lender, in which event they shall be deemed to have been advanced to Pledgor and shall be reimbursed by Pledgor to Lender upon demand therefor. Such sums shall be secured by this Agreement and shall constitute part of the "Obligations" of Pledgor to Lender as Borrower under the Loan Agreement.

13. _Lender's Powers for Lender's Sole Benefit_. The powers conferred on Lender hereunder are solely for Lender's benefit and do not impose any duty on Lender to exercise any such powers. Pledgor waives, to the fullest extent permitted by law, all rights whatsoever against

Lender for any loss, expense, liability or damage suffered by Pledgor as a result of actions taken pursuant to this Agreement, except to the extent such losses, expenses, liabilities or damages result from the gross negligence or willful misconduct of Lender, or to the extent otherwise expressly provided herein.

14. <u>Waiver of Redemption and Deficiency Rights</u>. Pledgor hereby waives, to the fullest extent permitted by law, every statute of limitation, any right of redemption, any moratorium or redemption period, and any right which Pledgor may have to direct the order in which any of the Collateral shall be disposed of in the event of any disposition thereof pursuant hereto, except as otherwise expressly provided herein or in the other Loan Documents.

15. <u>Security Agreement</u>. This Agreement is a security agreement pursuant to the UCC for any and all of the Collateral, and, prior to the occurrence of and during the continuation of an Event of Default hereunder, any assignment of the Collateral by the Pledgor pursuant to this Agreement is an assignment for security purposes only.

16. <u>Security Interest Absolute</u>. All rights of Lender hereunder, the grant of a security interest in the Collateral and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Organizational Documents; (b) any change in time, manner or place of payment of, or in any other term of, the Loan, or any release, amendment or waiver of or any consent to any departure from the Loan Agreement or any other of the Loan Documents; (c) any exchange, release or nonperfection of any other collateral, or any release, amendment or waiver of or consent to or departure from any guarantee, for all or any of the Loan; or (d) any other similar circumstance which might otherwise constitute a defense available to, or a discharge of Pledgor in respect of the Loan or in respect of this Agreement.

17. <u>Authorization to File Financing Statements</u>. Pledgor's execution of this Agreement evidences Pledgor's authorization to file such UCC financing statements as are necessary to perfect Lender's security interest in the Collateral at any time prior to the full satisfaction of the Loan.

18. <u>Review of Financial Condition</u>. Pledgor hereby consents and agrees that Lender shall be permitted at any time and from time to time to review and/or confirm the financial condition of Pledgor, including ordering and reviewing credit reports from a nationally recognized credit agency.

19. <u>Waiver of Jury Trial</u>. Pledgor and Lender, to the full extent permitted by law, each hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, relinquishes and forever forgoes the right to a trial by jury in any action or proceeding, including any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with the Loan Documents, the Loan or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any person (including, without limitation, such person's directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with such person), in connection with the Loan or the Loan Documents, including in any counterclaim which Pledgor may be permitted to assert thereunder or which may be asserted by Lender or its agents against Pledgor, whether sounding in contract, tort or otherwise. This waiver by Pledgor of its right to a jury trial is a material inducement for Lender to make the Loan.

20. <u>Jurisdiction, Court Proceedings</u>. Pledgor, to the fullest extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel,

(i) submits to personal, nonexclusive jurisdiction in the State of Minnesota with respect to any suit, action or proceeding by any person arising from, relating to or in connection with the Loan Documents or the Loan, (ii) agrees that any such suit, action or proceeding may be brought in any state or federal court of competent jurisdiction sitting in Minneapolis, Minnesota, (iii) submits to the jurisdiction of such courts, (iv) agrees that he will not bring any action, suit or proceeding in any forum other than Minneapolis, Minnesota (but nothing herein shall affect the right of Lender to bring any action, suit or proceeding in any other forum), (v) irrevocably agrees not to assert any objection which he may ever have to the laying of venue of any such suit, action or proceeding in any federal or state court located in Minnesota and any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, and (vi) consents and agrees to service of any summons, complaint or other legal process in any such suit, action or proceeding by registered or certified U.S. mail, postage prepaid, to Pledgor at the address for notices described herein and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

21. _Governing Law._ The Loan has been applied for, considered, approved and made, and all necessary Loan Documents have been accepted by Lender in the State of Minnesota. This Agreement shall, therefore, be governed by Minnesota law without giving effect to the principles of conflicts of laws.

22. _Offsets, Counterclaims and Defenses._ Pledgor hereby knowingly waives the right to assert any counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against him by Lender. Any assignee of the Loan Documents or any successor of Lender shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan Documents which Pledgor may otherwise have against any assignor of the Loan Documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Pledgor in any action or proceeding brought by any such assignee under such Loan Document. Any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Pledgor.

23. _Voluntary Agreement._ Pledgor represents and warrants that he is fully aware of the terms contained in the Loan Documents and that he has voluntarily and without coercion or duress of any kind entered into this Agreement.

24. _Waiver._ Pledgor hereby waives and releases all errors, defects and imperfections in any proceedings instituted by Lender under this Agreement, as well as all benefit that might accrue to Pledgor by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extensions of time for payment.

25. _Notices._ All notices or other written communications hereunder or under any other Loan Document shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof, or (ii) 1 Business Day after having been deposited for overnight delivery with any reputable overnight courier service addressed as follows:

If to Pledgor:                          Steven B. Hoyt
                                        Suite 108
                                        708 South Third Street
                                        Minneapolis, Minnesota 55415
                                        Facsimile No.: 612-338-7797


        If to Lender:                   Commerce Bank
                                        7650 Edinborough Way, Suite 150
                                        Edina, Minnesota 55435
                                        Attention: Gerald Anderson
                                        Facsimile No.: 952-841-9755

        With copy to:                   Messerli and Kramer P.A.
                                        150 South 5th Street, Suite 1800
                                        Minneapolis, MN 55402
                                        Attention: Jerome J. Simons, Jr.
                                        Facsimile No.: 612-672-3777

or addressed as such party may from time to time designate by written notice to the other parties.
"Business Day" means a day on which commercial banks are not authorized or required by law
to close in Minneapolis, Minnesota. Notwithstanding the foregoing, Pledgor expressly agrees
that computer generated late notices sent by Lender in the ordinary course of its business, shall
constitute valid and sufficient notice of payment defaults when such notice is required by this
Agreement or any other Loan Document.

[Signature Page Follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Pledge and Security Agreement to be duly executed as of the date first above written.

**PLEDGOR**:

By: _____
Name: Steven B. Hoyt

STATE OF MINNESOTA ) 
                         ) **ss.**
COUNTY OF HENNEPIN )

The foregoing instrument was acknowledged before me this 3rd day of March, 2008, by **Steven Hoyt**, a Minnesota resident, as such person's free act and deed.

_____
Notary Public

CHRISTINE C. SCHMIDT
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

**LENDER**:

By: _____
Name: Gerald Anderson
Title: Executive Vice President

375851v4

# **SCHEDULE I**

## Pledged Partnership Interests

| Pledgor: | Partnership interests of Issuer owned by Pledgor and being pledged |
|---|---|
| Steven B. Hoyt | 222,932.862 limited partnership units of Issuer evidenced by IRET Properties Certificate No. 1636 and 47,158.534 limited partnership units of Issuer evidenced by IRET Properties Certificate No. 1637. |

## **SCHEDULE II**

Pledgor:                                         Location of Filing:

Steven B. Hoyt                                   Secretary of State - MN

375851v4

# PLEDGE AND SECURITY AGREEMENT
### (Additional IRET Properties Limited Partnership Units)

THIS PLEDGE AND SECURITY AGREEMENT (together with all amendments, restatements and other modifications, this **"Agreement"**), is dated as of January 25th, 2010, by **Steven B. Hoyt**, a Minnesota resident ("**Pledgor**") and **Commerce Bank**, a Minnesota banking corporation ("**Lender**").

## BACKGROUND

A.      Lender has made a loan in an amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000.00) (the "**Loan**") to Pledgor pursuant to that certain Loan Agreement by and between Pledgor and Lender dated March 3, 2008 (together with all amendments, restatements and other modifications, the "**Loan Agreement**"), which is incorporated herein by this reference, and as evidenced by that certain Promissory Note from Pledgor to the order of Lender dated March 3, 2008 in the principal amount of the Loan (together with all amendments, restatements and other modifications, the "**Note**"), which is incorporated herein by this reference.

B.      Pledgor is a limited partner of and owns 15352.861 of limited partnership units, in IRET Properties, a North Dakota Limited Partnership (the "**Issuer**"), referenced in IRET Properties Certificate No. 1634, and 2851.179 of limited partnership units of Issuer referenced in IRET Properties Certificate No. 1635 (collectively, the "**Certificates**"), and as more particularly described on Schedule I attached hereto.

C.      It is a condition precedent to the obligation of Lender to enter into a First Loan Modification Agreement with respect to the Loan that Pledgor shall have executed and delivered this Agreement to Lender.

NOW, THEREFORE, based upon the foregoing background, which the parties agree to be true and correct, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree:

1.      Certain Definitions.  Unless otherwise defined herein or the context otherwise requires, each term defined in either the Loan Agreement or in the UCC is used in this Agreement with the same meaning; provided that, if the definition given to such term in the Loan Agreement conflicts with the definition given to such term in the UCC, the Loan Agreement definition shall control to the extent legally allowable; and if any definition given to such term in Article 9 of the UCC conflicts with the definition given to such term in any other chapter of the UCC, the Article 9 definition shall prevail.  As used herein, the following terms have the meanings indicated:

"Certificate of Limited Partnership" means the certificate of limited partnership of Issuer as currently in effect, in the form delivered to Lender with the execution and delivery of the Loan Agreement.

"Collateral" has the meaning specified in Section 2.

"Event of Default" means any default under any Loan Document which is not cured within any applicable grace or cure period.



**EXHIBIT**
3

"Governmental Authority" means any federal, state, county, municipal, parish, provincial or other government, or any department, commission, board, court, agency, committee, whether of the United States of America or any other country, or any instrumentality of any of them, or any other political subdivision thereof.

"Loan Documents" means collectively the Loan Agreement, the Note, this Agreement and any other loan or security document executed by the Pledgor, or any guarantor or accommodation pledgor, or other person or entity in connection with the Loan, together with all amendments, restatements and other modifications thereto.

"Material Adverse Effect" means if the business prospects, operations or financial condition of a person, entity or property has changed in a manner which could materially impair the value of Lender's security for the Loan, prevent timely repayment of the Loan or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

"Organizational Documents" means the Certificate of Limited Partnership, the Partnership Agreement, and any other agreements affecting the rights, limitations, preferences or obligations of Pledgor with respect to any of the foregoing or with respect to the Partnership Interests or otherwise, in each case, as the same may be amended or modified from time to time in accordance with any of the Loan Documents.

"Partnership Agreement" means the limited partnership agreement of Issuer dated January 31, 1997, as currently in effect, in the form delivered to Lender herewith.

"Partnership Interests" has the meaning specified in Section 2.

"Transfer" means any sale, exchange, transfer, lease, conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition.

"UCC" means at any time the Uniform Commercial Code as in effect in the State of Minnesota; provided, that if, by reason of mandatory provisions of law, the validity or perfection of Lender's security interest in the Collateral or any part thereof is governed by the Uniform Commercial Code or other similar law as in effect in a jurisdiction other than Minnesota, "UCC" means the Uniform Commercial Code or such similar law as in effect in such other jurisdiction for purposes of the provisions hereof relating to such validity or perfection.

2.     Collateral; General Terms

(a)     Security Interest. As security for the payment and performance of all obligations of the Pledgor to Lender under the Loan Agreement, the Note, and all other Loan Documents (as defined in the Loan Agreement) with or in favor of Lender, Pledgor hereby grants Lender a continuing first-priority security interest in, lien on and right of set-off against, and hereby assigns to Lender as security, all of Pledgor's right, title and interest, in and to the following property and interests in property (save insofar as otherwise expressly excluded by the terms of this Agreement), whether now owned or hereafter acquired or existing and wherever located (collectively, the "Collateral"):

(i) all of Pledgor's right, title and interest in and to Pledgor's partnership interests and partnership units of, in and to Issuer as set forth in the Certificates and on Schedule I and all of Pledgor's equity and other interests in, to and of Issuer relating thereto, including, for the avoidance of doubt, all voting, management, and exchange rights connected therewith or related thereto (collectively, the **"Partnership Interests"**), together with all instruments of transfer in respect of such interests, executed in blank, all cash, securities, dividends, proceeds and other property whether constituting investment property, accounts, documents, general intangibles and/or instruments or otherwise at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any and all of the Partnership Interests or arising from or in respect of, or constituting any and all of the Partnership Interests;

(ii) to the extent not included in clause (i) above, any and all rights and remedies of Pledgor under any of the Organizational Documents, as applicable, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inuring to the benefit of, Pledgor;

(iii) all securities hereafter delivered to Lender in substitution or exchange for or in addition to any and all of the Collateral, all certificates and instruments representing or evidencing such securities or any and all of the Collateral and all cash, securities, dividends, proceeds and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral;

(iv) all books and records (including credit files, computer programs, printouts and other computer materials and records) of Pledgor pertaining to any of the Collateral;

(v) all of Pledgor's right, title and interest in and to the profits and losses of Issuer, and Pledgor's right as a limited partner of Issuer to receive distributions of the assets of Issuer upon complete or partial liquidation or otherwise; and

(vi) all cash and non-cash proceeds and products of the Collateral, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed when Collateral or proceeds are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

(b) <u>Pledgor Remains Liable</u>. Anything herein to the contrary notwithstanding, (i) Pledgor shall remain liable under the Organizational Documents to the extent set forth therein and shall perform all of his duties and obligations thereunder to the same extent as if this Agreement had not been executed; (ii) the exercise by Lender of any of the rights hereunder shall not release Pledgor from any of his duties or obligations under any of the Organizational Documents; and (iii) Lender shall not have any obligation or liability under any of the Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Pledgor thereunder or to take any action to collect or

enforce any claim for payment assigned hereunder; provided that, upon foreclosure thereof, Lender and any other transferee of the Collateral shall take the same subject to the Organizational Documents.

