In re:

STEVEN BRUCE HOYT,

Debtor.

Case No. 11-43816
Chapter 11

# DEBTOR'S RESPONSE TO COMMERCE BANK'S MOTION FOR RELIEF FROM AUTOMATIC STAY

**A. Summary of the Debtor's Position.**

Commerce Bank holds a claim against the Debtor of approximately $13.4 million secured by a variety of collateral: preferred membership interests in WCSE Industrial LLC (the property purchased with the loan proceeds), the Debtor's 50% interest in NT Spartanburg LLC, and approximately 288,000 units in IRET, a publicly traded real estate investment trust. The bank seeks modification of the automatic stay to allow the foreclosure sale of the IRET units on the grounds that (1) cause has been shown to lift the stay and (2) that the Debtor has no equity in the IRET units and they are not necessary for the Debtor's successful reorganization.

The Debtor objects to the lifting of the stay in that the bank is wrong in each of its contentions. Cause has not been shown by the bank. The Debtor's offer of adequate protection, outlined below, combined with the substantial equity cushion in the collateral taken as a whole, is sufficient to overcome the bank's assertion that there is cause to lift the stay.

More importantly, the Debtor has equity in the property and it is necessary for a successful reorganization. The IRET units have always been secondary collateral for the bank's loan, the primary collateral being the very substantial preferred membership interests in WCSE

Industrial LLC. While those membership interests are the heart of the Debtor's estate, the IRET units and their dividends provide liquidity to the Debtor's operations, including some ability to pay interest. Moreover, sale of the IRET units would cause substantial adverse tax consequences to the Debtor at a very early stage in the case.

In sum, granting the bank's motion would jeopardize the Debtor's ability to propose a plan for the benefit of all creditors. The Debtor believes that market for commercial real estate, which makes up virtually the entire estate, is rebounding and will provide the cash, whether by sale of properties or from rental income, to pay the Debtor's obligations. That will not happen in a liquidation, which is what may be prompted if the bank's motion is granted. The Debtor should be accorded the opportunity to propose and confirm a plan.

**B. Background.**

1. The Debtor's business.

Debtor is an industrial/warehouse developer who has been in business for thirty (30) years, operating Hoyt Properties Inc. ("HPI"). HPI has enjoyed success developing and repositioning properties in the Twin Cities area, including over 4 million square feet of new construction and 4 million square feet of exiting property purchased for repositioning.

HPI has built a platform to operate this business, including property management and leasing. These critical functions are performed in-house. Other commercial real estate functions (financing, construction, investment sales and brokerage) are typically outsourced. The company's business strategy has been to create value through effective leasing and management.

During the early development of the company, its principals included Debtor's brother (Brad) and father (Bruce). Twenty (20) years ago, Brad formed his own company and Bruce Hoyt retired. At that point, Debtor embarked on his current business strategy. In the 1990's,

Debtor emerged from a severe business downturn similar to that being experienced today. He accessed the public markets, joining with two (2) other developers to form First Industrial Realty Trust (NYSE-FR). Later, Debtor established a relationship with Investors Real Estate Trust (NASDAQ-IRET), selling over $125 million in properties to IRET and joining its Board of Trustees. That relationship continued until 2007. IRET has grown from assets of $350 million at the time of Mr. Hoyt's initial involvement, to $1.9 billion today.

Debtor's business continues to be focused on multi-tenant industrial properties. HPI and its staff have a unique understanding of small-to-medium sized businesses, and specialize in high-touch property management. Non-industrial investments have been made by Debtor in partnership with other local investors. Debtor has typically assumed a minority, passive role in such investments, which include retail and land development.

Debtor has been adversely affected by the deterioration in the capital markets since 2007. Although the business fundamentals of HPI's customers have remained mostly stable, Debtor's banks have suffered enormously from their lending decisions and subsequent regulatory issues. These banks loaned money to risky businesses such as residential condominiums, golf courses and speculative land development. The failure of those borrowers has forced severe retrenchment by most community banks, as they have come under the scrutiny of bank regulators. Solid loans are typically offered short term extensions, if any, as banks try to downsize their assets (loans) in response to regulatory pressure. Commerce Bank, the moving party, and its participants, American Bank (St. Paul) and First Commercial Bank, fall into this category of banks.