3. <u>Representations and Warranties</u>. Pledgor represents and warrants the following to Lender:

(a) <u>Formation; Good Standing</u>. Pledgor is a resident of the State of Minnesota, with his principal homestead residence located in Minnesota.

(b) <u>Authorization; Binding Effect</u>. Pledgor has the power and authority to execute and deliver this Agreement and to perform his obligations hereunder, and all such action has been duly and validly authorized by all necessary action on his part. This Agreement has been duly and validly executed and delivered by Pledgor and constitutes the legal, valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms.

(c) <u>No Consents</u>. Except as required for perfection of the security interest in the Collateral as described herein, no permits, licenses, franchises, approvals, authorizations, qualifications or consents of, or registrations or filings with, governmental authorities, Issuer, the general partner of Issuer, or any other person or entity are required in connection with the execution or delivery by Pledgor of, or the performance by Pledgor of its obligations under, this Agreement, except such as have been obtained or made and are in full force and effect.

(d) <u>No Conflict</u>. To the knowledge of Pledgor, the execution and delivery of, and the performance by Pledgor of his obligations under this Agreement do not and will not result in a breach or constitute a violation of, conflict with, or constitute a default under any of the Organizational Documents of Issuer, or any law, regulation, order or judgment applicable to Pledgor or any agreement or instrument to which Pledgor is a party or by which Pledgor or any of his property is bound.

(e) <u>No Material Litigation</u>. There are no actions, suits, proceedings or claims pending or, to the knowledge of Pledgor, threatened against or affecting Pledgor or any of his property which, individually or in the aggregate, could reasonably be expected to lead to or cause a Material Adverse Effect.

(f) <u>Title to Collateral</u>. Pledgor is the sole owner of all of the Collateral, beneficially and of record, free and clear of any liens other than the liens created hereunder and under the other Loan Documents. The Collateral is not subject to any option to purchase, right of first refusal or similar rights of any kind and no exchange rights pertaining thereto have or will be exercised by Pledgor without the prior written consent of Lender. Further, the limited partnership units referenced in the Certificate(s) are subject only to the restrictions provided in Section 9.02 of the Partnership Agreement and in the _____ Contribution Agreement and the _____ Contribution Agreement (as hereinafter defined). The "contracts between Mr. Hoyt and the Partnership" referenced in the Consent to Pledge of Partnership Interest delivered to the Lender herewith (the **"Issuer's Consent"**) are (i) the Agreement for Contribution of Property dated _____, by and between _____ and the Issuer (the "_____ **Contribution**

**Agreement"), which** _____Contribution Agreement is applicable to the limited partnership units referenced in Certificate No. _____; and (ii) the Agreement for Contribution of Property dated _____, by and between _____ and the Issuer (the "_____ **Contribution Agreement'**), which _____ Contribution Agreement is applicable to the limited partnership units referenced in Certificate No. _____.

      (g)   <u>Perfection</u>. Upon (i) the execution and delivery of this Agreement, and (ii) the filing of UCC financing statements naming Pledgor as the debtor and Lender as the secured party in the offices set forth on Schedule II attached hereto and made part hereof, or such other jurisdictions as Lender shall reasonably request and require, Lender will have a valid, perfected, continuing, first-priority security interest in or lien on the Collateral. All instruments of transfer are duly executed and give the Lender the authority they purport to confer. The grant and perfection of the security interests in the Partnership Interests and other Collateral for the benefit of Lender, in accordance with the terms hereof are not made in violation of the registration requirements of the Securities Act of 1933 (the **"Securities Act"**), any applicable provisions of other federal securities laws, state securities or "blue sky" laws, foreign securities law, or applicable general corporation law or any other applicable law.

      (h)   <u>Residency</u>. Pledgor maintains his primary homestead residence in the State of Minnesota.

      (i)   <u>Certification of Partnership Interests</u>. The Issuer has not "opted in" to have such Partnership Interests treated as securities under Article 8 of the UCC and the Partnership Interests have not been certificated as a security under Article 8 of the UCC.

    4.   <u>Covenants</u>. Pledgor covenants and agrees with Lender as set forth below:

      (a)   <u>Protection of Collateral</u>. Pledgor will not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any lien on the Collateral other than as permitted by the Loan Documents, and if Pledgor fails to do so, Lender may, but shall be under no obligation to, without waiving or releasing any obligation or liability of Pledgor hereunder or any Event of Default, at any time thereafter make such payment or any part thereof, obtain such discharge or otherwise defend Pledgor's title to the Collateral.

      (b)   <u>Change in Pledgor Residency</u>. Pledgor shall not relocate his primary homestead residency to a State other than Minnesota without first notifying Lender by giving at least 30 days prior written notice.

      (c)   <u>Payment of Taxes</u>. Pledgor shall pay, and save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, and all stamp, excise, sale or other taxes which may be payable or determined to be payable with respect to any of the Collateral upon the exchange thereof to publicly traded securities or otherwise or in connection with any of the transactions contemplated by this Agreement.

      (d)   <u>Further Assurance; Preservation and Perfection of Security Interest</u>. At his own expense, Pledgor shall do, and insofar as he is able, cause Issuer to do, all such acts, and

shall execute and deliver to Lender all such financing statements, certificates, instruments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as Lender may reasonably request from time to time in order to give full effect to this Agreement, and for the purpose of effectively perfecting, maintaining and preserving Lender's security interest and the benefits intended to be granted to Lender hereunder. To the extent permitted by applicable law, Pledgor hereby authorizes Lender to execute and file, in the name of Pledgor or otherwise, UCC financing statements, including continuation statements or other documentation, which Lender in its reasonable discretion may deem necessary or appropriate for the purpose specified above.

(e)     Preservation of Related Collateral. Pledgor will not allow any default, for which he is responsible, to occur under and in respect of the Collateral, and shall fully perform or cause to be performed when due all of his obligations with respect to the Collateral.

(f)     Papers; Records and Files.

(i)     Maintenance. Pledgor shall acquire and shall assemble, maintain and have available a complete file relating to the Collateral, including all statements and other information delivered to Pledgor pursuant to the Organizational Documents. Pledgor shall maintain all such papers, records and files not in the possession of Lender in good and complete condition and shall preserve them against loss.

(ii)     Lender's Rights of Inspection. Upon reasonable advance notice from Lender and during regular business hours, Pledgor shall make any or all such papers, records or files available to Lender in order that Lender may examine any such papers, records and files, either by its employees or by agents or contractors, or both, and make copies of all or any portion thereof.

(g)     Additional Liens; Amendments to Organizational Documents. Pledgor shall not:

(i)     exchange, sell, assign, pledge, grant any lien on, Transfer, dispose of or otherwise encumber the Collateral or any part thereof, including entering into any lock-up or any other arrangement with respect to the Collateral;

(ii)     subject to the terms of this Agreement, take any action to prevent Issuer from issuing any securities in exchange for the Partnership Interests;

(iii)     cause     or permit further informational certification of the Partnership Interests subject to this Agreement;

(iv)     cause or permit Issuer to "opt in" under Article 8 of the UCC causing the UCC general intangible collateral type of the Partnership Interests to transform into securities; or

(v)     cause or permit amendment, modification or other material change to the Organizational Documents.

(h)    <u>Maintain Business of Issuer</u>. Pledgor shall, insofar as he is able, cause Issuer to take the actions and achieve the objectives listed in this Agreement and Pledgor agrees that Pledgor will not take any action, or refuse to grant any consent, which would interfere with or impede the ability of Issuer to take such actions or achieve such objectives.

(i)    <u>Books and Records; Discussion; Consents</u>.

(i)    Pledgor shall, and insofar as he is able, cause Issuer to keep and maintain on a fiscal year basis proper books and records in accordance with the requirements set forth in the Loan Agreement. Lender and its authorized representatives shall have the right upon written notice to Issuer and Pledgor at reasonable times and upon reasonable notice to examine the foregoing books and records and to make such copies or extracts thereof as Lender may require.

(ii)    Pledgor shall, and insofar as he is able, cause Issuer to promptly after written request by Lender, furnish or cause to be furnished to Lender, in such manner and in such detail as may be requested by Lender, such additional information as may be reasonably requested by Lender with respect to each of Pledgor and Issuer.

(j)    <u>Notices</u>. Pledgor shall, and insofar as he is able, cause Issuer to, as appropriate, promptly give Lender written notice of:

(i)    any default or event of default under any contractual obligation of Issuer that could be reasonably expected to result in a Material Adverse Effect, or any litigation, investigation or proceeding which may exist at any time between Issuer and any Governmental Authority or any other person, which, if not cured or if adversely determined, as the case may be, could reasonably be expected to result in a Material Adverse Effect; and

(ii)    of a change in the business, operations, property or financial or other condition or prospects of Pledgor or Issuer which could result in a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement setting forth details of the occurrence referred to therein and stating what action the applicable person proposes to take, if any, with respect thereto.

(k)    <u>Additional Consents</u>. Pledgor shall, and insofar as he is able, cause Issuer to, (i) consent to (A) the pledge by Pledgor to Lender of the Partnership Interests, and (B) the Transfer of the Partnership Interests and the right of Lender to exercise all voting, management and exchange rights appurtenant or relating to the Partnership Interests in each case, by or in lieu of, foreclosure of the pledge (it being agreed that Lender may, in its sole discretion, foreclose solely on or exercise the voting, management or exchange rights) and (ii) acknowledge and agree that the pledge by Pledgor to Lender of the Partnership Interests and the foreclosure of the Partnership Interests by Lender or other transfer of the Partnership Interests in lieu of foreclosure, shall not constitute an unpermitted transfer under any of the Organizational Documents.

5.    <u>Rights of Pledgor</u>. Notwithstanding any other provision of this Agreement to the contrary, Pledgor shall be entitled until an Event of Default to exercise any and all voting and

other consensual rights pertaining to the related Partnership Interests or any part thereof for any purpose not inconsistent with the terms of this Agreement or the other Loan Documents.

6. Remedies.

(a) Should any Event of Default occur and be continuing, Lender is hereby authorized and empowered, at its election, to do any of the following by way of example but without limitation and without liability except to account for money and other property actually received by it, but Lender shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to so or delay in so doing:

(i) to transfer and register in its or its nominee's name the whole or any part of the Collateral, including by means of the completion of the instruments of transfer delivered herewith, if any;

(ii) to exercise all voting, management and exchange rights with respect to the Collateral;

(iii) to demand, sue for, collect, receive and give acquittance for any and all cash distributions or monies due or to become due upon or by virtue thereof, and to settle, prosecute or defend any action or proceeding with respect thereto;

(iv) to sell in one or more sales (public or private) the whole or any part of the Collateral or otherwise to transfer or assign the same, in each case, however, to the extent permitted and in the manner provided in the UCC;

(v) to receive and retain all distributions with respect to the Collateral;

(vi) to otherwise enforce and act with respect to the Collateral or the proceeds thereof as though Lender were the outright owner thereof;

(vii) to exercise all other rights and remedies available under law or in equity; and

(viii) upon the exercise by Lender of any right, privilege or option pertaining to the Partnership Interests, and in connection therewith, to deposit and deliver any and all of the Partnership Interests with Issuer or any committee, depository, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine. Lender is hereby granted a power of attorney to effect the aforesaid registration in the name of the Lender or its nominee of the Partnership Interests.

(b) In the event of any disposition of the Collateral as provided in subsection (a)(iv), Lender shall give to Pledgor at least 10 Business Days prior written notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition is to be made. Pledgor hereby acknowledges that 10 Business Days prior written notice of such sale or sales shall be reasonable notice. Except as otherwise expressly provided in the Loan Documents or the UCC, Lender may enforce its rights hereunder without any other notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law or otherwise (all of which are hereby expressly waived by Pledgor, to the fullest extent permitted by law). Lender may buy any part or all of the Collateral at any public sale conducted in accordance with the UCC and as set forth herein.