    2.    The loan from Commerce.

Debtor organized a private equity fund in 2007 to acquire twenty seven (27) industrial multi-tenant buildings located in the Twin Cities. The purchase price was $63,000,000. Mortgage debt of $48,000,000 was supplemented by $17,500,000 of equity and preferred equity. The extra $2,500,000 was utilized to fund required lender reserves and cover closing costs.

Debtor made a significant personal investment in this Fund. The strategy was to improve the quality and quantity of the rent roll, refinance and/or sell the properties at a profit. Within eight (8) months, the Fund had apparently executed its strategy. It had purchase agreements for many of the properties, and a loan commitment from Associated Bank to fund the refinancing gap. Unfortunately, Associated Bank suffered financial losses in other markets and reneged on its loan commitment. The Fund was forced to refinance with another lender. The prospective buyers of the properties were unable to close.

Wrightwood Capital, an investment fund from Chicago, had originally invested $12,500,000 in preferred equity toward the purchase of these properties (the other $5,000,000 was provided by Debtor and other investors). The Wrightwood facility was intended to be short term so that the Fund could execute its strategy and refinance. The terms of the Wrightwood facility were onerous. Faced with the failure of the Associated Bank loan, Debtor initiated discussions with Commerce Bank to refinance the Wrightwood $12,500,000 facility.

Eventually, Commerce Bank (represented by its President Gerald Anderson) agreed to provide this loan. The initial two (2) year term was intended to get the Fund to the point where it could sell properties after the capital markets disruption subsided. The loan was shared by Commerce Bank with American Bank and First Commercial Bank, presumably pursuant to a participation agreement.

The primary collateral for the loan was and is the Debtor's preferred membership interests in WCSE Industrial LLC. Through this entity, Debtor controls virtually all of the equity in the twenty-seven (27) properties. Even though the value of these interests exceeded, and still exceed, the amount of the loan, Commerce Bank requested a security interest in the IRET Units as additional collateral. At all times, this collateral was intended to supplement the Bank's security but was not intended as the source for repayment of the loan. That source has always been the sale or refinancing of the pooled properties.

The passage of time did not produce the expected normalization of the capital markets. In fact, things got worse. As a result, the loan from Commerce Bank matured on February 3, 2011 and was not paid. The consortium of banks, however, provided short term extensions of the loan to Debtor as all parties hoped for relief in the markets. One such extension was made after Debtor agreed to provide additional collateral (see "Collateral Dispute" below). Negotiations for an additional extension of the loan to enable the sale of the primary collateral have not been successful, as the banks indicate they "cannot" or "will not" grant more than a one (1) year extension with large additional collateral requirements. In February of 2011, Commerce Bank initiated foreclosure of the IRET Units, the "additional collateral" held by the bank. Debtor filed the petition commencing this case to protect the collateral and enable a plan of reorganization to provide repayment of the Commerce Bank loan and the Debtor's other obligations.

3. The Collateral Dispute.

On January 25, 2010 the Debtor agreed to the banks' demand for additional collateral. The additional collateral consisted of Debtor's 50% interest in NT Spartanburg, LLC and 18,204.04 Operating Partnership Units in IRET (the "Additional Units"). Debtor had indicated

to Mr. Gerald Anderson and counsel for the banks that he was unwilling to provide the Additional Units because he might need them for personal liquidity. Mr. Anderson indicated the bank was only interested in the pledge of these Units to be assured that Mr. Hoyt would not pledge them to another creditor bank. The Bank's counsel drafted the language in the First Loan Modification Agreement, a copy of which is attached as **<u>Debtor's Exhibit A</u>**, protecting the Debtor and providing for mandatory release of the pledge upon request. Section III A 6 provides:

> "Lender agrees to release from time to time upon the request of Borrower some or all of the Additional IRET Partnership Units from the Pledge Agreement-Additional IRET Partnership Units for the contemporaneous sale thereof by Borrower; <u>provided that</u> the proceeds of such sale shall be directly deposited into Borrower's Checking Account. Borrower shall issue such directives as may be required by Lender in form and content acceptable to Lender to assure that the proceeds from such sales are remitted to Lender for direct deposit into Borrower's Checking Account."

On August 17, 2010, Debtor requested release, in writing, of the Additional Units. See attached **<u>Debtor's Exhibit B</u>**. The Bank declined to respond. Shortly thereafter, Mr. Anderson left the employ of Commerce Bank. Debtor verbally requested release of the Units to Mr. Anderson's successor, Mr. Jim Senske who also declined.