(c)     Pledgor recognizes that Lender may be unable to effect a public sale of the Collateral or any part thereof by reason of certain prohibitions contained in the Securities Act and other applicable laws, but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers and may otherwise be required to impose additional limitations on sales as a result thereof. Pledgor agrees that any such private sales may be at prices and other terms less favorable to the seller than if sold at public sales and that such private sales shall not by reason thereof be deemed not to have been made in a commercially reasonable manner. Pledgor agrees to use its best efforts to cause Issuer to execute and deliver all such instruments and documents and to do or cause to be done all such other acts and things as may be necessary or, in the opinion of Lender, advisable (i) to cause the Collateral, or any part thereof, to be exempt from registration under the provisions of the Securities Act; (ii) to amend such instruments and documents which, in the opinion of Lender, are necessary or advisable to meet the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto; and (iii) to make any sales of any portion or all of the Collateral pursuant to this Section valid and binding and in compliance with any and all applicable laws, provided that nothing herein shall require the Partnership Interests to be registered under the Securities Act or other similar laws. Pledgor further agrees to use its best efforts to cause Issuer to comply with the provisions of the state securities or "blue sky" laws of any jurisdiction which the Lender shall designate, to the extent that any such laws apply.

7.     Pledgor's Duties Upon an Event of Default.  Pledgor understand, acknowledges and agrees that Lender may not be able to fully exercise the exchange rights applicable to the Partnership Interests granted to Lender pursuant to this Agreement without Pledgor's cooperation and assistance and that if Lender is unable to exercise such exchange rights, Lender will not have an adequate remedy to liquidate the Collateral.  Accordingly, Pledgor irrevocably agrees with Lender that following an Event of Default Pledgor shall, upon Lender's request, exercise, to the extent permitted by the Partnership Agreement and as applicable by the _____ Contribution Agreement and the _____ Contribution Agreement, Pledgor's "Exchange Right" (as defined in the Partnership Agreement), or otherwise, to cause the Partnership Interests to be redeemed for a cash payment or exchanged for unrestricted "IRET Shares" (as defined in the Partnership Agreement), and shall direct the Issuer to deliver such cash payment or IRET Shares directly to Lender as proceeds of the Partnership Interests and which, upon receipt by Lender,  shall be applied to the Loan or held by Lender as Collateral and sold by Lender in accordance with the terms of this Agreement.  Pledgor further agrees that if Pledgor fails to comply with his obligations to Lender under this Section 7, Lender shall be entitled to obtain an order of specific performance of Pledgor's obligations under this Section 7 without posting bond or any other security, and Pledgor waives any defense or objection thereto and agrees to pay or reimburse Lender for all costs and expenses incurred by Lender, including reasonable attorneys' fees, in obtaining and enforcing any such order of specific performance.

8.     Limitation on Duties Regarding Collateral.  Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if any, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Lender deals with similar partnership interests and other similar property for its own account.  Neither Lender nor any of its directors, officers, partners, members, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Pledgor or otherwise.

9.     Prejudgment Remedy Provision.  In the event of any legal action between Pledgor and Lender hereunder, Pledgor expressly waives, to the extent permitted by law, any and all rights Pledgor may have under the law as now constituted or hereafter amended that may

constitute a limitation on prejudgment remedies, and Lender may invoke any prejudgment remedy available to it, including self help, garnishment, attachment, foreign attachments and request, with respect to the Collateral, to enforce the provisions of this Agreement.

10. <u>Application of Proceeds</u>. Except as otherwise provided herein or in the other Loan Documents, Lender shall apply any proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable out-of-pocket costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Loan, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any provision of law, including Section 9-615 of the UCC, need Lender account for the surplus, if any, to Pledgor.

11. <u>Appointment of Lender as Pledgor's Lawful Attorney</u>. Pledgor irrevocably designates, makes, constitutes and appoints Lender (and all persons designated by Lender) as his true and lawful proxy and attorney-in-fact (coupled with an interest) upon the occurrence and continuance of an Event of Default to take the following actions:

      (a)    at such time or times hereafter as Lender or its agent in its sole discretion may determine, in Pledgor's or Lender's name, to endorse Pledgor's name on any checks, notes, drafts, instruments, documents or any other payment relating to the Collateral and/or proceeds which come into the possession of Lender or come under Lender's control;

      (b)    to the extent permitted by law, to sign Pledgor's name on any documents necessary or desirable for the purpose of maintaining or achieving the perfection of a security interest in the Collateral; and

      (c)    to the extent permitted by law, to sign Pledgor's name to any document necessary or appropriate in order to permit Lender to fully exercise its rights here under this Agreement.

12. <u>Reimbursement</u>. All reasonable sums expended by Lender in connection with the exercise of any right or remedy provided for herein or in connection with preserving the Collateral and Lender's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral, shall be and shall remain the obligation of Pledgor. At the option of Lender, all such sums may be paid from the Collateral or may be advanced by Lender, in which event they shall be deemed to have been advanced to Pledgor and shall be reimbursed by Pledgor to Lender upon demand therefor. Such sums shall be secured by this Agreement and shall constitute part of the "Obligations" of Pledgor to Lender as Borrower under the Loan Agreement.

13. <u>Lender's Powers for Lender's Sole Benefit</u>. The powers conferred on Lender hereunder are solely for Lender's benefit and do not impose any duty on Lender to exercise any such powers. Pledgor waives, to the fullest extent permitted by law, all rights whatsoever against Lender for any loss, expense, liability or damage suffered by Pledgor as a result of actions taken pursuant to this Agreement, except to the extent such losses, expenses, liabilities or damages result from the gross negligence or willful misconduct of Lender, or to the extent otherwise expressly provided herein.

14.     Waiver of Redemption and Deficiency Rights.  Pledgor hereby waives, to the fullest extent permitted by law, every statute of limitation, any right of redemption, any moratorium or redemption period, and any right which Pledgor may have to direct the order in which any of the Collateral shall be disposed of in the event of any disposition thereof pursuant hereto, except as otherwise expressly provided herein or in the other Loan Documents.

15.     Security Agreement.  This Agreement is a security agreement pursuant to the UCC for any and all of the Collateral, and, prior to the occurrence of and during the continuation of an Event of Default hereunder, any assignment of the Collateral by the Pledgor pursuant to this Agreement is an assignment for security purposes only.

16.     Security Interest Absolute.  All rights of Lender hereunder, the grant of a security interest in the Collateral and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Organizational Documents; (b) any change in time, manner or place of payment of, or in any other term of, the Loan, or any release, amendment or waiver of or any consent to any departure from the Loan Agreement or any other of the Loan Documents; (c) any exchange, release or nonperfection of any other collateral, or any release, amendment or waiver of or consent to or departure from any guarantee, for all or any of the Loan; or (d) any other similar circumstance which might otherwise constitute a defense available to, or a discharge of Pledgor in respect of the Loan or in respect of this Agreement.

17.     Authorization to File Financing Statements.  Pledgor's execution of this Agreement evidences Pledgor's authorization to file such UCC financing statements as are necessary to perfect Lender's security interest in the Collateral at any time prior to the full satisfaction of the Loan.

18.     Review of Financial Condition.  Pledgor hereby consents and agrees that Lender shall be permitted at any time and from time to time to review and/or confirm the financial condition of Pledgor, including ordering and reviewing credit reports from a nationally recognized credit agency.

19.     Waiver of Jury Trial.  Pledgor and Lender, to the full extent permitted by law, each hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, relinquishes and forever forgoes the right to a trial by jury in any action or proceeding, including any tort action, brought by any of them against the other based upon, arising out of, or in any way relating to or in connection with the Loan Documents, the Loan or any course of conduct, act, omission, course of dealing, statements (whether verbal or written) or actions of any person (including, without limitation, such person's directors, officers, partners, members, employees, agents or attorneys, or any other persons affiliated with such person), in connection with the Loan or the Loan Documents, including in any counterclaim which Pledgor may be permitted to assert thereunder or which may be asserted by Lender or its agents against Pledgor, whether sounding in contract, tort or otherwise.  This waiver by Pledgor of its right to a jury trial is a material inducement for Lender to make the Loan.

20.     Jurisdiction, Court Proceedings.  Pledgor, to the fullest extent permitted by law, hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, (i) submits to personal, nonexclusive jurisdiction in the State of Minnesota with respect to any suit, action or proceeding by any person arising from, relating to or in connection with the Loan Documents or the Loan, (ii) agrees that any such suit, action or proceeding may be brought in any state or federal court of competent jurisdiction sitting in Minneapolis, Minnesota, (iii) submits to the jurisdiction of such courts, (iv) agrees that he will not bring any action, suit or

proceeding in any forum other than Minneapolis, Minnesota (but nothing herein shall affect the right of Lender to bring any action, suit or proceeding in any other forum), (v) irrevocably agrees not to assert any objection which he may ever have to the laying of venue of any such suit, action or proceeding in any federal or state court located in Minnesota and any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, and (vi) consents and agrees to service of any summons, complaint or other legal process in any such suit, action or proceeding by registered or certified U.S. mail, postage prepaid, to Pledgor at the address for notices described herein and consents and agrees that such service shall constitute in every respect valid and effective service (but nothing herein shall affect the validity or effectiveness of process served in any other manner permitted by law).

21.     <u>Governing Law</u>.  The Loan has been applied for, considered, approved and made, and all necessary Loan Documents have been accepted by Lender in the State of Minnesota. This Agreement shall, therefore, be governed by Minnesota law without giving effect to the principles of conflicts of laws.

22.     <u>Offsets, Counterclaims and Defenses</u>.  Pledgor hereby knowingly waives the right to assert any counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against him by Lender.  Any assignee of the Loan Documents or any successor of Lender shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Loan Documents which Pledgor may otherwise have against any assignor of the Loan Documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Pledgor in any action or proceeding brought by any such assignee under such Loan Document.  Any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Pledgor.

23.     <u>Voluntary Agreement</u>.  Pledgor represents and warrants that he is fully aware of the terms contained in the Loan Documents and that he has voluntarily and without coercion or duress of any kind entered into this Agreement.

24.     <u>Waiver</u>.  Pledgor hereby waives and releases all errors, defects and imperfections in any proceedings instituted by Lender under this Agreement, as well as all benefit that might accrue to Pledgor by virtue of any present or future laws exempting any property, real or personal, or any part of the proceeds arising from any sale of such property, from attachment, levy, or sale under execution, or providing for any stay of execution, exemption from civil process, or extensions of time for payment.

25.     <u>Notices</u>.  All notices or other written communications hereunder or under any other Loan Document shall be deemed to have been properly given (i) upon delivery, if delivered in person or by facsimile transmission with receipt acknowledged by the recipient thereof, or (ii) 1 Business Day after having been deposited for overnight delivery with any reputable overnight courier service addressed as follows:

If to Pledgor:          Steven B. Hoyt
                        Suite 439
                        275 Market Street
                        Minneapolis, Minnesota 55405
                        Facsimile No.: 612-338-7797

If to Lender:     Commerce Bank
                  7650 Edinborough Way, Suite 150
                  Edina, Minnesota 55435
                  Attention: Gerald Anderson
                  Facsimile No.: 952-841-9755

or addressed as such party may from time to time designate by written notice to the other parties. "Business Day" means a day on which commercial banks are not authorized or required by law to close in Minneapolis, Minnesota. Notwithstanding the foregoing, Pledgor expressly agrees that computer generated late notices sent by Lender in the ordinary course of its business, shall constitute valid and sufficient notice of payment defaults when such notice is required by this Agreement or any other Loan Document.

[Signature Page Follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Pledge and Security Agreement to be duly executed as of the date first above written.

**PLEDGOR:**

By: _____

Name: Steven B. Hoyt

STATE OF MINNESOTA )
                         ) ss.
COUNTY OF HENNEPIN )

The foregoing instrument was acknowledged before me this 25th day of January, 2010, by Steven Hoyt, a Minnesota resident, as such person's free act and deed.