It is the Debtor's position that the Bank breached the Loan Modification Agreement by refusing the release the collateral in question and that the Debtor is entitled to release of the Additional Units for his cash needs.

**C. Cause to lift the stay has not been shown.**

The Bank argues that cause to lift the stay is shown by its statements that the value of the IRET Units is volatile and that it will have to wait years to be paid from its primary collateral, the Debtor's preferred shares in Pools A-D. Neither contention is true. In fact, limitations on the sale of the IRET Units substantially limits the value of the relief sought by the bank. The

Debtor's offer of adequate protection (below) provides stability to the bank's position and should remove any suggestion that the stay should be lifted.

1.      Value of the IRET Units is stable and the dividends are reliable.

Real Estate Investment Trusts ("REITs") are entities defined under the Internal Revenue Code. They may be private, but are primarily publicly held. The primary feature of a REIT is that it must distribute 95% of its taxable income to its shareholders. If it does, it avoids double taxation of the dividends and retains REIT status.

Because the distribution of income (as dividends) is mandated, the value of REIT shares is primarily a function of the quality and amount of the dividend. Quality is determined by length of time the dividend has been paid, and prospects for continued distributions. In the specific case of IRET, the dividend has been paid – maintained or increasing every quarter – for 160 straight quarters over 40 years. It is regarded as the longest tenure of continuous dividends for any publicly traded REIT in the United States. The nature of IRET's assets – medical, office, industrial and office – offer a diverse portfolio of product types and geographic distribution. Additional information on IRET is attached as **Debtor's Exhibit C**.

The stock prices of REITs in general, or specific REITs, are not directly correlated to the "stock market". Rather, they tend to fluctuate in a narrow range similar to government regulated utilities. They are viewed by investment analysts as income vehicles, and fluctuation occurs primarily with investors' perception of alternative return possibilities in other markets.

IRET's stock price has traded in a narrow range, reflecting its stable dividend. Over the last 5 years, the stock's price has declined from $9.03/share on June 30, 2006 to $8.66/share on June 30, 2011. During that time its highest price was $11.59/share on October 5, 2007 and its lowest price was $7.95 on November 21, 2008, during the stock market melt-down. On

March 7, 2008, at about the time the Commerce Bank loan was made, the price was $9.20/share. In addition, over the past 5 years, the quarterly dividend on the IRET Units, which has been paid without fail every quarter, has increased from $.165/unit to $.172/unit. Information on IRET stock prices as of June 30, 2011 is attached as **Debtor's Exhibit D**.

2. Limitations on conversion of the Units and sale of the stock.

People acquire "Units" in Investor Real Estate Trust in two (2) different ways. Many individuals have effectuated so-called "1031 exchanges" by executing an agreement with IRET, wherein the investor supplies cash in return for Units. Debtor's Units were acquired as a result of sale of specific real properties (technically this is called a "contribution") to IRET. The Debtor's tax basis in the real properties became his tax basis of the newly issued Units. There is no tax recognition resulting from the transaction. Rather, recognition of the taxable gain is deferred to the date on which the units are converted to tradable shares.

In order to sell the Units they must be exchanged for common shares of IRET. This "conversion" is a taxable event under the Internal Revenue Code, regardless of when the shares are actually sold. (See Section E.2. below).

Conversion is limited by agreement between IRET and the Unit holder. Limitations are imposed for various reasons, including (1) Internal Revenue Code mandated "safe harbor" provisions, (2) SEC requirements, and (3) IRET concern over "dumping" of shares on the market, depressing share prices as a result of order imbalance. Further, IRET periodically offers shares to the public in secondary offerings and in doing so does not want to compete with selling Unit holders.

The Units pledged to Commerce Bank as backup collateral are subject to such restrictions. Specifically, no more than five percent of the number of Units issued to the Debtor

can be sold in any given calendar quarter. Further, the Debtor's former wife shares conversion rights with him as a result of their 2008 divorce, pursuant to which the former spouse received an allocation of IRET units as part of the property settlement. Thus, the limitation on sale applies to them jointly. Under agreement with the Debtor's former wife, they share the right to convert and sell Units jointly, with each have the right in alternating quarters. Therefore, if the Bank were able to cause conversion of the Units for purposes of sale, it would be substantially restricted in its ability to convert the IRET share to cash.