_____
Notary Public

CAROL B. SLATER
Notary Public
Minnesota
My Commission Expires January 31, 2015

**LENDER:**

By: _____

Name: Gerald Anderson
Title: Executive Vice President

434421.1

## SCHEDULE I

Pledged Partnership Interests

| Pledgor: | Partnership interests of Issuer owned by Pledgor and being pledged |
|---|---|
| Steven B. Hoyt | 15352.861 limited partnership units of Issuer evidenced by IRET Properties Certificate No. 1634 and 2851.179 limited partnership units of Issuer evidenced by IRET Properties Certificate No. 1635. |

# **SCHEDULE II**

Pledgor:                                                Location of Filing:

Steven B. Hoyt                                          Secretary of State - MN

414421.1

**Filing NO: 200810866199**
**Filing Date: 2008/03/06**
**Filing Time: 5:00 PM**
**State of Minnesota**
**Processing Office: Secretary of State**
**Filed by: schdo01**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
**Joseph J. Deuhs, Jr. (612-332-1030)**

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**Joseph J. Deuhs, Jr., Esq.**
**Leonard, O'Brien, Spencer, Gale & Sayre, LTD.**
**100 South Fifth Street, Suite 2500**
**Minneapolis, Minnesota 55402**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

1a. ORGANIZATION'S NAME

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| **Hoyt** | **Steven** | **B.** | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **708 South 3rd Street, Suite 108** | **Minneapolis** | **MN** | **55415** | **USA** |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME – (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
**Commerce Bank**

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **7650 Edinborough Way, Suite 150** | **Edina** | **MN** | **55435** | **USA** |

4. This FINANCING STATEMENT covers the following collateral

**See Exhibit A attached hereto and incorporated herein by reference.**

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]   f. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

**FILE WITH THE MINNESOTA SECRETARY OF STATE**

376157


EXHIBIT

# EXHIBIT A

All of Debtor's right, title and interest, in, to and under the following property and interests in property, whether now owned or hereafter acquired or existing and wherever located (collectively, the "**Collateral**"):

    (1) 222,932.862 of limited partnership units, in IRET Properties, a North Dakota Limited Partnership (the "**Issuer**"), referenced in IRET Properties Certificate No. 1636 ("**Certificate No. 1636**"), and 47,158.534 limited partnership units of Issuer referenced in IRET Properties Certificate No. 1637 ("**Certificate No. 1637**") (Certificate No. 1636 and Certificate No. 1637 are sometimes referred to herein as the "**Certificates**");

    (2) The Certificates;

    (3) All of Debtor's right, title and interest in and to Debtor's partnership interests and partnership units of, in and to Issuer as set forth in the Certificates and all of Debtor's equity and other interests in, to and of Issuer relating thereto, including, for the avoidance of doubt, all voting, management, and exchange rights connected therewith or related thereto (collectively, the "**Partnership Interests**"), together with all instruments of transfer in respect of such interests, executed in blank, all cash, securities, dividends, proceeds and other property whether constituting investment property, accounts, documents, general intangibles and/or instruments or otherwise at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any and all of the Partnership Interests or arising from or in respect of, or constituting any and all of the Partnership Interests;

    (4) To the extent not included in paragraphs (1), (2) and (3) above, any and all rights and remedies of Debtor under any of the Organizational Documents (as hereinafter defined), as applicable, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inuring to the benefit of, Debtor;

    (5) All securities hereafter delivered to Secured Party in substitution or exchange for or in addition to any and all of the Collateral, all certificates and instruments representing or evidencing such securities or any and all of the Collateral and all cash, securities, dividends, proceeds and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral;

    (6) All of Debtor's right, title and interest in and to the profits and losses of Issuer, and Debtor's right as a limited partner of Issuer to receive distributions of the assets of Issuer upon complete or partial liquidation or otherwise; and

    (7) All cash and non-cash proceeds and products of the Collateral, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed when Collateral or proceeds are sold, leased, collected, exchanged or

otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

As used herein, the following terms have the following meanings:

"Certificate of Limited Partnership" means the certificate of limited partnership of Issuer as currently in effect, in the form delivered to Secured Party herewith.

"Partnership Agreement" means the limited partnership agreement of Issuer dated January 31, 1997, as currently in effect, in the form delivered to Secured Party herewith.

"Organizational Documents" means the Certificate of Limited Partnership, the Partnership Agreement, and any other agreements affecting the rights, limitations, preferences or obligations of Debtor with respect to any of the foregoing or with respect to the Partnership Interests or otherwise, in each case, as the same may be amended or modified from time to time in accordance with the Pledge and Security Agreement between Debtor and Secured Party.

# UCC FINANCING STATEMENT

| A. NAME & PHONE OF CONTACT AT FILER (optional) | | Filing Number: | **201018882796** |
|---|---|---|---|
| | | Filing Date: | **01/26/2010** |
| B. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>**Lori Jean Ludke**<br>**Leonard, O'Brien, Spencer, Gale & Sayre, Ltd.**<br>**100 South Fifth Street**<br>**Suite 2500**<br>**MINNEAPOLIS, MN 55402** | | Filing Time: | **12:11 pm** |
| | | Processing Office: | **State of Minnesota**<br>**Secretary of State** |
| | | Filed By: | **UCCOnlineFiling** |

## 1. DEBTOR'S EXACT FULL LEGAL NAME
INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| **HOYT** | **STEVEN** | **B** | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| **708 SOUTH 3RD STREET, SUITE 108** | **MINNEAPOLIS** | **MN** | **55415** | **USA** |

| Tax ID #: SSN or EIN |
|---|
| |

## 2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME
INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| | | | | |

| Tax ID #: SSN or EIN |
|---|
| |

## 3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)
ORGANIZATION'S NAME

**COMMERCE BANK**

> **EXHIBIT**
> **5**
> tabbies®

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| **7650 EDINBOROUGH WAY, SUITE 150** | **EDINA** | **MN** | **55435** | **USA** |

**4.   This FINANCING STATEMENT covers the following collateral :**

All of Debtor's right, title and interest, in, to and under the following property and interests in property, whether now owned or hereafter acquired or existing and wherever located (collectively, the "Collateral"): (1) 15352.861 of limited partnership units, in IRET Properties, a North Dakota Limited Partnership (the "Issuer"), referenced in IRET Properties Certificate No. 1634 ("Certificate No. 1634"), and 2851.179 limited partnership units of Issuer referenced in IRET Properties Certificate No. 1635 ("Certificate No. 1635") (Certificate No. 1634 and Certificate No. 1635 are sometimes referred to herein as the "Certificates") (2) the Certificates (3) all of Debtor's right, title and interest in and to Debtor's partnership interests and partnership units of, in and to Issuer as set forth in the Certificates and all of Debtor's equity and other interests in, to and of Issuer relating thereto, including, for the avoidance of doubt, all voting, management, and exchange rights connected therewith or related thereto (collectively, the "Partnership Interests"), together with all instruments of transfer in respect of such interests, executed in blank, all cash, securities, dividends, proceeds and other property whether constituting investment property, accounts, documents, general intangibles and/or instruments or otherwise at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any and all of the Partnership Interests or arising from or in respect of, or constituting any and all of the Partnership Interests (4) to the extent

| 5.   ALTERNATIVE DESIGNATION (if applicable) | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Bailee/Bailor | ☐ Seller/Buyer | ☐ AG. Lien | ☐ Non-UCC Filing |
|---|---|---|---|---|---|---|

| 6. | ☐ This FINANCING STATEMENT is to be filed (for recorded) in the REAL ESTATE RECORDS.   Attach Addendum   (if applicable) | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE)   (optional) | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|---|

**8.   OPTIONAL FILER REFERENCE DATA:**

052945-64904

1

# UCC FINANCING STATEMENT - ADDENDUM

Filing Number: 201018882796

## 9. NAME OF FIRST DEBTOR ON RELATED FINANCING STATEMENT

**INDIVIDUAL'S NAME**

| Last Name | First Name | Middle Name, Suffix |
|---|---|---|
| **HOYT** | **STEVEN** | **B** |

## 10. MISCELLANEOUS:

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

## 11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME

**INDIVIDUAL'S NAME**

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| | | | | |

Tax ID #: SSN or EIN

## 12. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR S/P's NAME

**INDIVIDUAL'S NAME**

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| | | | | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

14. Description of real estate:

16. Additional collateral description:
not included in paragraphs (1), (2) and (3) above, any and all rights and remedies of Debtor under any of the Organizational Documents (as hereinafter defined), as applicable, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inuring to the benefit of, Debtor (5) all securities hereafter delivered to Secured Party in substitution or exchange for or in addition to any and all of the Collateral, all certificates and instruments representing or evidencing such securities or any and all of the Collateral and all cash, securities, dividends, proceeds and other property at any time and from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Collateral (6) all of Debtor's right, title and interest in and to the profits and losses of Issuer, and Debtor's right as a limited partner of

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

2

# UCC FINANCING STATEMENT - ADDENDUM

### 9. NAME OF FIRST DEBTOR ON RELATED FINANCING STATEMENT

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name, Suffix |
|-----------|-----------|---------------------|
| HOYT | STEVEN | B |

### 10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

### 11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|-----------|-----------|-------------|--------|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|-----------------|------|-------|-------------|---------|
| | | | | |

Tax ID #: SSN or EIN

### 12. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR S/P's NAME

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|-----------|-----------|-------------|--------|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|-----------------|------|-------|-------------|---------|
| | | | | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

14. Description of real estate:

16. Additional collateral description:
Issuer to receive distributions of the assets of Issuer upon complete or partial liquidation or otherwise and (7) all cash and non-cash proceeds and products of the Collateral, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed when Collateral or proceeds are sold, leased, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto. As used herein, the following terms have the following meanings: "Certificate of Limited Partnership" means the certificate of limited partnership of Issuer as currently in effect, in the form delivered to Secured Party herewith. "Partnership Agreement" means the limited partnership agreement of Issuer dated January 31, 1997, as currently in effect, in the form delivered to Secured Party herewith.

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

3

# UCC FINANCING STATEMENT - ADDENDUM

## 9. NAME OF FIRST DEBTOR ON RELATED FINANCING STATEMENT

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name, Suffix |
|---|---|---|
| **HOYT** | **STEVEN** | **B** |

## 10. MISCELLANEOUS:

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

## 11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| | | | | |

| Tax ID #: SSN or EIN |
|---|
| |

## 12. ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR S/P's NAME

INDIVIDUAL'S NAME

| Last Name | First Name | Middle Name | Suffix |
|---|---|---|---|
| | | | |

| Mailing Address | City | State | Postal Code | Country |
|---|---|---|---|---|
| | | | | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.

14. Description of real estate:

16. Additional collateral description:
"Organizational Documents" means the Certificate of Limited Partnership, the Partnership Agreement, and any other agreements affecting the rights, limitations, preferences or obligations of Debtor with respect to any of the foregoing or with respect to the Partnership Interests or otherwise, in each case, as the same may be amended or modified from time to time in accordance with the Pledge and Security Agreement between Debtor and Secured Party.  THE PURCHASE BY OR THE PLEDGE TO ANY PERSON OTHER THAN THE SECURED PARTY OF ANY OF THE ABOVE DESCRIBED COLLATERAL VIOLATES THE RIGHTS OF SECURED PARTY.

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.
Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

4

Customer Service | Suggestions | Enter Symbol US [  ] GO | Search | LOG OFF

New Account

Trading & Portfolios | Research | Community | Banking

US Markets
Accounts | Global Markets | Quotes | News | Charts | Stocks | Mutual Funds & ETFs | Guidance & Retirement | Bonds | Education | Cash Management

June 10, 2011 9:04 AM ET

IRET | Historical Quote | GO | Symbol Lookup | Recent Quotes IRET, SCLR, EMRI... | Alerts | Refresh

# INVESTORS REAL ESTATE TR SH BEN INT   IRET: NASDAQ
Services : Real Estate Operations

Snapshot | Charts | News



## PRICE HISTORY

| Date | Open | Day Low | Day High | Close | Volume |
|------|------|---------|----------|-------|--------|
| 6/9/2011 | 9.35 | 9.25 | 9.35 | 9.27 | 273,200 |
| 6/8/2011 | 9.37 | 9.28 | 9.41 | 9.31 | 325,200 |
| 6/7/2011 | 9.34 | 9.34 | 9.44 | 9.36 | 229,500 |
| 6/6/2011 | 9.36 | 9.26 | 9.36 | 9.26 | 301,400 |
| 6/3/2011 | 9.28 | 9.28 | 9.39 | 9.32 | 242,000 |
| 6/2/2011 | 9.27 | 9.26 | 9.39 | 9.34 | 363,100 |
| 6/1/2011 | 9.69 | 9.26 | 9.80 | 9.27 | 585,000 |
| 5/31/2011 | 9.61 | 9.61 | 9.75 | 9.69 | 792,900 |
| 5/27/2011 | 9.55 | 9.49 | 9.65 | 9.57 | 234,200 |
| 5/26/2011 | 9.47 | 9.41 | 9.55 | 9.54 | 181,100 |
| 5/25/2011 | 9.40 | 9.36 | 9.49 | 9.49 | 149,300 |
| 5/24/2011 | 9.47 | 9.41 | 9.48 | 9.4 | 222,400 |
| 5/23/2011 | 9.41 | 9.41 | 9.47 | 9.43 | 169,800 |
| 5/20/2011 | 9.42 | 9.41 | 9.50 | 9.43 | 215,700 |
| 5/19/2011 | 9.42 | 9.40 | 9.49 | 9.49 | 147,200 |
| 5/18/2011 | 9.33 | 9.30 | 9.41 | 9.41 | 202,800 |
| 5/17/2011 | 9.28 | 9.28 | 9.39 | 9.34 | 159,600 |



EXHIBIT

tabbies

6

| | | | | | |
|---|---|---|---|---|---|
| 5/16/2011 | 9.29 | 9.28 | 9.39 | 9.28 | 189,600 |
| 5/13/2011 | 9.47 | 9.28 | 9.47 | 9.3 | 182,800 |
| 5/12/2011 | 9.31 | 9.27 | 9.47 | 9.47 | 163,100 |
| 5/11/2011 | 9.46 | 9.31 | 9.47 | 9.31 | 194,100 |
| 5/10/2011 | 9.34 | 9.33 | 9.45 | 9.45 | 176,300 |
| 5/9/2011 | 9.28 | 9.25 | 9.33 | 9.31 | 132,100 |
| 5/6/2011 | 9.30 | 9.25 | 9.34 | 9.25 | 173,800 |
| 5/5/2011 | 9.27 | 9.25 | 9.34 | 9.27 | 240,400 |

Download to Excel

Page 1 of 11 Next >

Quotes and other information supplied by independent providers identified on the E*TRADE vendor disclosures page

**PLEASE READ THE IMPORTANT DISCLOSURES BELOW**

Securities products and services are offered by E*TRADE Securities LLC, Member FINRA/SIPC.