3. Property in pools can be sold earlier than 2014.

The primary collateral for the Loan is the membership interests in WCSE Industrial LLC, through which effective control of the entire Stone Arch Fund II Industrial portfolio is governed. These properties are organized into four (4) separate pools (A, B, C and D). Individual properties within each pool cannot be carved out and individually sold because they are cross-collateralized with the respective A, B, C or D mortgage. However, a pool of property may be sold at any time. In fact, the pools' mortgages provide for sale and assumption of the underlying mortgage debt by the buyer.

The Bank asserts that there will be substantial delay before this collateral can be sold to pay down the Commerce debt. That is not true. Debtor has and is marketing the pools for sale. The success of this effort will depend on the performance of the pool, and a loosening of the investment market. Both are occurring, and there is a reasonable likelihood that one or more pools can be sold prior to May, 2014. A sale of all four (4) pools or all twenty seven (27) properties is not necessary to pay off the Commerce Bank loan.

4. Offer of adequate protection.

      i. Cash payment. The dividends paid each quarter on the IRET Units held as collateral by the bank would be paid to the bank for application to the debt. The nature of these payments, as interest for example, will be determined under the Debtor's confirmed plan.

     ii. Limitation on asserting collateral release. To the extent of any diminution in value of the bank's collateral during this case and before confirmation of the Debtor's plan, the Debtor will waive his claim that the bank has an obligation to release the Additional Units.

    iii. Equity cushion. The bank has a substantial equity cushion to protect its security interests. With the IRET Units valued at $8.65/unit, the value of its collateral exceeds the amount of the debt by at least $6 million, or 45% of the debt. This cushion combined with the cash payment and the limited waiver of claim described above is more than adequate to protect the bank's interests.

The Bankruptcy Court for the District of Minnesota has stated that "[t]he primary factor in determining the existence of adequate protection in this case is the existence of an adequate equity cushion." *In re Johnson*, 90 B.R. 973, 979 (Bankr. D. Minn. 1988). The *Johnson* court further stated that an "equity cushion is the value in the property above the amount owed to the creditor with a secured claim that will protect the creditor's secured interest from decreasing in value during the period that the automatic stay remains in effect." *Id.* citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *In re Jun End In The Berkshires, Inc.*, 46 B.R. 892, 899 (Bktcy D. Mass. 1985). See also *In re Rassier*, 85 B.R. 524, 530 (Bankr. D. Minn. 1988).

The purpose of adequate protection is to protect the creditor's secured interest. As Judge Dreher held in the *Johnson* case, "[b]y providing the creditor with a method of protection for the creditor's interest, the debtor is allowed to continue its reorganization efforts." The same rule should apply to the Debtor in this case.

**D. The Debtor has equity in the IRET Units.**

1.  Value of the primary collateral, the WCSE Preferred Units.

The primary collateral for the Commerce Bank loan is the WCSE Preferred Units. Those units have a face value of $16,458,333, including the value of the accrued dividends. That valuation is supported by the net values of the parcels of real property in the four pools after payment of the first mortgage debt--values that range from $17,443,000 at a cap rate of 9% to $24,961,000 at a cap rate of 8%. These capitalization rates are confirmed by recent sales of comparable properties in the Twin Cities market. In addition, the bank has a security interest in the Debtor's equity in NT Spartanburg LLC which is valued at $425,000. Thus, even without taking into account the value of the IRET Units, the secondary collateral securing this loan, the bank is substantially over-collateralized.

2.  Legal argument.

Without citing case law which is on point, the bank contends that the Debtor's equity in the IRET Units should be determined without reference to the value of the WCSE Preferred Units. That is not the law.

The burden of proof to show that the Debtor has no equity in the Collateral is on the party seeking relief from the stay. 11 U.S.C. § 362(g)(1); *In re Bowman*, 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000); *see also In re Tri-Growth Centre City, Ltd.*, 136 B.R. 848, 850 (Bankr. S.D. Cal. 1992).

The term "equity" under § 362(d)(2)(A) has been defined by the majority of courts as the difference between the value of all collateral and all encumbrances against it. *In re Cardell*, 88 B.R. 627, 631 (Bankr. D.N.J. 1988) citing *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir. 1984); *In re Faires*, 34 B.R. 549, 551 (Bankr. W.D. Wash. 1983). This view is still the majority view. *See, e.g., In re EnCap Golf Holding, LLC*, 2008 Bankr. LEXIS 2774 (Bankr. D.N.J. Sept. 4, 2008) ("the court agrees with *In re Cardell*, that for the purposes of determining the debtors' equity under 362(d)(2) the value of all the collateral should be considered.")