**System response and account access times may vary due to a variety of factors, including trading volumes, market conditions, system performance, and other factors.**

Statement of Financial Condition | About Brokerage Insurance | Customer/User Agreement | Privacy Statement | Business Continuity Plan
Online Security | Contact Us | About Us

© 2011 E*TRADE Financial Corporation All rights reserved. Version 1.0. LTNp

In re:                                                          BKY Case No.:  11-43816

Steven Bruce Hoyt,                                                          Chapter 11

      Debtor.

## MEMORANDUM IN SUPPORT OF MOTION BY
## COMMERCE BANK FOR RELIEF FROM STAY

Commerce Bank, by and through its undersigned attorneys, hereby submits this Memorandum of Law in support of its motion for relief from the automatic stay.  The facts and arguments stated in the Motion are incorporated herein by reference.

## FACTS

On March 3, 2008, the Debtor borrowed $12.5 million dollars from the Bank evidenced by a Promissory Note (a copy of which is attached to the Motion as Exhibit 1) and other documents (the "**Loan**"). The Debtor used the proceeds of the Loan to acquire all of the ownership units in WCSC Minneapolis Industrial Investor LLC ("**WCSC**").  WCSC owns 71.8%, and StoneArch II, LLC owns 28.9%, of another entity, StoneArch II/WCSE Minneapolis Industries LLC, which, through various layers of downstream entities, owns 4 separate pools of real estate development projects.

The Loan is secured, in part, by the IRET Units, which are convertible into shares of IRET, Inc., a publicly traded company.  The IRET Units, if converted into tradable shares, had a value of $9.30 per share, or $2,681,147.55, as of June 6, 2011.

The Debtor is in default under the payment terms of the Loan.  The Loan initially matured, by its terms, on May 3, 2010.  Subsequently, the Bank and the Debtor entered into loan

extension agreements which extended the maturity date of the Loan to February 3, 2011. The Debtor failed to pay the Loan when it matured, as extended, on February 3, 2011, and accordingly is in default thereof.

The principal balance owed under the Loan, as of February 3, 2011, was $12,500,000.00, plus accrued and unpaid interest and late charges of $692,760.41. Per diem interest accrues at the rate of $2,083.32 per day. In addition, the Debtor is liable to the Bank for certain other fees, charges, and attorneys' fees, which the Bank estimates to be approximately $45,000.00.

The Debtor accordingly owes $13,383,476.49 to the Bank under the Loan as of June 1, 2011.

The Bank had scheduled a foreclosure sale of the IRET Units to take place on June 3, 2011. The Debtor filed his petition in this case three days prior to the foreclosure sale date.

The Bank holds a security interest in the IRET Units under Security Agreements dated March 3, 2008 and January 25, 2010, copies of which are attached as Exhibits 2 and 3 to the Motion. The Bank has perfected its security interest in the IRET Units by filings made in the Office of the Minnesota Secretary of State on June 3, 2008 and January 26, 2010, as Document Nos. 200810866199 and 201018882796, copies are attached as Exhibits 4 and 5 to the Motion.

## **ARGUMENT**

The Bank requests relief from the stay to allow a foreclosure and sale of the IRET Units.

Section 362(d) of the Bankruptcy Code provides in pertinent part as follows:

    (d) On request of a party in interest and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

        (1) for cause, including the lack of adequate protection of an interest in property of such party in interest:

        (2) with respect to a stay of an act against property under subsection (a) of this section, if –

(A)  the debtor does not have an equity in such property; and

(B)  the property is not necessary to an effective reorganization.

11 U.S.C. §362(d)(1)-(2).  As discussed more fully below, the application of these provisions, and the sound rationale for their application in bankruptcy cases, plainly supports the modification of the stay as requested by the Bank.

## I.  CAUSE EXISTS FOR MODIFICATION OF THE AUTOMATIC STAY BECAUSE THE BANK IS NOT ADEQUATELY PROTECTED.

Relief from the automatic stay may be granted "for cause" under 11 U.S.C. § 362(d)(1). "Cause" may include, but is not limited to, the lack of adequate protection of a secured party's interest in property. *In re May,* 2002 W.L. 3211462, 3 (Bankr. E.D. Ark. July 18, 2002) (copy attached).  The concept of adequate protection is intended to protect an entity's interest in property from a decline or threatened decline in value. *Id.*, citing *In re Anthem Communities/RBG, LLC,* 267 B.R. 867, 871 (Bankr. D. Col. 2001); *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988). A creditor may show that it lacks adequate protection by presenting evidence of no equity in the property, depreciating property values, the non-payment of taxes or other senior liens, the failure to insure the property, an increase in secured debt due to interest accruals or otherwise, the failure to maintain the property, or other factors jeopardizing the creditor's position. *Id.,* citing *In re Anthem Communities/RBG, LLC*, 484 U.S. at 871; *In re Marchand*, 61 B.R. 81, 84 (Bankr. E.D. Ark. 1986). What constitutes adequate protection is a factual issue to be decided on a case-by-case basis.  *Id.*, citing  *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985).  In the present case, the Bank has no protection from the risk of a decline in the value of the IRET Units.

Adequate protection must be considered on a case-by-case basis and upon equitable considerations arising from the facts of each case.  *In re Dahlquist*, 34 B.R. 476, 483 (Bankr. D.

S.D. (1983). It has been held, as detailed in *In re Mosello*, 195 B.R. 277 (Bankr. S.D. N.Y. 1996) that:

> The purpose of "adequate protection" for a creditor "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir.1994) (en banc), quoting from *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987). "The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992). "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Development Group, Inc.*, 16 F.3d at 564.

> As stated in *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D. N.J. 1986): "Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy", citing *In re Coors of the Cumberland*, 19 B.R. 313, 321 (Bankr. M.D. Tenn. 1982). The Congressional intent to preserve pre-petition contractual financial interests by means of the adequate protection requirement is evident in the House Report, quoted in *In re Dunes Casino Hotel*, 69 B.R. at 793–94:

> > [Adequate protection] is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

> H.R.Rep. No. 595 at 339, 1978, U.S.Code Cong. & Ad. News at 5787, 6295.

Other cases have stated that the "important question" in determining the adequacy of protection is whether the interest of the secured creditor "is being unjustifiably jeopardized." *In re Plabell Rubber Products, Inc.*, 137 B.R. 897, 899 (Bankr. N.D. Ohio 1992), quoting from In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

Debtor may argue that an alleged "equity cushion" exists if the value of the IRET Units is combined with an alleged value of other collateral held by the Bank, and that alleged equity

cushion will adequately protect the Bank. The Bank maintains that the value of the other collateral is irrelevant for purposes of this Motion. Equitable considerations other than an alleged equity cushion must be taken into account in determining if a creditor is adequately protected. See, *In re Colrud*, 45 B.R. 169 (Bankr. D. Ak. 1984) (despite equity cushion, cause existed due to low interest rate, nonpayment of loan, and character of lender); See also, *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (while the presence of an equity cushion is a relevant factor, it should not be a determinative factor in any adequate protection analysis, particularly one relating to §341(d)(2)(B)).

The Bank wants to foreclose on the IRET Units. As noted in the Motion, the IRET Units have declined in value since the commencement of this case. The Debtor's main business is that of a real estate investor and developer. The Debtor owns interests in a large number of companies which are engaged in real estate development and investments. It can be safely assumed that any Plan of Reorganization that the Debtor may file will be centered on a long-term revival of the value of the real estate market generally and improved results over a number of years from the Debtor's particular real estate projects.

The other collateral held by the Bank consists of an interest in entities which indirectly own real estate projects in four separate pools. The Debtor predictably will propose to ultimately sell those real estate pools, in several years, and after the real estate market has improved, to generate funds to pay the Loan in full. Based on information from the Debtor, three of the four pools cannot be sold until sometime in 2014. However, the Bank should not be subjected to a serious market deterioration risk on the IRET Units for three years or more, while it waits for the Debtor to complete a liquidation of the pools to pay the Loan.

In any event, the purported value of the other collateral is irrelevant for purposes of this Motion. The IRET Units have declined in value since the commencement of this case, and are highly susceptible to further declines. As one court has noted:

> …when there is a considerable equity in mortgaged property and it can be sold within a short period of time, the debtors, without according any adequate protection, might be permitted that short period of time in which to sell the property. That is to say that there are imaginable cases in which the equity which exists so obviously protects the secured creditors so completely that any other adequate protection is not necessary. But, as time goes by and as a short period becomes a long one—as in the case at bar—the absence of adequate protection becomes crucial. *The passage of a long period of time without sale of the property, for one thing, indicates that the great equity originally claimed may not in reality exis*t.

*Matter of Orlando*, 53 B.R. 245, 249 (Bankr. W.D. Mo. 1985) (italics supplied).

Assertions of repayment which are highly speculative, such as this, do not offer adequate protection. See, *In re DB Capital Holdings, LCC*, 2011 W.L. 2118877, *11 (Bankr. D. Colo. May 25, 2011), citing *Rader v. Boyd*, 252 F.2d 585 (10th Cir. 1958) ("an arrangement which offers no more than a speculative venture with creditor's funds is not adequate protection for the secured creditors"); see also *Rocco v. J.P. Morgan Chase Bank*, 255 Fed. Appx. 638 (3rd Cir. 2007) (finding speculative offer of adequate protection relating to litigation outcome is not sufficient), and *In re Whitney*, 1988 WL 141523, *5 (copy attached) (Bankr. D. Minn.1988) ("an offer of illiquid and highly speculative value in an incomplete construction project does not rise to the level of adequate protection contemplated by 11 U.S.C. § 361"); *Saypol*, at 803 (A reasonable probability is not be grounded solely on speculation.)

Whether or not equity exists when the value of the IRET Units and the purported value of the Bank's other collateral exists is beside the point, because the Debtor apparently will have no means or ability to pay the matured Loan for a number of years. The Bank has been offered no adequate protection with respect to the substantial risk of deterioration over three plus years in

the value of the IRET Units. Indeed, from the date of commencement of this case to May 9, 2011, the value of the Units has already shrunk by at least 4%.

The Debtor has stated, in many meetings with the Bank, that at least three, if not all four of the real estate pools owned by WCSC, cannot be sold until sometime in 2014. Regardless of the present value of the WCSC interest, making the Bank wait for three and a half years will subject the Bank to unreasonable risks of deterioration in the value of the IRET Units. The authorities cited herein firmly reject the notion that a secured lender is required to wait years before being able to realize upon its collateral, when no protection is afforded the lender from the risk of deterioration in the value of the collateral.

**II.**      **THE DEBTOR DOES NOT POSSESS EQUITY IN THE IRET UNITS, AND THE IRET UNITS ARE NOT NECESSARY FOR THE DEBTOR'S REORGANIZATION.**

The court in *In re Bowan*, 253 B.R. 233 (8th Cir. B.A.P. 2000) stated as follows:

> Under section 362(d)(2), the creditor seeking relief from the automatic stay initially bears the burden of showing that the debtor has no equity in the secured property. See *Anderson v. Farm Credit Bank of St. Paul (In re Anderson)*, 913 F.2d 530, 532 (8th Cir.1990); *In re Fenske*, 96 B.R. 244, 247 (Bankr. D. N.D. 1988) (citing *United Sav. Ass'n v. Timbers of Inwood Forest Assocs*., 484 U.S. 365 (1988)); see also 11 U.S.C. §362(g)(1) (1994) ("In any hearing under subsection (d) . . . of this section concerning relief from the stay . . . the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and ... the party opposing such relief has the burden of proof on all other issues."). Once the creditor sustains that burden, the burden of proof then shifts to the debtor to show that the property is necessary to an effective reorganization. See *Anderson*, 913 F.2d at 532.
>
> The test for determining equity under the first part of § 362(d)(2) involves a comparison between the total liens against the property and the property's current value. *Nantucket Investors II v. California Federal Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 206 (3d Cir. 1995). All encumbrances are totaled to determine equity whether or not all lienholders have requested relief from the stay. *Id*. at 207. . . .