**E. The IRET Units are necessary to an effective reorganization.**

1. Source of liquidity.

The Debtor is the President of Hoyt Properties, Inc., described above as the operating entity at the heart of his operations. However, the Debtor does not take a salary from HPI. Before the commencement of this case, the Debtor's IRET units provided liquidity to fund his living and business expenses. The Debtor expects to return to that status quo after confirmation of his plan. Liquidation of the IRET Units now would substantially erode the liquidity which will be necessary to effect his plan of reorganization.

2. Tax consequences of sale.

In order to be sold, the IRET Units must first be converted to IRET Shares which are tradable on the open market subject to the limitations described above. Presumably, if the stay were modified, the Bank would convert the IRET units to make them salable. Under the Internal Revenue Code ("IRC") that conversion would result in a gain taxable to the Debtor equal to the difference between the stock price and the Debtor's tax basis in the IRET Units. IRC §§ 721, 736(b), 731(a)(1). The Debtor's aggregate tax basis in the units is negative $1,405,611.55. Thus, the taxable gain from a conversion of the 288,295.436 units held by the bank, assuming a

price of $8.75/share, would exceed $3.9 million. While the Debtor has some tax attributes which he carries forward from prior returns, such a large taxable gain would substantially reduce the Debtor's flexibility in constructing his plan of reorganization and could cause a substantial cash shortfall in the case.

  3. Sale of the pooled properties can take place in less than 3 years.

Debtor is actively marketing the pools of properties for sale. The investment market is a dichotomy between "stabilized" and "distress" properties. At one end of the spectrum, a new Walgreens store with a fresh lease is the most valuable real estate in the market. At the other end, an empty building with no prospective tenants and high required capital expenditures is the least desirable property. The twenty seven (27) properties that comprise the primary collateral are not distressed real estate. Rather, they need a nominal level of additional leasing to be considered "stabilized" and eligible for sale. Debtor has no desire or motivation to prolong the process of monetizing the portfolio. He does not need to sell all of the properties to pay off the Commerce Bank debt.

  4. Dividends not used for personal expenses.

Under the Debtor's offer of adequate protection, all dividends from the IRET Units pledged to Commerce Bank will be paid to the bank to be applied against the debt. Thus, those dividends will not be used for any personal expenses.

**F. Conclusion**

Based on the foregoing arguments, the Debtor requests that the Court deny the motion in all respects.

Dated: June 30, 2011        RAVICH MEYER KIRKMAN
                            McGRATH NAUMAN & TANSEY,
                            A PROFESSIONAL ASSOCIATION

                            By  /e/  Michael L. Meyer (72527)

                            4545 IDS Center
                            80 South Eighth Street
                            Minneapolis, MN 55402
                            (612) 332-8511

                            ATTORNEYS FOR DEBTOR

## VERIFICATION

I, Steven Bruce Hoyt, declare under penalty of perjury that the facts set forth in the foregoing Response to Commerce Bank's Motion for Relief from Automatic Stay, are true and correct according to the best of my knowledge, information and belief.

Executed on: June **30**, 2011

_____
Steven Bruce Hoyt

{00023219 2 }

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:

STEVEN BRUCE HOYT,            Case No. 11-43816
                                                 Chapter 11
           Debtor.

## UNSWORN CERTIFICATE OF SERVICE

       I, Michael L. Meyer, declare under penalty of perjury that on June 30, 2011, copies of Debtor's:

1.      Response to Commerce Bank's Motion for Relief from Automatic Stay;

were served by sending to each party a copy thereof as noted on the attached Service List.

Dated: June 30, 2011          By: /e/    Michael L. Meyer (72527)

                                         Ravich Meyer Kirkman McGrath
                                         Nauman & Tansey, P.A.
                                         4545 IDS Center
                                         80 South Eighth Street
                                         Minneapolis, MN 55402
                                         (612) 332-8511