. . . The Supreme Court held that the debtor must show there is a "reasonable possibility of a successful reorganization within a reasonable time" to satisfy section 362(d)(2)'s "necessary for an effective reorganization" component. *Timbers of Inwood Forest*, 484 U.S. at 376. More specifically, a debtor must show that its proposed plan of reorganization is feasible and therefore, likely confirmable. See *Fenske*, 96 B.R. at 247, 248. According to the Eighth Circuit, the "feasibility test contemplates 'the probability of actual performance of provisions of the plan.... The test is whether things which are to be done after confirmation can be done as a practical matter under the facts.' " *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985) (quoting In re Bergman, 585 F.2d 1171, 1179 (2d Cir.1978)). In other words, "[s]incerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are visionary promises." Id. ("The Clarksons' failure to file operation reports or audit reports makes informed expectations about the plan's success virtually impossible.... Although we sympathize with the Clarksons, we find that the feasibility test is firmly rooted in predictions based on objective fact.").

*Id.*, at 238-39.

### A.     The Debtor Has No Equity In The IRET Units.

As detailed in the Bank's verified Motion, the Debtor indisputably lacks equity in the IRET Units. The concept of equity in property in bankruptcy cases is an exceedingly simple one: if the sum total of the indebtedness secured by all creditors' liens exceeds the value of the property, then the debtor has no equity in the property. As explained in a leading bankruptcy treatise, the test for determining whether a debtor has equity in property involves a comparison of the value of the property encumbered by the lien with the amounts owed by the debtor:

A debtor has no equity in the property for purposes of section 362(d)(2) when the debts secured by liens on the property exceed the value of the property. The fact that a senior creditor may have an equity cushion in the collateral does not by itself indicate that the debtor has equity. A junior creditor's interest may be the source of the cushion for the senior creditor. For example, suppose that a property is worth $500,000 and is subject to a $100,000 senior lien and a $450,000 junior lien. The senior creditor has a considerable equity cushion of $400,000, the amount by which the value of the property exceeds the senior creditor's claim. However, the debtor has no equity in the property. If the property were sold, the senior creditor would receive the first $100,000 and the junior creditor would receive the next $400,000. ***Since the estate will receive no benefit from the sale, there is little reason to permit the trustee to control the sale. In such a case, unless the debtor can demonstrate that the property is necessary to an effective reorganization, the property is of no value to the debtor or to the estate and relief***

8

*should be granted so that the party with a real interest in the property can control its disposition.*

Lawrence P. King, 3 COLLIER ON BANKRUPTCY (15th Ed. Rev. 1999) at 362-95-96, ¶ 362.07(4)(a); *see also In re Bowman*, 253 B.R. 233, 238 (8th Cir. BAP 2000) ("The test for determining equity under the first part of § 362(d)(2) involves a comparison between the total liens against the property and the property's current value."); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 375 (1988) (holding that a lack of equity is synonymous with a creditor being undersecured).

The Debtor cannot dispute that he owes the Bank in excess of $12.5 million. The value of the IRET Units is approximately $2.6 million dollars. The shares under which the IRET Units are convertible are traded on the NASDAQ Exchange. An exhibit to the Bank's Motion reflects that the closing price of the Units as of June 9, 2001, was $9.29, down from $9.69 on the date the Debtor filed his petition. By reason thereof, it is indisputable that the Debtor has no equity in the IRET Units, and it is further indisputable that the IRET Units have declined in value since the commencement of this case. Accordingly, the requirements of Section 362(d)(2)(A) have been met.

**B.      The IRET Units Are Not Necessary For The Debtor's Reorganization**.

The unreported case of *In re Joseph H. Whitney*, 1998 WL 141523 (Bankr. D. Minn.) (a copy of which is attached hereto), involved a lender's motion for relief from the stay to allow foreclosure on the Chapter 11 debtor's securities. Judge Dreher held that the securities were not necessary for the debtor's reorganization, because the securities were an investment and were not an asset used in the trade or business of the debtor. The debtor had no equity in the securities. Based thereon, the Court held that the shares were not necessary for the debtor's reorganization, and granted the secured lender relief under Section 362(d)(2).

Other courts have required a debtor to show that an effective reorganization is possible and that the property in question will contribute to the reorganization. In the case of *In re Saypol*, 31 B.R. 796, 803 (Bankr. S.D. N.Y. 1983), the court held that the debtor's stock holdings lacked any attribution which would contribute either to the funding of a liquidation plan or to the rehabilitation of the debtor, and the court granted the secured lender relief to foreclose on the stock.

In the case of *In re Penny*, 52 B.R. 816 (Bankr. E.D. N.C.) involved a fact situation very similar to the case at bar. In that case, the debtor held real estate investments, and securities, both of which were pledged to a secured lender. After determining that the debtor had no equity in the securities, the court concluded that the securities were not needed for the debtor's reorganization. The debtor's main business was that of an attorney and real estate investor.

In the present case, the debtor's main business is that of managing his diverse portfolio of corporate entities which, in turn, own various real estate projects and developments. The IRET Units are simply an investment, as Judge Dreher found in the case of *In re Joseph H. Whitney*. The IRET Units are not related to or integral to the operation of the Debtor's real estate projects. It is clear that the IRET Units are not necessary for the Debtor's reorganization.

**C.     The Debtor Should Not Use the IRET Units or Dividends for Personal Expenses.**

Debtor's schedules reflect that he owns (and has sizeable mortgages on) two expensive homes, drives an expensive automobile, and generally lives a very enviable lifestyle. The case law authority clearly instructs that debtors cannot use cash collateral and assets subject to liens for maintaining a luxurious lifestyle.

An individual debtor in Chapter 11 must make a sufficient financial commitment to creditors to satisfy the good faith requirement [for a plan]. *In re Weber*, 209 B.R. 793, 798

(Bankr. D. Mass. 1997) (citations omitted); See also, *In re Griffieth*, 209 B.R.823, 828 (Bankr. N.D. N.Y. 1996) (high private school expenses unreasonable); *In re Cappuccetti*, 172 B.R. 37, 40 (Bankr. E.D. Ark. 1994) (debtor's decision to live in a condominium adjacent to a golf course at high monthly rent, in addition to two time-share properties, was evidence of bad faith). A high-cost lifestyle is impossible to tolerate from Chapter 11 debtors in possession. Essential to any analysis of the meaning and policy of the bankruptcy code is the recognition that a bankruptcy court is a court of equity. *In re Briggs Transportation Company*, 780 F.2d 1339, 1343 (8th Cir. 1985). The Debtor simply cannot use the IRET Units, or dividends therefrom, to pay his high personal expenses while failing to pay his debts, including the Loan, as the debts became due.

## CONCLUSION

Cause exists, due to lack of adequate protection, to grant the Bank relief from the say. In addition, it is clear that the Debtor owns no equity in the IRET Units, and the IRET Units are not necessary for a reorganization of the Debtor. The Bank's motion for relief from the say should be granted.

**LEONARD, O'BRIEN
SPENCER, GALE & SAYRE, LTD.**

/e/  Matthew R. Burton

Dated: June 16, 2011          By_____

Brian F. Leonard, #62236
Matthew R. Burton, #210018
Attorneys for Commerce Bank
100 South Fifth Street, Suite 2500
Minneapolis, Minnesota  55402-1234
(612) 332-1030

439891

11


Not Reported in B.R., 2002 WL 32114562 (Bkrtcy.E.D.Ark.)
**(Cite as: 2002 WL 32114562 (Bkrtcy.E.D.Ark.))**

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
E.D. Arkansas, Western Division.
In re: Karen MAY.

No. 4:02–BK–14785 E.
July 18, 2002.

Mr. James V. Coutts, for Regions.

Mr. John R. Peel, for FAVB.

Mr. William Skelton, for debtor.

*ORDER DENYING REGIONS BANK'S MOTION
FOR RELIEF FROM STAY*
EVANS, Bankruptcy J.
**\*1** Motions for Relief From Stay filed by Regions
Bank ("Regions") and First Arkansas Valley Bank,
S.A. ("FAVB") were heard on June 11, 2002, and the
Court took the matters under advisement. The Chapter
7 Trustee, M. Randy Rice, Esq., appeared and opposed
the motions. James V. Coutts, Esq. appeared for Re-
gions. John R. Peel appeared for FAVB. The Debtor,
Karen May, was also present.

The Trustee and FAVB subsequently settled
FAVB's motion and an agreed Order resolving
FAVB's motion was entered by this Court on July 2,
2002. This Order decides Regions' motion for relief
from stay. This is a core proceeding pursuant to 28
U.S.C. § 157(b)(2)(G), and the Court has jurisdiction
to enter a final judgment in this matter.

FACTUAL BACKGROUND
The Debtor filed this chapter 7 bankruptcy on
April 30, 2002. This matter concerns two parcels of
real estate in Pope County owned by the Debtor,
"Ruth Lane" and "Lakeridge Estates," in which Re-
gions asserts a security interest (collectively referred
to as the "Properties"). Prior to Debtor's bankruptcy
filing, Regions initiated foreclosure suits on these
Properties in the Circuit Court of Pope County, and
seeks relief from stay to continue those actions.

*Ruth Lane*
Ruth Lane consists of approximately eight acres
in Pope County. This property is also commonly re-
ferred to as "Maple Springs Road" according to its
legal description. On March 9, 2001, Debtor borrowed
$50,099.50 from Regions and mortgaged Ruth Lane
as collateral for the loan. Debtor borrowed the money
individually and executed the mortgage as grantor.
However, Debtor did not own Ruth Lane at the time
she executed the mortgage. Debtor testified that at the
time the mortgage was given, Ruth Lane was actually
owned by her son, Bradley J. Shoptaw, and her
daughter, Robyn S. Shoptaw. On March 28, 2002,
Debtor's son and daughter transferred Ruth Lane to
their mother by quitclaim deed. Debtor testified that
this transaction was intended to give Regions a valid
first mortgage on Ruth Lane.

Debtor valued Ruth Lane at $135,000.00 on her
bankruptcy schedules. Mr. Blake Tarpley, vice pres-
ident of Regions Bank in Russellville, testified that the
Debtor owed approximately $47,000.00 in principal
and interest on the Ruth Lane loan. Regions' ac-
knowledged that Ruth Lane was worth approximately
$85,000.00 and that the parties had agreed there was
equity in Ruth Lane.

*Lakeridge Estates*
Lakeridge Estates consists of one and a half lots in
Pope County. Russellville Title & Closing, Inc.
("Russellville Title") borrowed $169,730.09 from
Regions on May 19, 2000 and mortgaged Lakeridge
Estates as collateral for the loan. The original note
matured on May 19, 2001, and the outstanding balance
of $162,961.80 was refinanced with a new maturity
date of May 19, 2003. The mortgage was subsequently
modified to reflect the extended maturity date. Debtor
executed a personal guarantee in favor of Regions
guaranteeing the loan to Russellville Title. Russell-
ville Title was a company solely owned by Debtor; its
corporate status is now revoked.

**\*2** Although Debtor executed the note and
mortgage on behalf of Russellville Title as its Presi-
dent, neither Russellville Title nor Debtor held title to
Lakeridge Estates at the time Debtor executed the
mortgage. Like the Ruth Lane property, Lakeridge

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Estates was transferred to Debtor by her son and daughter by quitclaim deed on March 28, 2002.

Debtor valued Lakeridge Estates at $30,000.00 on her bankruptcy schedules. Tarpley testified that the Debtor currently owed approximately $171,000.00 in principal and interest on the Lakeridge Estates loan. Debtor listed the property for sale with Moore & Company Realtors for $33,500.00 on May 10, 2001. The Debtor testified that she was "confident" the property was worth no more than $30,000.00 or $33,500.00. Mr. Tony Moore of Moore & Company Realtors testified that no offers had been made on the property following its listing, and that the lack of offers indicates that the property is not worth the listing price of $33,500.00. Moore testified that he believed the listing price should be lowered to $18,000.00 in order to sell the property based on current market conditions. The Trustee offered no evidence of a different value for the property.

## DISCUSSION

With respect to Ruth Lane, Regions seeks relief from stay so that it can proceed with a state court foreclosure action and "quick sell" the property. Regions does not allege the Debtor has no equity in Ruth Lane or that it lacks adequate protection, but that the costs of litigation with respect to Ruth Lane continue to rise, and therefore, Regions wants to quickly move forward with a foreclosure sale of the property. With respect to Lakeridge Estates, Regions asserts that it is entitled to relief from stay because the Debtor has no equity in the property and Regions lacks adequate protection.

The Trustee argues that relief from stay should be denied because there is equity with respect to Ruth Lane, and there are questions regarding the validity of Regions' security interests in both Properties. Specifically, because the mortgages were not executed by the owner of the Properties, and title was later acquired by Debtor within 90 days prior to her bankruptcy filing, the Trustee needs time to pursue possible avoidance actions in bankruptcy court to determine the validity of Regions' liens.

While Regions acknowledges that there may be an issue with respect to the validity of Regions' security interests in the Properties, it contends that those issues are "state court questions" which should be decided in the Pope County Circuit Court where Re-

gions previously filed foreclosure suits against Debtor. However, Regions did not develop this argument by presenting evidence that the state court is the most appropriate place to determine such issues. Neither did Regions assert that it is moving for relief from stay so that it can determine the validity of its security interests in state court.[FN1] In fact, in its pleadings, Regions notes that Debtor has not defended the Pope County foreclosure suits and is in default in those actions. Accordingly, it does not appear that the validity of Regions' security interests are or will be an issue that is tried in the state court.