                                         ATTORNEYS FOR DEBTOR

| | | |
|---|---|---|
| ELECTRONIC<br>SARAH J WENCIL<br>UNITED STATES TRUSTEE<br>1015 U S COURTHOUSE<br>300 SOUTH FOURTH STREET<br>MINNEAPOLIS MN 55415 | MINN DEPT OF REVENUE<br>COLLECTION ENFORCEMENT<br>551 BANKRUPTCY / P O 64447<br>ST PAUL MN 55164 | INTERNAL REVENUE SERVICE<br>ATTN SPECIAL PROCEDURES<br>WELLS FARGO PL STOP 5700<br>30 EAST SEVENTH<br>ST PAUL MN 55101 |
| IRS DISTRICT COUNSEL<br>650 GALTIER PLAZA<br>380 JACKSON STREET<br>ST PAUL MN 55101 | US ATTORNEY<br>600 U S COURHOUSE<br>300 SOUTH FOURTH STREET<br>MINNEAPOLIS MN 55415 | ELECTRONIC<br>STEVEN B HOYT<br>1550KENWOOD PARKWAY<br>MINNEAPOLIS MN 55405 |
| ELECTRONIC<br>PNC BANK NA<br>C/O BRAD BERISH<br>ADELMAN & GETTLEMAN LTD<br>53 W JACKSON BLVD STE 1050<br>CHICAGO IL 60604 | BEAL BANK<br>ATTN MICHAEL ALVAREZ<br>7195 DALLAS PARKWAY<br>PLANO TX 75024 | SECURITY BANK<br>ATTN PAULA SCHONS<br>735 11TH STREET EAST<br>GLENCOE MN 55336 |
| ELECTRONIC<br>SOUTHERN FINANCIAL GROUP LLC<br>C/O J. DAVID DICKSON<br>BEARD KULTGEN BROPHY BOSTWICK & DICKSON<br>P O BOX 21117<br>WACO TX 76702-1117 | NORTH AMERICAN BANKING COMPANY<br>ATTN STEVE KING<br>2230 ALBERT STREET<br>ROSEVILLE MN 55113 | SB 1<br>C/O MARTIN CHESTER<br>FAEGRE & BENSON<br>90 SOUTH SEVENTH STREET STE 2200<br>MINNEAPOLIS MN 55402 |
| ELECTRONIC<br>BOUNDARY WATERS BANK<br>C/O SHAWN M DUNLEVY<br>FRYBERGER BUCHANAN SMITH & FREDERICK PA<br>302 WEST SUPERIOR STREET STE 700<br>DULUTH MN 55802 | ELETRONC<br>COMMERCE BANK<br>C/O BRIAN F LEONARD / GROVER C SAYRE III<br>LEONARD O'BRIEN SPENCER GALE & SAYRE LTD<br>100 SOUTH FIFTH STREET STE 2500<br>MINNEAPOLIS MN 55402 | CROWN BANK<br>6600 FRANCE AVENUE SOUTH STE 125<br>EDINA MN 55435 |
| EQUITY BANK<br>5900 GREEN OAK DRIVE STE 100<br>MINNETONKA MN 55343 | MERCHANTS BANK<br>7300 W 147TH STREET   STE 100<br>APPLE VALLEY MN 55124 | NORTHERN TRUST<br>8525 E PINNACLE PEAK ROAD<br>SCOTTSDALE AZ 85255 |
| ELECTRONIC<br>PARK MIDWAY BANK<br>C/O NICHOLAS C JELLUM<br>ANASTASI & ASSOCIATES PA<br>14985 60TH STREET NORTH<br>STILLWATER MN 55082 | ELECTRONIC<br>JEROME J SIMONS JR<br>C/O JOSEPH W LAWVER<br>MESSERLI & KRAMER P A<br>100 SOUTH FIFTH STREET   STE 1400<br>MINNEAPOLIS MN 55402 | ELECTRONIC<br>MESSERLI & KRAMER P A<br>C/O JOSEPH W LAWVER<br>MESSERLI & KRAMER P A<br>100 SOUTH FIFTH STREET   STE 1400<br>MINNEAPOLIS MN 55402 |
| ELECTRONIC<br>MICHELLE MILNES<br>C/O A EIDSNESS / W GRAHAM<br>HENSON & EFRON PA<br>220 SOUTH SIXTH STREET STE 1800<br>MINNEAPOLIS MN 55402-4503 | ELECTRONIC<br>ROBERT J FOSTER<br>C/O JOSEPH A WENTZELL<br>WENTZELL LAW OFFICE PLLC<br>2812 ANTHONY LANE SO STE 200<br>ST ANTHONY MN 55418 | ELECTRONIC<br>JAMES WINKELS<br>C/O JOSEPH A WENTZELL<br>WENTZELL LAW OFFICE PLLC<br>2812 ANTHONY LANE SO STE 200<br>ST ANTHONY MN 55418 |