> FN1. Relief from stay "for cause" under 11 U.S.C. § 362(d)(1) may include relief from stay to allow litigation involving the debtor to proceed in a nonbankruptcy forum under certain circumstances. *In re Blan (Blan v. Nachogdoches County Hospital),* 237 B.R. 737 (B.A.P. 8th Cir.1999).

## I. LEGAL STANDARDS AND BURDENS OF PROOF.

*Relief From Stay "For Cause"— Adequate Protection.*

**\*3** Relief from the automatic stay may be granted "for cause" under 11 U.S.C. § 362(d)(1). "Cause" may include, but is not limited to, the lack of adequate protection of a secured party's interest in property. The concept of adequate protection is intended to protect an entity's interest in property from a decline or threatened decline in value. *See In re Anthem Communities/RBG, LLC, 267 B.R. 867, 871 (Bankr.D.Colo.2001); United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 370 (1988).* A creditor may show that it lacks adequate protection by presenting evidence of no equity in the property, depreciating property values, the non-payment of taxes or other senior liens, the failure to insure the property, an increase in secured debt due to interest accruals or otherwise, the failure to maintain the property, or other factors jeopardizing the creditor's position. *See In re Anthem Communities/RBG, LLC,* 484 U.S. at 871; *In re Marchand,* 61 B.R. 81, 84 (Bankr.E.D.Ark.1986). What constitutes adequate protection is a factual issue to be decided on a case-by-case basis. *See In re Martin,* 761 F.2d 472, 474 (8th Cir.1985). However, 11 U.S.C. § 361 provides that adequate protection may be provided by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2002 WL 32114562 (Bkrtcy.E.D.Ark.)
(Cite as: 2002 WL 32114562 (Bkrtcy.E.D.Ark.))

making periodic cash payments to the secured creditor, providing the creditor with additional or replacement liens or other relief that will result in the realization by the creditor of the "indubitable equivalent" of the creditor's interest in the property.

*Relief From Stay—Lack of Equity in Property That Is Not Necessary For An Effective Reorganization.*

Relief from the stay against property may also be granted under 11 U.S.C. § 362(d)(2) if a two-prong test is met. First, the debtor must have no equity in the subject property, and second, the subject property must not be necessary to the debtor's reorganization. However, if a creditor proves that there is no equity in the subject property in a Chapter 7 case, the stay should be lifted because there can be no question that the property is not necessary for an effective reorganization where the debtor only seeks to liquidate her assets. *See In re Knight Jewelry,* 168 B.R. 199 (Bankr.W.D.Mo.1994); *In re Roxrun Estates, Inc.,* 74 B.R. 997 (Bankr.S.D.N .Y.1987).

*Burden of Proof*

Regardless of whether a creditor moves for relief under subsection (d)(1) or (d)(2), the creditor must first establish the validity and perfection of its security interest and the amount of the debt and other allowable costs secured by its claim. *See In re Irving A. Horns Farms Inc.,* 42 B.R. 832, 836 (Bankr.N.D.Iowa 1984). *See also First Nat'l Bank of Denver v. Turley,* 705 f.2d 1024 (8th Cir.1983) ("To obtain relief from stay under 11 U.S.C. § 362(d), a creditor must show the court that its interest in the debtor's property is sufficiently clear and in need of protection to justify exempting it from the normal course of bankruptcy proceedings.") Once a creditor has established the validity and perfection of its security interest and the amount of the debt and other allowable costs secured by its claim, the creditor carries the ultimate burden of proof with respect to a debtor's equity, and the debtor opposing stay relief has the burden on the remaining issues. 11 U.S.C. § 362(g). *See also First Nat'l Bank in Sioux City v. Dahlquist (In re Dahquist),* 34 B.R. 476, 481 (Bankr.D.S.D.1983).

II. ANALYSIS.

*4 Applying the legal standards and burdens of proof outlined above, Regions must make a *prima facie* case that it is entitled to relief from stay under § 362(d)(1) or § 362(d)(2). To do this, Regions must first prove that it has a valid security interest in the

Properties, and then prove that Debtor has no equity in the Properties or that it otherwise lacks adequate protection in the Properties.

*Ruth Lane*

Regions did not make a *prima facie* case that it has a valid security interest in Ruth Lane. Regions introduced a promissory note and mortgage showing that the Debtor borrowed funds from Regions and mortgaged Ruth Lane as collateral for that loan; yet, Debtor testified she did not own Ruth Lane at that time. Furthermore, the Trustee introduced quitclaim deeds showing that Ruth Lane was transferred to Debtor more than a year after she mortgaged the property. Although the transfer of title to Debtor just before her bankruptcy filing may have cured Regions' security interest under Arkansas' after-acquired title statute (Ark.Code Ann. § 18–12–601), the substance of the transaction may constitute an avoidable preference under bankruptcy law such that Regions does not in fact have a valid security interest in Ruth Lane that would entitle it to relief from stay. *See, e.g., In re Russell,* 29 B.R. 332 (Bankr.E.D.N.Y.1983) (perfection of security interest within three months of debtors' petition constituted a voidable preference). Finally, Regions failed to state any grounds entitling it to relief from stay in any case. It did not allege that it lacked adequate protection and acknowledged that there was equity in the property.

*Lakeridge Estates*

Regions also failed to make a *prima facie* case that it has a valid security interest in Lakeridge Estates. Although Regions established that Debtor took out a loan and mortgaged Lakeridge Estates as collateral for that loan on behalf of Russellville Title, Debtor testified that neither she nor Russellville Title held title to the property. Additionally, the Trustee introduced quitclaim deeds showing that the property was transferred to Debtor nearly two years after the loan was made. Again, because the transaction that may have validated Regions' mortgage may not withstand a preference action in bankruptcy court, Regions has failed to show that it has a valid security interest in Lakeridge Estates.

The Court further finds that had Regions' established a valid security interest in Lakeridge Estates, it would be entitled to relief from stay because the Debtor and Moore's testimony established the value of Lakeridge Estates as under $33,500.00, well below the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2002 WL 32114562 (Bkrtcy.E.D.Ark.)
**(Cite as: 2002 WL 32114562 (Bkrtcy.E.D.Ark.))**

approximate $171,000.00 currently owed Regions. The Trustee failed to offer any evidence to rebut these values.

### CONCLUSION

Regions failed to meet its burden of proof that it has a valid security interest in the Properties, and accordingly is not entitled to relief from stay. The Court does not make any finding as to whether Regions has a valid security interest in the Properties or the priority of that security interest with respect to the Trustee; the validity and priority of Regions' mortgages should be decided in the context of an adversary proceeding pursuant to Fed. R. Bankr.P. 7001. For the reasons stated herein,

**\*5** Regions' Motion for Relief from Stay is DENIED.

IT IS SO ORDERED.

Bkrtcy.E.D.Ark.,2002.
In re May
Not Reported in B.R., 2002 WL 32114562 (Bkrtcy.E.D.Ark.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in B.R., 1988 WL 141523 (Bkrtcy.D.Minn.)
**(Cite as: 1988 WL 141523 (Bkrtcy.D.Minn.))**

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Minnesota.
In re Joseph H. WHITNEY, Debtor.

Bankruptcy No. 4–88–3885.
Dec. 20, 1988.

T. Jay Salmen, Julie Becker, St. Paul, Minn., for debtor.

Patrick Hennessy, Minneapolis, Minn., for Bank.

Steven Kluz, Minneapolis, Minn., for Creditors' Committee.

*MEMORANDUM ORDER*
NANCY C. DREHER, Bankruptcy Judge.
**\*1** At Minneapolis, Minnesota, this 20th day of December, 1988.

The above-entitled matter came on for hearing before the undersigned on the 22nd day of November, 1988, on a motion by Park National Bank ("the Bank") for relief from stay under 11 U.S.C. § 362(d)(1) and (2), and for court approval of a cure by the Bank of its violation of the stay. Debtor was represented by T. Jay Salmen and Julie Becker; the Bank was represented by Patrick Hennessy; the Unsecured Creditors' Committee was represented by Steven Kluz. The court has jurisdiction to hear and finally determine this matter pursuant to 11 U.S.C. §§ 157 and 1334, and Local Rule 103(b). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(G).

*FACTS*
At issue in this motion is the value of 57,915 shares of stock in A.M.P., Inc., which debtor pledged to the Bank to secure an indebtedness which amounted to $3,155,029.60 as of the date the chapter 11 petition was filed.[FN1] That figure includes $2,996,722.64 in principal, accrued prepetition interest of $142,308.43, and prepetition accrued costs and expenses of collection in the sum of $15,998.53. This indebtedness was evidenced by:

(1) Debtor's Promissory Note to the Bank dated February 15, 1988, in the original principal sum of $1,850,986.87;

(2) A Promissory Note from EDI Holding Corporation to the Bank dated August 6, 1987, in the original principal amount of $200,000.00, which note is in default and has been guaranteed by the debtor;

(3) A Reimbursement Agreement by Park City West, Inc., and Mallard Creek, Inc., dated August 4, 1987, providing a reimbursement obligation with respect to an irrevocable letter of credit issued by the Bank on August 4, 1987, in the original amount of $500,000.00, also guaranteed by debtor on August 4, 1987, which was drawn upon by the beneficiary on April 27, 1988;

(4) A Reimbursement Agreement from France Place Apartments, Inc., to the Bank dated April 5, 1988, guaranteeing repayment of an irrevocable letter of credit in the amount of $60,000.00, issued by the Bank on April 5, 1988, which has not yet been drawn upon and which indebtedness is guaranteed by the debtor by a guaranty dated September 14, 1987;[FN2] and

(5) A reimbursement obligation by France Place Apartments, Inc., on an irrevocable letter of credit issued by the Bank in the original amount of $410,000.00, and drawn upon by the beneficiary on September 29, 1988, guaranteed by the debtor by a guaranty dated September 14, 1987.

All of these obligations are secured by 57,915 shares of A.M.P., Inc. stock owned by the debtor and pledged to the Bank pursuant to pledge agreements dated March 31, 1987, August 4, 1987, September 14, 1987, and April 5, 1988.

The Bank's security interest in the stock was perfected when the Bank took possession of the stock certificates in April of 1987. The Bank has continuously maintained possession of those stock certificates since that date.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1988 WL 141523 (Bkrtcy.D.Minn.)
**(Cite as: 1988 WL 141523 (Bkrtcy.D.Minn.))**

Prior to the filing of the debtor's petition, the note referenced in paragraph 1, the guaranty of the EDI Holding Corporation indebtedness referenced in paragraph 2, and the guaranty referenced in paragraph 3 above had become due and payable in full and the Bank had made demand upon the debtor for that amount. In addition, debtor had defaulted on the margin requirements required by the referenced agreements and the Bank had made demand and given notice of acceleration of such obligations. The debtor's obligation on the guaranty referenced in paragraph 5 above was triggered when the holder of the letter of credit drew upon it on September 29, 1988. There has been no call on the letter of credit referenced in paragraph 4, but the Bank remains liable on that obligation.

*2 The pledge agreements provided that debtor pledged not only the stock but also the proceeds thereof, including dividends. A.M.P., Inc. has paid at least one dividend in the sum of approximately $14,000.00 since the Bank withdrew debtor's authority to receive those dividends, but debtor has not turned over the dividends to the Bank.

Debtor filed his petition for relief on September 27, 1988. On September 29, 1988, upon receipt of the draw of the letter of credit referred to in paragraph 5 above, the Bank sold 10,000 shares of the pledged stock. At the time no officer or agent of the Bank had been given notice or had actual knowledge of the debtor's filing of his petition. Subsequently, the Bank cured this violation of the stay by repurchasing A.M.P., Inc. stock in the open market at a price only slightly lower than the original sales price.[FN3]

EDI, Inc., Mallard Creek, Inc., and Park City West have all filed petitions for relief under chapter 7 of the Bankruptcy Code. France Place Apartments, Inc., of which debtor is President, has not responded to the Bank's demands for payment. The apartment project being built by it has been deeded back to the construction lender in lieu of foreclosure.

A.M.P., Inc. is traded on the New York Stock Exchange. On the date of filing of the petition for relief (September 27, 1988), the stock closed at $41 per share; on the date of the hearing (November 22, 1988), it closed at $41 5/8 per share; and on the day prior to this opinion being issued (December 19, 1988), the court takes judicial notice of the fact that it

closed at 45. There was no evidence introduced on the price of the stock on the date the motion for relief from stay was filed, November 3, 1988. In general, however, the evidence shows that between the date of filing and the current date, the stock has tended to hover between $41 and $45 per share.

There are over 107 million shares of A.M.P., Inc. stock outstanding, the pledged stock involved in this motion representing 5/10 ths of 1% of the same, and approximately 1/6 th of the average daily trading volume. There is no evidence that the Bank would sell its shares as a block (indeed, it probably would not); no evidence that even if it did the sale would have any effect on the market price for the shares; and, no showing of any "overhang factor" (that is, proof that the market is reacting or has reacted to the possibility of a block sale of stock as a result of these proceedings).

Prior to the market's crash in October of 1987, A.M.P., Inc. was trading at an all-time high in the low 70's. It plummeted to the low 30's during the crash. Postcrash, in 1988, its high has been at 54 and its low around 40. A.M.P., Inc. has tended to remain in the low 40's in recent months. Excluding 1987, when all market indicators were at an all-time high, A.M.P., Inc.'s all-time high was 54.

A.M.P., Inc. is the world's largest manufacturer of electrical and electronic connectors and terminals. There is strong evidence that A.M.P., Inc. is an extremely well-managed company and essentially very sound. In the words of debtor's expert, there are very few companies as well managed as this one. The company is a leader in its industry and recognized around the world for product excellence. With the exception of 1985, sales and earnings per share have risen steadily from $1.25 in 1981 to $2.31 in 1987, with estimated earnings per share in 1988 of $3.30.[FN4] A.M.P., Inc. is selling at a price to earnings ratio of 14; the market is selling in general at 12. Based on historic trends, debtor's expert projected that the price of A.M.P., Inc.'s stock would likely rise to $54 in the near future and could rise to $76 per share within a short period of time thereafter. The basis for this opinion was, in large part, the significant increased earnings by the company in 1987 and projected earnings in 1988.

*3 The Bank introduced expert testimony to show, however, that the market price is already re-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1988 WL 141523 (Bkrtcy.D.Minn.)
**(Cite as: 1988 WL 141523 (Bkrtcy.D.Minn.))**

flecting the strength of the company and that the stock is essentially fairly priced at its current market level in the low to mid–40's. It also urged, through its expert, that the stock price has tended to fluctuate and be substantially affected by downswings in the value of the dollar in foreign markets, which is currently at a low. Debtor has no control over any possible market fluctuations. There is evidence that A.M.P., Inc. tends to be more volatile than the market in general.

At a price of $45 per share, the Bank is underse-cured by approximately $500,000.00. The debtor, it is conceded, has no equity in the property. In order for the stock to provide a return over and above the deb-tor's obligations to the Bank, A.M.P., Inc. would have to rise nine points from its current price to around $54 per share, its pre–1987 all-time high.

Recognizing the apparent need to do so, debtor has made an offer of adequate protection. Debtor has offered to assign his residual interest as a sole share-holder in France Place Apartments, Inc. ("France Place") in a settlement agreement made between France Place, the construction lender ("Security") on the apartment complex being built by it, and Whitney family trusts. The apartment project is in the midst of construction and because of financial difficulties, Security has agreed to take a deed in lieu of foreclo-sure and to complete the project. Representatives of the family trusts have also agreed to satisfy their second mortgage on the property. All three parties have agreed that if and when the project is completed and sold, they will share on a formula basis in the net proceeds of sales, after payment of agreed amounts of indebtedness to each and payments of construction costs and other numerous debts. Security maintains complete control of the property, as well as discretion as to its completion and sales price. Debtor introduced expert testimony which valued debtor's interest in the agreement at approximately $300,000.00. The value of the residual interests of France Place in the agree-ment depends wholly on the price at which the project is sold upon completion. According to the agreement, the first $8,700,000.00 in sales price, or thereabouts, will go to Security and another lender; after that France Place is entitled to be paid $355,000.00. Deb-tor's expert valued the project at between $9.3 million and $10.6 million.

The apartment project is, however, behind sche-dule; it should have been completed by December

1987, and there is no estimate of how long it might take to complete. Debtor's expert's estimate of value was based on a project fully completed and leased. There is evidence, however, that before France Place receives any funds from this venture, approximately $9,000,000.00 would be disbursed to Security and other lenders. Also, France Place is indebted to the Bank already to reimburse the Bank for the letter of credit in the amount of $410,000.00 referred to above. Although any payment by France Place would reduce the Bank's claim against debtor, the Bank does already have a claim against this property to some extent.

*DISCUSSION*

*4 The Bank argues that it is entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (2). Those sections provide:

(d) On request of a party in interest and after no-tice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or condi-tioning such stay—

(1) for cause, including the lack of adequate pro-tection of an interest in property of such party in in-terest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

*Id.*

The interest in property that is protected is the value of the collateral. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates,* 108 S.Ct. 626, 629–30 (1988). That interest is not adequately protected if the security is depreciating during the term of the stay. *In re Johnson,* 90 B.R. 973, 978 (Bkrt-cy.D.Minn.1988). Furthermore, the secured party is entitled to protection against a further decline in value following the date it made its motion. *See Id.* at 978.

*A. Section 362(d)(1)*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1988 WL 141523 (Bkrtcy.D.Minn.)
(Cite as: 1988 WL 141523 (Bkrtcy.D.Minn.))

Initially this court must consider whether the A.M.P., Inc. stock is of such a volatile nature to constitute cause for relief from stay under § 362(d)(1). Based upon all the evidence presented, there is no reason to conclude cause exists for relief from stay when the evidence establishes that A.M.P., Inc. stock is likely to be a steady performer in the near future. The stock has not dropped in price any appreciable degree since the Bank's motion was filed; rather, it has tended to hover between $41 and $45 per share. A.M.P., Inc. was trading at $41 per share when the Bank filed its motion for relief from stay. Based on the evidence, there is minimal risk that the stock will go down in value. Rather, it is the more likely scenario the stock will increase in value, although probably not nearly as much as debtor's numbers would suggest. Because the market indicators do not suggest any reason for precipitous or volatile decline off the $41 per share at which the stock was trading when the petition was filed, and because the stock has not dropped below that trading price but rather has been increasing slightly, I have concluded the value of the Bank's collateral is not declining. Therefore, in this respect, there is no "cause" for relief from stay.

The Bank also argues under § 362(d)(1) that its lack of adequate protection is cause for relief from stay. Debtor argues, based upon testimony by its expert, that because the intrinsic value of A.M.P., Inc. is likely to increase, the Bank is provided with its bargained for collateral interest. This is mere speculation on the part of the debtor and in no way constitutes adequate protection of the Bank's interest. The parties agree that there is no equity cushion which could provide adequate protection, *see Johnson,* 90 B.R. at 979–80, and this court will not speculate on further market forces in order to conclude there may be adequate protection in the future.

*5 In the alternative, debtor has made an offer of adequate protection of the Bank's interest in debtor's residual interest as a sole shareholder of France Place Apartments, Inc., as part of a settlement agreement between that entity, Security Pacific Mortgage, and Real Estate Services, Inc. This court concludes, however, that an offer of illiquid and highly speculative value in an incomplete construction project does not rise to the level of adequate protection contemplated by 11 U.S.C. § 361.

Section 361 of the Bankruptcy Code provides

three alternative means for providing adequate protection. That section specifically provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. The Eighth Circuit has established a three prong test for adequate protection, and stated in that context:

In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*In re Martin,* 761 F.2d 472, 476–77 (8th Cir.1985). With respect to the three prong *Martin* test, the value of the Bank's interest and the attendant market risks have already been established by this court in its previous discussion. Debtor's offer of adequate protection fails under the third prong be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause an offer of an illiquid and highly speculative value in an incomplete construction project does not rise to the level of indubitable equivalence of the Bank's security interest in the collateral as contemplated by the Code and caselaw. *See Martin*, 761 F.2d at 476–77. The concept of indubitable equivalence requires such relief as will result in realization of value. *Id.* at 476. Debtor's offer of adequate protection simply does not result in the Bank realizing the value of its bargained-for rights.

### B. *Section 362(d)(2)*

*6 The more difficult issue presented is whether the A.M.P., Inc. stock, subject to the Bank's security interest, is necessary to the debtor's reorganization. Both parties concede the debtor has no equity in the A.M.P., Inc. stock, therefore the equity cushion analysis this court previously addressed in *In re Johnson*, 90 B.R. 973 (Bkrtcy.D.Minn.1988) is not dispositive of the issue.

According to the necessity test, "property is necessary to an effective reorganization whenever it is necessary, either in the operation of the business or in a plan, to further the interests of the estate through rehabilitation or liquidation." *In re Rassier*, 85 B.R. 524, 528 (Bkrtcy.D.Minn.1988). A number of decisions which have applied the necessity test in a favorable manner for the debtor have done so in single asset cases, or where the debtor needed to use equipment or inventory to carry on its business. *See Johnson*, 90 B.R. at 981; *Rassier*, 85 B.R. at 530. *See also In re Sunstone Ridge Assoc.*, 51 B.R. 560, 563 (D.Utah 1985); *In re Deeter*, 53 B.R. 623, 625 (Bkrtcy.N.D.Ind.1985).

Because the debtor has no equity in the stock, this court finds it difficult to see how, in this type of a reorganization, the stock could be necessary to debtor's reorganization at all. Based on expert testimony, this court also has difficulty finding that the value of the stock, even viewing it on a long-term rather than a short-term basis, will increase to approximately $54 per share during the period of this reorganization or that the stock will ever produce any equity for the unsecured creditors. At this point in time of the reorganization even if the stock is liquidated by the debtor, it would provide no benefit to the debtor or unsecured creditors in furtherance of the reorganization. Furthermore, the stock is an investment asset, and not an asset used in a trade or business of the debtor, and in

the context of this case is not necessary to debtor's reorganization. Therefore, the Bank is entitled to relief under § 362(d)(2).

THEREFORE, IT IS HEREBY ORDERED:

1. The automatic stay is terminated to the extent necessary to allow the Bank to take such action as necessary to foreclose upon and liquidate A.M.P., Inc. stock pledged by debtor to the Bank, subject to the terms of the Pledge Agreement and applicable law.

2. The Bank may take such action as is necessary to notify and advise A.M.P., Inc., or its agents, to pay all future dividends payable on the collateral pledged to the Bank, such dividends being cash collateral of the Bank.

3. The Bank's actions in selling 10,000 shares of A.M.P., Inc. stock on September 29, 1988, such sale occurring without knowledge that the debtor had filed its chapter 11 petition, and its cure thereof by repurchase are hereby approved retroactively.

FN1. There is a dispute between the parties over whether debtor pledged only 50,000 shares. The court finds that the pledged stock consists, in fact, of the 59,915 shares noted in this opinion.

FN2. There is a dispute between the parties as to whether the $60,000.00 ought to be included in the indebtedness owed, since the letter of credit has not yet been called. For purposes of this decision, the differential is insignificant.

FN3. The Bank sold the stock at $41.00 per share and repurchased at 40 7/8 , thus realizing a very small profit.

FN4. Based on recent decline in the value of the dollar, the estimates of earnings per share have been revised slightly downward, but this does not seem to have affected the stock price in any significant way.

Bkrtcy.D.Minn.,1988.
In re Whitney
Not Reported in B.R., 1988 WL 141523 (Bkrt-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 1988 WL 141523 (Bkrtcy.D.Minn.)
**(Cite as: 1988 WL 141523 (Bkrtcy.D.Minn.))**

cy.D.Minn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                    BKY Case No.:  11-43816

Steven Bruce Hoyt,                                                    Chapter 11

       Debtor.

## UNSWORN CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2011, I caused the following documents:

> ***Notice of Hearing and Motion for Relief from Automatic Stay, Memorandum in Support of Motion by Commerce Bank for Relief from Stay and Order (proposed)***

to be filed electronically with the Clerk of Court through ECF, and that the above documents will be delivered by automatic e-mail notification pursuant to ECF and this constitutes service or notice pursuant to Local Rule 9006-1(a).

I further certify that I caused a copy of the foregoing documents to be mailed by first-class mail, postage paid, to the following:

STEVEN BRUCE HOYT
1550 KENWOOD PARKWAY
MINNEAPOLIS, MN 55405


                                     /e/  Stephanie Wood

Dated:  June 16, 2011                    _____
                                    Stephanie Wood
                                    100 South Fifth Street, Suite 2500
                                    Minneapolis, MN  55402
                                    (612) 332-1030

440254

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                    BKY Case No.:  11-43816

Steven Bruce Hoyt,                                    Chapter 11

        Debtor.

## ORDER

The above entitled matter came before the court upon the Motion of Commerce Bank, pursuant to 11 U.S.C. §362.

Based on the motion, the file and the court being fully advised in the premises,

IT IS ORDERED:

1.      Commerce Bank's motion for relief from the automatic stay is granted.

2.      The automatic stay is hereby modified so as to allow Commerce Bank to exercise all its rights relating to, and to foreclose its interest in, the 288,295.436 IRET Units, and the dividends generated therefrom, in which Commerce Bank holds a security interest, to convert such IRET Units into tradable securities, and to sell the IRET Units and/or such tradable securities, and to apply the proceeds of sale to the Debtor's obligations owed to Commerce Bank.

3.      Notwithstanding Federal Rules of Bankruptcy Procedure 4001(a)(3), this Order is effective immediately.

Dated: _____                    _____

                                             Gregory F. Kishel
                                           Chief Judge of the U.S. Bankruptcy Court

439837