**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In Re:

STEVEN BRUCE HOYT,                                        Case No. 11-43816
                                                         Chapter 11
             Debtor.

**NOTICE OF HEARING AND VERIFIED MOTION FOR ORDER**
**DIRECTING RULE 2004 EXAMINATIONS**

To:  The Debtor, the parties identified below, and other entities specified in Local Rule 9013-3.

1.      Beal Bank Nevada ("Beal"), an interested party in the Chapter 11 Bankruptcy estate of Steven Bruce Hoyt ("Debtor"), by and through its undersigned attorneys, hereby moves the Court for the relief requested below and gives notice of hearing.

2.      The Court will hold a hearing on this motion at 9:30 a.m. on Wednesday, August 10, 2011 or as soon thereafter as counsel may be heard in Courtroom No. 8 West, U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415.

3.      Any response to this motion must be filed and served not later than August 5, 2011, which is five days before the time set for the hearing (including Saturdays, Sundays and holidays).  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005, and Local Rule 1070-1.  This is a core proceeding.  The petition commencing Debtor's Chapter 11 case was filed on May 31, 2011.

5.      This motion arises under Fed. R. Bankr. P. 2004 and Local Rules 2004-1 and 9013-4.  This motion is filed under Bankruptcy Rule 9014 and Local Rules 9013-1 *et seq.*

6.      Beal seeks entry of an order permitting it to subpoena Crown Bank and StoneArch Fund IV, LLC ("Stone Arch") pursuant to Fed. R. Bankr. P. 2004 and 9016.

## BASIS FOR RELIEF

7.      Bankruptcy Rule 2004 states, in relevant part:

> (a)    <u>Examination on Motion</u>.   On motion of any party in interest, the court may order the examination of any entity.

> (b)    <u>Scope of Examination</u>.  The examination of an entity under this rule or of the debtor under § 343 of the Code may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge.

> (c)    <u>Compelling Attendance and Production of Documentary Evidence</u>.   The attendance of an entity for examination and for the production of documents, whether the examination is to be conducted within or without the district in which the case is pending may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or trial.

8.      The Rule provides for very broad discovery that reaches, in a chapter 11 case, any matter relevant to the case or to the formulation of plan.   "The purpose of a Rule 2004 examination is "to show the condition of the estate and to enable the court to discover its extent and whereabouts and to come into possession of it that the rights of creditors may be preserved."" <u>In re Coffee Cupboard, Inc.</u>, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (citing Cameron v. United States, 231 U.S. 710, 714 (1914); <u>see also</u> <u>In re Ionosphere Clubs, Inc.</u>, 156 B.R. 414, 432 (S.D.N.Y. 1993) ("Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation.") aff'd, 17 F.3d 600 (2d Cir. 1994).   Indeed, the investigative power embodied in Rule 2004 is so broad that an examination thereunder can

"legitimately be in the nature of a fishing expedition." <u>In re Wilcher</u>, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985).

9.      As a creditor, Beal is a party in interest pursuant to Section 1109(b).  Beal is listed in Debtor's schedules as a creditor of Debtor holding unsecured claims in excess of $5,000,000.00.  Beal also has an undivided fifty percent (50%) interest in the Crown Bank loan in the original principal amount of $3,000,000.00. The participation agreement between Crown Bank and BankFirst, Beal's predecessor-in-interest, is attached as <u>Exhibit A.</u>  Beal acquired BankFirst's interest in the Crown Bank/Hoyt loan through a Loan Sale Agreement with the FDIC dated July 24, 2009.

10.     The loan made by Crown Bank to Debtor (to which Beal has an undivided interest) was made pursuant to a Term Promissory Note dated February 28, 2007.  The Promissory Note is attached hereto as <u>Exhibit B</u>.  In exchange for making this loan, Debtor pledged certain IRET membership units in a REIT pursuant to that certain Instruments Security Agreement dated February 28, 2007, which is attached hereto as <u>Exhibit C</u>.  The Units pledged are evidenced by Certificates 1628 & 1633, as identified in the Consent to Pledge of Partnership Interest whereby IRET consented to Debtor's pledge.  This Consent is attached hereto as <u>Exhibit D.</u>

11.     Debtor listed this loan by identifying three different creditors in his Amended Schedule D filed on July 7, 2011.  (Docket 38).  He lists Crown Bank as having a claim of $1,375,000.00.   He also lists "Crown Bank/Bruce Hoyt" (his father) as having a claim of $450,000.00. And he lists "Crown Bank/Stone Arch IV" as having a claim of $962,500.00.  (<u>Id</u>.)

12.     This segregation of the loan is furthered evidenced by the Operating Statement Balance Sheet filed by Debtor on July 22, 2011, showing the "Crown Bank – Beal" liability in

the amount of $1,375,000.00, (Docket 54) which corresponds to the "Crown Bank" claim in Debtor's Amended Schedule D.

13.     Since the commencement of the case, Beal has attempted to determine who holds its collateral and to otherwise exercise its rights under the participation agreement. To that end, it has sought information from Crown Bank as well as Stone Arch. From the email and other correspondence between counsel for Beal, Charles Schoenwetter, on the one hand, and Crown Bank and Stone Arch on the other hand, Crown Bank and Stone Arch have refused to provide information requested by Beal concerning its rights as a secured creditor of Debtor. Attached hereto as Exhibits E through H is a series of correspondence exchanged between Crown Bank and Beal. Attached hereto as Exhibit I is a series of correspondence between Stone Arch and Beal.

14.     In response to Beal's request for information, in an e-mail dated July 11, 2011, counsel for Crown Bank informed counsel for Beal that Crown Bank "did not retain any rights with respect to that loan." (*See* Exhibit F.) A few days later, however, Crown Bank informs Beal that **"with the permission of Steven Hoyt,** Crown Bank also confirms that it continues to hold physical possession of the certificates for two IRET Properties limited partnership units that secure loan No. 4070397." (See Exhibit G (emphasis added).) It is unclear why Crown Bank required the Debtor's permission to inform Beal of its collateral. Then, after seeking additional clarification, Crown Bank's attorney informed Beal that "I have sent you two emails providing the information that Crown Bank can provide regarding this loan. **I do not intend to respond further.**" (*See* Exhibit H (emphasis added)). Moreover, Debtor, on behalf of Stone Arch, responded to Crown Bank's requests to Stone Arch by directing Beal's counsel to direct all "requests regarding the 'Hoyt Loan File'" to Debtor's attorney, Michael Meyer.

15.    In his Amended Schedule B filed on July 22, 2011, Debtor acknowledges having a 67% interest in Stone Arch. (Docket 55.) Curiously, however, Debtor lists the current value of his interest as $0.00, despite the fact that he shows Stone Arch having a $962,500.00 claim. (*See* Docket 55 to Docket 38).

16.    In light Crown Bank's refusal to provide additional information about a loan to which Beal has an undivided interest, including, but not limited to, confirmation about who controls Beal's collateral, Beal respectfully requests that this Court allow Beal to conduct a Rule 2004 examination of Crown Bank and Stone Arch. The 2004 examination may shed light on what role Debtor has in dictating Crown Bank's actions and what role Debtor has in Stone Arch, which purportedly has a participation interest in the loan. Beal also asks that Crown Bank and Stone Arch produce the documents requested.

WHEREFORE, Beal Bank of Nevada moves the Court for an order directing the above-listed entities to appear for an examination and to produce documents in their possession or control, and such other relief as may be just and equitable.

Dated:  July 27, 2011                FABYANSKE, WESTRA, HART, &
                                     THOMPSON, P.A.


                                     By:  /s/  Jeffrey W. Jones
                                          Paul L. Ratelle (#127632)
                                          Jeffrey W. Jones (#311418)
                                          800 LaSalle Avenue, Suite 1900
                                          Minneapolis, MN 55402
                                          (612) 359-7600 (P)
                                          (612) 359-7602 (F)

                                     ATTORNEYS FOR BEAL BANK NEVADA

## <u>VERIFICATION</u>

The undersigned, Ralph S. Wheatly, Vice President of CLMG Corporation, the loan servicer for Beal Bank Nevada, declares under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

_____
Ralph S. Wheatly

## PARTICIPATION AGREEMENT

This Participation Agreement (the "Agreement") is made this 28th day of **February**, 2007 by and between Crown Bank, a Minnesota Corporation (the "Lead Bank"), and **BankFirst** (the "Participant").

**RECITALS**
Steven B. Hoyt (the "Borrower"), has executed and delivered to the Lead Bank a Note dated February 28, 2007 relating to a loan by the Lead Bank to the Borrower, and certain other related loan documents collectively referred to as the "Loan". The Lead Bank and the Participant have agreed that the Participant may participate in the Loan upon the following terms and conditions.

## AGREEMENT

ACCORDINGLY, in consideration of the mutual agreements herein made, the Lead Bank and the Participant hereby agree that:

1.   **Sale and Purchase.** The Lead Bank hereby sells and the Participant hereby purchases an undivided interest in and to the Loan and in the collateral for the Loan in an amount equal to the Participant's Participation Percentage as stated on Exhibit "A". The Participant shall share proportionately in all future payments received from the Borrower (including but not necessarily limited to principal, interest, late fees, penalties) and shall be proportionately secured by any collateral and the provisions of any loan documents between the Lead Bank and the Borrower; including any credit agreements, any financing statements, certificates, filings and other instruments, agreements and writings issued in connection therewith ("the Loan Documents"). The proceeds of any collection, liquidation, or disposition of collateral shall (after making allowance for expenses as provided in paragraph 12) be applied, first, to the payment of interest on the Loan, and next to the payment of principal on the Loan.

Upon receipt by the Lead Bank of verifiable payment on behalf of the Borrower, the Lead Bank agrees to remit the Participant's proportional share of that payment (via wire, ACH, certified funds) to the Participant by Noon Central Time the following day.

If subsequent advances are allowed under the Loan, the Participant shall be required to advance (by wire, ACH, or certified funds) its proportionate share to the Lead Bank by Noon Central Time of the day following the advance request.

2.   **Participant Rate.** The Participant shall be entitled to receive and will accept interest on its participation hereunder at the rate stated on Exhibit "A".

3.   **Fee Distribution.** All subsequent late fees and penalties shall be divided pro-rata between Lead Bank and Participants. Loan fees and commitment fees are only distributed if specifically stated on Exhibit "A".

4.   **Documentation Review.** Participant shall have the right to examine and make copies of the original Loan Documents, the records of Lead Bank evidencing the payment history of the Loan, receipt of payments from Participant for participation interests, and payments by Lead Bank to Participant on participation interests, and documents provided to Lead Bank by or on behalf of Borrower or any guarantor relating to the Loan, at any reasonable time during Lead Bank's normal business hours. Lead Bank shall provide Participant with copies of financial statements and all other records and reports submitted by Borrower and any guarantor as requested by Participant.

5.   **Representations and Warranties.** Neither the Lead Bank nor the Participant (i) shall be liable or responsible for representations or warranties made by, or for obligations binding upon or assumed by, the Borrower or anyone else; or (ii) makes any representation or warranty as to the Borrower, as to any financial statements or collateral reports submitted by or for the Borrower, as to any risk of loss with respect to this transaction or as to any matter whatsoever, except only that the Lead Bank warrants to the Participant that it has good title to the participation

1



EXHIBIT
**A**

interest acquired by the Participant hereunder; or (iii) shall have any right of recourse against any other party hereto.

PARTICIPANT REPRESENTS THAT IT IS AN INSTITUTIONAL INVESTOR. PARTICIPANT ACKNOWLEDGES THAT LEAD BANK MAKES NO WARRANTY OR REPRESENTATION AND SHALL NOT BE RESPONSIBLE FOR ANY STATEMENT, WARRANTY OR REPRESENTATION MADE IN CONNECTION WITH THE COLLATERAL OR ANY DOCUMENT IN CONNECTION WITH THE LOAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PARTICIPANT ACKNOWLEDGES THAT LEAD BANK HAS MADE NO GUARANTY OF REPAYMENT, IT BEING UNDERSTOOD PARTICIPANT SHALL LOOK ONLY TO THE BORROWER, ANY OBLIGOR AND COLLATERAL FOR REPAYMENT OF THE LOAN.

6. **Participant's Consent.** Lead Bank may not take any of the following actions without the Participant's prior written consent: (1) increase the principal amount of the Loan, (2) waive any payment of principal or interest on the Loan, (3) waive or extend either the due date of any payment owing by Borrower or the maturity of the Loan, (4) reduce the principal or interest rate applicable to the Loan.

Lead Bank may not take any of the following actions without the prior written consent of the beneficial holders of more than 50% of the principal balance of the Loan: (1) release or substitute a material portion of Collateral, (2) release any guarantee or guarantor, liability of any party under the Loan, or the claims of Lead Bank or Participant under the Loan, which release would have a material effect on the repayment or collectability of the Loan, (3) amend, modify, or agree to amend or modify the Loan Documents.

Notwithstanding anything in this Agreement or the Loan Documents to the contrary, Lead Bank may, without Participant's consent (1) perform all ministerial actions to be performed by Lead Bank under the Loan Documents and (2) exercise any of the rights, modifications, or waivers described in the preceding sentence so long as (a) the exercise thereof is not material to the Loan, Borrower's performance under the Loan, or Lead Bank's and Participant's rights under the Loan and (b) Lead Bank has provided Participant with notification of any such exercise.

Neither the Lead Bank nor any of its directors, officers, employees, or agents shall be liable for any action taken or omitted by the Lead Bank or any of them except in the case of willful misconduct for actual proximate damage (but not for general or exemplary damages).

7. **Event of Termination.** The term "Event of Termination" means the earliest of the following events: (i) occurrence of an event of default under any Loan Document; (ii) demand for payment for the Loan; (iii) commencement of any foreclosure of any collateral securing the Loan.

The Lead Bank will not, whether before or after an Event of Termination, take any action which does not affect it and each of its participants in like fashion, in a manner commensurate with the proportionate shares of each.

After an Event of Termination, the Participant shall have the right (i) to request, that any payments, collections and proceeds of collateral be applied to the payment of indebtedness secured thereby (if such payments, collections and proceeds are so applied, then, subject to final payment thereof, the Lead Bank shall promptly remit to the Participant the amount of the Participant's proportionate share thereof or apply such amount in payment of any amounts which may be due to the Lead Bank from the Participant); (ii) if it holds, alone or together with other participants, more than 50% of the Loan, to direct (acting alone or with such other participants) that the Lead Bank declare a default under any credit agreement or any of the other Loan Documents, exercise collection rights with respect to any collateral and foreclose against or accept a transfer in lieu of foreclosure of such collateral; and (iii) prospectively revoke by written notice to the Lead Bank, the powers and authorities granted to the Lead Bank in paragraph 6, but only with respect to and to the extent of the Participant's participation hereunder. Notwithstanding such revocation, the Lead Bank shall thereafter have the power, authority and privilege (but not the duty) to complete any act which the Lead Bank had initiated or become committed for, at or prior to the time of receipt of such notice, or any act which in its opinion might if omitted or abandoned expose the Lead Bank to any risk of legal liability. Such revocation shall not affect or impair the Lead

Bank's right to act in its own interest or in the interest of any of its other participants in the Loan. The Lead Bank may decline to take any action directed by the participants under this paragraph if the Lead Bank reasonably believes that such action will expose the Lead Bank to liability.

All payments received by the Lead Bank after the occurrence of any Event of Termination (whether such payments are from the Borrower or out of any collateral or from any other person or out of any other property) may be applied first to pay or reimburse the Lead Bank and Participant, as applicable, for any and all costs, expenses, losses, damages and liabilities (including, without limitation, all reasonable attorney's fees and foreclosure and collection expenses) at any time incurred by or imposed upon the Lead Bank with respect to any Loan Document or in connection with or as a result of any action taken or omitted by the Lead Bank under paragraph 6. If such payments are not sufficient to pay or reimburse the Lead Bank, the Participant will pay the Lead Bank the amount of the Participant's proportionate share of the deficiency.

8.  **Participant's Sale Restrictions.**  The Participant may transfer its interest in the Loan only with the prior written consent of Lead Bank, which consent shall not unreasonably be withheld.  Any such purported transfer in violation of this covenant is void.   Participant acknowledges that it has purchased and will purchase its participation interest for its own account and not with a view toward resale or redistribution.  Each transferee shall be subject to the provisions of this Agreement and to any request made, waiver or consent given or other action taken hereunder by its transferor prior to the receipt by the Participant of the written consent of Lead Bank.

9.  **Lead Bank Default.**  Each of the following shall constitute an event of default by the Lead Bank:

a.      Lead Bank shall breach the terms of this Agreement and shall fail to cure such default within sixty (60) days after written notice from majority (more than 50% pro-rata) of the holders of participation interests in the Loan to Lead Bank;

b.      Lead Bank shall make an assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts as they become due, or shall file a petition in voluntary bankruptcy or for an arrangement or reorganization pursuant to the Federal Bankruptcy Code or any similar law, state or federal now or hereafter existing ("Bankruptcy Proceeding"), or shall become "insolvent" as that term is defined in the Federal Bankruptcy Code, or shall file an answer admitting insolvency or inability to pay or shall fail to obtain a vacation or stay of any involuntary Bankruptcy Proceeding within ninety (90) days after the institution of the same, or shall be adjudicated a bankrupt or declared insolvent in any Bankruptcy Proceeding, or shall have a custodian, trustee or receiver appointed for or have any court take jurisdiction of its property, or any part thereof, in any voluntary proceeding for the purpose of reorganization, arrangement, dissolution or liquidation, and such custodian, trustee or receiver shall not be discharged or such jurisdiction not be relinquished, vacated or stayed within ninety (90) days;

c.      Lead Bank shall be dissolved, wound up, fail to maintain its existence or shall be assigned, merged into, or consolidated with another entity other than: (i) pursuant to a plan of consolidation or merger into, with or as part of Lead Bank or Lead Bank's affiliates; or (ii) any entity currently owning Lead Bank or an affiliate thereof;

d.      Any material representation or warranty by Lead Bank hereunder shall be false or misstated; or

e.      Lead Bank is placed under regulatory supervision.

10.  **Effect of Lead Bank's Default.**   If any event of default by Lead Bank shall occur, then upon the written demand of a majority (more than 50% pro-rata) of the holders of participation interests in the Loan , Lead Bank shall turn over to and shall assign, endorse and transfer the Loan documents and Collateral to an "entity" named by such participants without recourse and Lead Bank shall thereafter be relieved of its obligations hereunder but shall be liable for its obligations arising hereunder prior to such date. If Lead Bank retains an interest in the Loan, Lead Bank shall become solely a participant with the rights of a participant and with no right or obligation to administer the Loan. Following such assignment, Lead Bank shall deliver to the "entity" assuming the obligations

3

**d. Severability of Invalid Provisions.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**e. Interpretation of Agreement.** The paragraph headings in this Agreement are inserted for convenience only and shall not be considered part of the Agreement nor be used in its interpretation. All references in this Agreement to the singular shall be deemed to include the plural when the context so requires, and vice versa. References in the collective or conjunctive shall also include the disjunctive unless the context otherwise clearly requires a different interpretation.

**f. Counterparts.** This Agreement may be executed in one or more counterpart originals, all of which shall constitute one and the same instrument.

17. **Binding Agreement.** This Agreement shall be governed by the substantive laws of the State of Minnesota, and shall be binding upon and inure to the benefit of the parties and their respective participants, successors and assigns. Neither Borrower nor any other person, except the parties and their successors and assigns, shall be entitled to rely on, have the benefit of, or enforce any provision of this Agreement. The Participant hereby irrevocably submits to the jurisdiction of the Minnesota District Court, Fourth District, and the Federal District Court, District of Minnesota, over any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court.

In Witness Whereof, the parties have executed this Agreement as of the first day written above.

Lead Bank:                                      Participant:

Crown Bank                                      Bank First

By _____                    By _____

Its _____                    Its _____

5

## Exhibit "A"

1.) Borrower Name:                          Steven B. Hoyt

2.) Commitment Amount of Loan:              $3,000,000.00

3.) Participant's Participation %:          50.00%

4.) Maximum Principal Amount of             $1,500,000.00
Participation:

5.) Participation Rate:                     Variable Rate – Wall Street Journal Prime Rate as indicated in
                                            Note

6.) Monthly Servicing Fee:                  The above rate to the participant will be less a monthly
                                            servicing of .25% to Crown Bank which results in an initial
                                            rate of 9.00%

7.) Participant's Contact Information       BankFirst
for Notices and Correspondence:             225 South 6th Street Suite 2900
                                            Minneapolis, MN  55402

## TERM PROMISSORY NOTE

$3,000,000.00

Due February 29, 2008
Edina, Minnesota

Dated as of February 28, 2007

The undersigned, for value received, promises to pay to the order of Crown Bank (the "Bank"), at its main office in Edina, Minnesota in lawful money of the United States of America, the principal sum of $3,000,000.00, together with interest (computed on the basis of actual days elapsed in a 360 - day year) thereon from the date hereof until fully paid at an annual rate equal to 1.0% above the rate of interest from time to time reported by the *Wall Street Journal* (or other national reporting agency as selected by the Bank in its discretion) as its United States Prime Rate, but in no event shall the interest rate under this Note be less than 7.0%. Each change in the interest rate hereon shall become effective on the day the corresponding change in such Prime Rate.

Accrued interest on this Note shall be paid monthly on the last day of each month beginning on March 31, 2007. All principal and accrued interest shall be due and payable in full on February 29, 2008. The undersigned may pre-pay all or portion of this Note at any time without premium or penalty.

This Note is secured by an Instruments Security Agreement (the "Pledge") dated as of the date hereof executed by the undersigned.

Each of the following events shall constitute an Event of Default under this Note:

1.  If the undersigned shall fail to perform any of his obligations under this Note or shall fail to perform any of his obligations under the Pledge;

2.  If any other indebtedness of the undersigned to the Bank is not paid when due, or, if such indebtedness is subject to a cure period, by the end of the cure period;

3.  If a garnishment summons or a writ of attachment is issued against or served upon the Bank for the attachment of any property of the undersigned in the Bank's possession or any indebtedness owing to the undersigned;

4.  If the undersigned shall submit to the Bank any credit application or financial statement containing information which shall prove to be incorrect in any respect when made;

5.  If the undersigned shall fail to pay when due any indebtedness for borrowed money, or, if such indebtedness is subject to a cure period, by the end of the cure period;



6.  If a petition is filed by or against the undersigned under the United States Bankruptcy Code, or if a trustee, receiver or similar officer is appointed for the undersigned or for the property of the undersigned;

7.  If the undersigned shall fail to provide annual financial statements and tax return copies to the Bank;

8.  If the fair market value of the collateral subject to the Pledge at any time shall be less than the then outstanding principal balance of this Note;

9.  If the holder shall at any time in good faith believe that the prospect of due and punctual payment of this Note is impaired.

Upon any Event of Default, the Bank may, at its option, declare this Note to be immediately payable, together with all unpaid interest accrued hereon, without notice or demand and may exercise any other right available to the Bank. If this Note is not paid when due, either on the due date or upon acceleration, the Bank shall have the right to set off the indebtedness evidenced by this Note against any indebtedness of the Bank to the undersigned.

The Bank may at any time renew this Note or extend its maturity date for any period and release any security for, or any party to, this Note, all without notice to or consent of and without releasing any accommodation maker, endorser or guarantor. The undersigned agrees to pay all costs incurred by the Bank in the preparation of this Note and to pay all costs of collection, including attorneys' fees and legal expenses, in the event this Note is not paid when due whether suit is commenced or not, including costs and expenses in litigation, bankruptcy or insolvency proceedings. Presentment or other demand for payment, notice of dishonor and protest are hereby waived by the undersigned. This Note shall be governed by the substantive laws of the State of Minnesota. The undersigned hereby irrevocably submits to the jurisdiction of the Minnesota District Court, Fourth District, and the Federal District Court, District of Minnesota, Fourth Division, over any action or proceeding arising out of or relating to this Note and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court. **THE UNDERSIGNED WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION BASED ON OR PERTAINING TO THIS NOTE.**

Steven B. Hoyt

2

## INSTRUMENTS SECURITY AGREEMENT

February 28, 2007

**DEBTOR**

Steven B. Hoyt
708 South Third Street
Suite 108
Minneapolis, MN 55415

**SECURED PARTY**

Crown Bank
6600 France Avenue South
Suite 125
Edina, MN 55435

1.    <u>Security Interest and Collateral.</u>  To secure the payment and performance of each and every debt, liability and obligation that Debtor may now or at any time hereafter owe to Secured Party under a $3,000,000.00 Term Promissory Note dated as of the date hereof , and under any amendment, renewal or replacement thereof; all such debts, liabilities and obligations collectively referred to as the "Obligations"), Debtor hereby grants Secured Party a security interest (herein called the "Security Interest") in the property now or hereafter owned by Debtor that is described on Exhibit A attached hereto together with all replacements and proceeds of such property and all rights in connection with such property (the "Collateral").

2.    <u>Representations, Warranties and Covenants.</u>  Debtor represents, warrants and covenants that:

(a)    Debtor will duly endorse, in blank, each and every instrument constituting Collateral by signing on said instrument or by signing a separate document of assignment or transfer, if required by Secured Party.

(b)    Debtor is the owner of the Collateral free and clear of all liens, encumbrances, security interests and restrictions, except the Security Interest and any restrictive legend appearing on any instrument constituting Collateral.

(c)    Debtor will keep the Collateral free and clear of all liens, encumbrances and security interests other than the Security Interest, and any such liens, encumbrances and security interests not permitted under this Agreement shall be void.

(d)    Debtor will pay, when due, all taxes and other governmental charges levied or assessed upon or against any Collateral.



EXHIBIT
C

(e)     At any time, upon request by Secured Party, Debtor will deliver to Secured Party all notices, financial statements, reports or other communications received by Debtor as an owner or holder of the Collateral.

(f)     Debtor will upon receipt deliver to Secured Party in pledge as additional Collateral all securities distributed on account of the Collateral such as stock dividends and securities resulting from stock splits, reorganizations and recapitalizations.

3.     Rights of Secured Party. Debtor agrees that Secured Party may at any time, whether before or after the occurrence of an Event of Default and without notice or demand of any kind, (i) notify the obligor on or issuer of any Collateral to make payment to Secured Party of any amounts due or distributable thereon, (ii) in Debtor's name or Secured Party's name enforce collection of any Collateral by suit or otherwise, or surrender, release or exchange all or any part of it, or compromise, extend or renew for any period any obligation evidenced by the Collateral, (iii) receive all proceeds of the Collateral, and (iv) hold any increase or profits received from the Collateral as additional security for the obligations, except that any money received from the Collateral shall, at Secured Party's option, be applied in reduction of the Obligations, in such order of application as Secured Party may determine, or be remitted to Debtor.

4.     Events of Default. An Event of Default any Promissory Note evidencing the Obligations, and any renewals or replacements thereof, shall be an Event of Default hereunder.

5.     Remedies upon Event of Default. Upon the occurrence of an Event of Default and at any time thereafter, Secured Party may exercise any one or more of the following rights or remedies: (i) declare all unmatured Obligations to be immediately due and payable, and the same shall thereupon be immediately due and payable, without presentment or other notice or demand; (ii) exercise all voting and other rights as a holder of the Collateral; (iii) exercise and enforce any or all rights and remedies available upon default to a secured party under the Uniform Commercial Code, including the right to offer and sell the Collateral privately to purchasers who will agree to take the Collateral for investment and not with a view to

-2-

distribution and who will agree to the imposition of restrictive legends on the certificates
representing the Collateral, and the right to arrange for a sale that would otherwise qualify as
exempt from registration under the Securities Act of 1933; and if notice to Debtor of any
intended disposition of the Collateral or any other intended action is required by law in a
particular instance, such notice shall be deemed commercially reasonable if given at least 10
calendar days prior to the date of intended disposition or other action; (iv) exercise or enforce
any or all other rights or remedies available to Secured Party by law or agreement against the
Collateral, against Debtor or against any other person or property.

      6.   <u>Miscellaneous</u>. Any disposition of the Collateral in the manner provided in
Section 5 shall be deemed commercially reasonable. This Agreement can be waived, modified,
amended, terminated or discharged, and the Security Interest can be released, only explicitly in
a writing signed by Secured Party. A waiver signed by Secured Party shall be effective only in
the specific instance and for the specific purpose given. Mere delay or failure to act shall not
preclude the exercise or enforcement of any of Secured Party's rights or remedies. All rights
and remedies of Secured Party shall be cumulative and may be exercised singularly or
concurrently, at Secured Party's option, and the exercise or enforcement of any one such right
or remedy shall neither be a condition to nor bar the exercise or enforcement of any other. All
notices to be given to Debtor shall be deemed sufficiently given if delivered or mailed by
registered or certified mail, postage prepaid, to Debtor at its address set forth above or at the
most recent address shown on Secured Party's records. Secured Party's duty of care with
respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if Secured
Party exercises reasonable care in physically safekeeping such Collateral or, in the case of
Collateral in the custody or possession of a bailee or other third person, exercises reasonable
care in the selection of the bailee or other third person, and Secured Party need not otherwise
preserve, protect, insure or care for any Collateral. Secured Party shall not be obligated to
preserve any rights Debtor may have against prior parties, to exercise at all or in any particular
manner any voting rights that may be available with respect to any Collateral, to realize on the

Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application. Debtor will reimburse Secured Party for all expenses (including reasonable attorneys' fees and legal expenses) incurred by Secured Party in the protection, defense or enforcement of the Security Interest, including expenses incurred in any litigation or bankruptcy or insolvency proceedings. This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective heirs, representatives, successors and assigns and shall take effect when signed by Debtor and delivered to Secured Party, and Debtor waives notice of Secured Party's acceptance hereof. This Agreement shall be governed by the internal laws of Minnesota and, unless the context otherwise requires, all terms used herein that are defined in Articles 1 and 9 of the Uniform Commercial Code, as in effect in Minnesota, shall have the meanings therein stated. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications that can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations. The Debtor hereby irrevocably submits to the jurisdiction of the Minnesota District Court, Fourth District, and the Federal District Court, District of Minnesota, Fourth Division, over any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of such action or proceeding may be heard and determined in any such court.

Steven B. Hoyt

-4-

Exhibit A
Description of Collateral

| Owner | No. of Units | Certificate No. | Acquired |
|---|---|---|---|
| Steven B. Hoyt | 354,561 | 1546 | 12/22/05 |

Together with all replacements and proceeds of such property and all rights in connection with
such property

A-1

## CONSENT TO PLEDGE OF PARTNERSHIP INTEREST

02-25-08 A08:54 RCVD

IRET, Inc. ("IRET"), as general partner of IRET Properties, a North Dakota Limited Partnership (the "Partnership"), acknowledges that Steven B Hoyt, a limited partner of the Partnership ("Mr. Hoyt"), has pledged, as collateral for a loan from Crown Bank (the "Lender"), 326,535.287 Limited Partnership Units of the Partnership ("Units"), evidenced by Certificates No. 1628 & 1633, and all existing and future dividends, interest, cash, instruments and other property received, distributed or exchanged for or in respect of any or all of the Units, and all of its other existing and future rights relating to the Units (the "Collateral"), pursuant to a security agreement with Lender. Said security agreement (the "Security Agreement") is attached to this Consent as Exhibit A, and is hereby incorporated by reference. Notwithstanding the pledge described in this Consent, Mr. Hoyt shall remain liable for all of its duties and obligations under the Agreement of Limited Partnership of IRET Properties, a North Dakota Limited Partnership, dated January 31, 1997 (as amended, the "Partnership Agreement"). Prior to enforcing any of its rights under this Consent or the Security Agreement, other than the right to receive any distributions declared by the Partnership in respect to the Collateral, Lender shall execute any documentation reasonably required by the Partnership evidencing Lender's agreement to satisfy all of the obligations of a limited partner under the Partnership Agreement, and to be bound by all restrictions set forth therein. Until such time, however, Lender shall have no liability to the Partnership or any other limited partner as a result of this assignment.

IRET consents to the pledge by Mr. Hoyt of the Collateral to the Lender, and agrees that upon receipt of written notice from the Lender, IRET will cause all distributions declared after IRET's receipt of said notice to be tendered to Lender. IRET represents and warrants that IRET is the only general partner of the Partnership, and that this pledge complies with section 9.02 of the Partnership Agreement. IRET is providing this consent based on Lender's knowledge and understanding that conversion of the Collateral to Shares of Beneficial Interest of Investors Real Estate Trust is restricted by contracts between Mr. Hoyt and the Partnership, and that Mr. Hoyt's pledge of the Collateral to Lender is subject and subordinate to any such restrictions.

Mr. Hoyt acknowledges and agrees that neither IRET nor the Partnership shall be liable to Mr. Hoyt (or its successors or assigns) for carrying out their respective obligations to Mr. Hoyt and to the Lender under this Consent. Mr. Hoyt agrees to indemnify, to defend, and to hold IRET and the Partnership harmless from, all claims, demands, causes of action, and suit or suits of any nature whatsoever arising out of or relating to the pledge of the Collateral to Lender pursuant to the Security Agreement or to this Consent. Mr. Hoyt acknowledges and agrees that the Collateral cannot be assigned, transferred or further pledged without IRET's consent and the Lender's prior written release of the Collateral, and that the Collateral cannot be converted to Shares of Beneficial Interest of Investors Real Estate Trust without IRET's agreement and Lender's prior written release of the Collateral.



EXHIBIT

D

IRET PROPERTIES, A NORTH DAKOTA
LIMITED PARTNERSHIP

By IRET, Inc., its sole general partner

By _____

Date: _2/25/08_

Acknowledged and Agreed:
Steven B. Hoyt

By _____

Its _____

Date: _2/10/08_

02-25-08A08:55 RCVD

STATE OF NORTH DAKOTA    )
                         )ss.
COUNTY OF WARD           )

The foregoing instrument was acknowledged before me this 29th day of _February_,
2008, by _Tom Wentz Jr._ of IRET, Inc., the sole general partner of IRET Properties, a
North Dakota Limited Partnership.

```
┌─────────────────────────────────┐
│      L. KNOOP ANDERSON          │
│        Notary Public            │
│      State of North Dakota      │
│ My Commission Expires Aug. 20, 2013 │
└─────────────────────────────────┘
```

_____
Notary Public

STATE OF MINNESOTA    )
                      )ss.
COUNTY OF _Hennepin_  )

The foregoing instrument was acknowledged before me this 10th day of _February_,
2008, by Steven B. Hoyt.

```
┌─────────────────────────────────┐
│  (seal)   Sarah R. Leuden       │
│           Notary Public         │
│           Minnesota             │
│ My Commission Expires January 31, 2012 │
└─────────────────────────────────┘
```

_____
Notary Public

# *Bowman and Brooke* LLP

*Attorneys at Law*

150 South Fifth Street, Suite 3000
Minneapolis, MN  55402
Phone: 612.339.8682
Fax: 612.672.3200
www.bowmanandbrooke.com

Charles (CJ) Schoenwetter
Direct: 612.656.4037
Email: cj.schoenwetter@bowmanandbrooke.com

July 11, 2011                                                   ***Via Facsimile, eMail and U.S. Mail***

Kevin M. Busch, Esq.
Moss & Barnett
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-4129

      Re:    Steven B. Hoyt Loan #104070397 (hereinafter, the "Hoyt Loan")

Dear Mr. Busch:

Please accept this correspondence in furtherance to our discussion of last Friday, July 8, 2011. Specifically, I want to follow-up on two items:  (1) the timing to examine and copy the documents referred to in my letter dated July 7, 2011 (see attached Exhibit A); and (2) Crown Bank's status as the Lead Lender relative to the Hoyt Loan referenced above.

Examination and Copying of Documents

Kevin, could you please let me know the earliest opportunity to review the documents discussed in my July 7th correspondence?  Also, although Crown Bank maintains its files in a "virtual environment," I want to clarify that Beal Bank is not waiving its right to inspect the originals of such documents.  Indeed, with respect to understanding whether Crown Bank still possesses the collateral securing this loan, it would be very important for Beal Bank to view the original copies of certificated shares of IRET units pledged as collateral as well as all of the other loan documents.  Please let me know ASAP if we can review the original documents before this week concludes.

Crown Bank's Position Regarding Lead Lender Status and Other Issues

There appears to be a serious disagreement regarding whether Crown Bank continues to function as the Lead Lender for the Hoyt Loan referenced above.  Beal Bank is unclear regarding *who* is acting as the Lead Lender.  Allow me to explain.

*Steven Hoyt's Position:*  Last Friday, July 8, 2011, Steven Hoyt testified unequivocally, repeatedly and under oath before a judicial officer, during a 341 hearing in his bankruptcy proceeding, that Crown Bank never transferred the Lead Bank designation or servicing rights to the Hoyt Loan.  I understand that he further testified Crown Bank continues to hold the collateral for the Hoyt Loan.

*Crown Bank's Position:*  Beal Bank understands that Crown Bank asserts that Crown Bank is no longer the Lead Lender for the Hoyt Loan.  This is based on three separate statements:

**MINNEAPOLIS**      PHOENIX      DETROIT     SA

LOS ANGELES     RICHMOND     COLUMBIA     DALLAS

EXHIBIT
E

Kevin M. Busch, Esq.
July 11, 2011
Page 2

1.  Crown Bank in its February 14, 2011 email from Al Doering to Mike Alvarez
    stated: "Please note that Crown Bank has sold and released our interest and the
    servicing rights on the Steve Hoyt Loan (#4070397) to Stone Arch Fund." (*See*
    attached Exhibit B.)

2.  February 11, 2011 correspondence on Crown Bank letterhead from Maria Bonnie
    (Vice President) to Anthony Navarro of Stone Arch IV states: "I am pleased to
    inform you Crown Bank has executed the Loan Purchase and Sale Agreement
    between Crown Bank and the StoneArch Fund IV, LLC . . . for the sale of all
    Sellers' interest in the Steven B. Hoyt Loan dated February 28, 2007 and related
    Documents." (*See* attached Exhibit C.)

3.  On Friday, July 8, 2011, during a telephone conversation between you and me,
    you told me "there is a new Lead Lender" and then provided me with the correct,
    legal name of StoneArch Fund IV, LLC.   Based upon the context of our
    discussions, I understood you to mean that StoneArch Fund IV, LLC was the new
    Lead Lender.   In addition, although you needed to confirm this next point, you
    informed me that Crown Bank retained none of the collateral for the Hoyt Loan
    and that it had all been transferred to StoneArch Fund IV, LLC. (To be very
    clear, you qualified this statement about who currently held the collateral on the
    Hoyt Loan by saying that it was subject to confirmation by you.)

Kevin, Beal Bank needs clear, unequivocal answers about *who* the lead lender is and *where* the
collateral for the Hoyt Loan is being maintained.  This information is needed urgently in order to
protect Beal Bank's interests in the Hoyt Loan and associated collateral.  I appreciate your
anticipated assistance in getting to the bottom of these issues.

Additionally, Kevin, can you please confirm whether or not Crown Bank will provide access to
the documents transferring interest in the Hoyt Loan to StoneArch Fund IV, LLC and Bruce
Hoyt?  Jerry Miranowski informs me that Crown Bank had previously refused to share this
information because it was viewed as "confidential."  When you and I spoke last week, I
represented that we would agree to a reasonable confidentiality agreement.

I look forward to hearing from you as soon as possible regarding these important issues.

Regards,

BOWMAN AND BROOKE LLP

Charles (CJ) Schoenwetter

CJS/djd
Enclosures

1397395-EA 1

# Bowman and Brooke LLP

### Attorneys at Law

150 South Fifth Street, Suite 3000
Minneapolis, MN 55402
Phone: 612.339.8682
Fax: 612.672.3200
www.bowmanandbrooke.com

Charles (CJ) Schoenwetter
Direct: 612.656.4037
Email: cj.schoenwetter@bowmanandbrooke.com

July 7, 2011

Kevin M. Busch, Esq.
Moss & Barnett
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4129

     Re:    Steven B. Hoyt Loan #104070397

Dear Mr. Busch:

Please be informed that Bowman and Brooke LLP has been retained by Beal Bank Nevada ("Beal Bank") to address issue relating to the above-referenced loan.

Pursuant to Paragraph 4 of the February 28, 2007 Participation Agreement, Beal Bank respectfully requests the immediate opportunity examine and make copies of Crown Bank's complete Loan File relative to Steven Hoyt Loan #104070397, as well as all other documents and records that fall within the scope of Paragraph 4. The text of Paragraph 4 reads, in its entirety, as follows:

> 4. Documentation Review. Participant shall have the right to examine and make copies of the original Loan Documents, the records of Lead Bank evidencing the payment history of the loan, receipt of payments from Participant for participation interests, and payments by Lead Bank to Participant on participation interests, and documents provided to Lead Bank by or on behalf of Borrower or any guarantor relating to the Loan, at any reasonable time during Lead Bank's normal business hours. Lead Bank shall provide Participant with copies of financial statements and all other records and reports submitted by Borrower and any guarantor as requested by Participant.

If such an examination and review cannot be accomplished on or before July 11, 2011, please inform me immediately. Please notify me promptly of the earliest time available for purposes of conducting this examination and copying.

Regards,

BOWMAN AND BROOKE LLP

Charles (CJ) Schoenwetter

CJS/djd

**EXHIBIT**

**A**

1384538-EA 1

**MINNEAPOLIS**      PHOENIX      DETROIT      SAN JOSE

LOS ANGELES      RICHMOND      COLUMBIA      DALLAS      AUSTIN

## Mike Alvarez

| | |
|---|---|
| **From:** | Allan J. Doering [adoering@Crown-Bank.com] |
| **Sent:** | Monday, February 14, 2011 3:39 PM |
| **To:** | Mike Alvarez |
| **Cc:** | Maria Bonnie; Kevin Howk |
| **Subject:** | Hoyt |

Mike,

Please note that Crown Bank has sold and released our interest and the servicing rights on the Steve Hoyt Loan (# 4070397) to Stone Arch Fund.  All questions and correspondence should be directed to:

**Contact Person is Tony Navarro.**
**(612) 359-4476**

**The address is:**

**275 Market St. 439**
**Minneapolis, MN  55405**

We will leave our electronic file system available until you can make arrangements with Stone Arch.

Thanks, Al

**Al Doering**
SVP – Chief Credit Officer

CROWN BANK
6600 FRANCE AVENUE, SUITE 125
EDINA, MN 55435

DIRECT: 952-285-2731
FAX:     952-285-5900

1



EXHIBIT

B



**CROWN BANK**

6600 France Avenue South, Suite 125 • Edina, Minnesota 55435

February 11, 2011

Mr. Anthony Navarro
StoneArch Fund IV, LLC
275 Market Street, Suite 439
Minneapolis, MN  55405

Dear Mr. Navarro,

I am pleased to inform you Crown Bank has executed the Loan Purchase and Sale
Agreement between the Crown Bank and the StoneArch Fund IV, LLC ("Purchaser") for
the sale of all Sellers' interest in the Steven B. Hoyt Loan dated February 28, 2007 and
related Documents.  Attached is the executed purchase agreement.

Should you have any questions, please do not hesitate to contact me at (952)285-2723.

Regards,

Maria A. Bonnie
Vice President

EXHIBIT
C

**From:** Busch, Kevin M. [mailto:BuschK@moss-barnett.com]
**Sent:** Monday, July 11, 2011 3:02 PM
**To:** Charles Schoenwetter
**Subject:** RE: Hoyt Loan

    CJ, this email will confirm that Crown Bank completed an outright sale of Crown Bank's interest in Steven Hoyt loan No. 4070397 to StoneArch Fund IV, LLC on or about February 11, 2011.  Crown Bank did not retain any rights with respect to that loan.

    Thank you.


**Kevin M. Busch**
*Attorney at Law*
**Moss & Barnett**
*A Professional Association*
Ph: 612-877-5292  Fax: 612-877-5999
BuschK@Moss-Barnett.com
90 South Seventh Street, Suite 4800  | Minneapolis, MN 55402
www.moss-barnett.com



EXHIBIT
F

**From:** Busch, Kevin M. [mailto:BuschK@moss-barnett.com]
**Sent:** Thursday, July 14, 2011 11:12 AM
**To:** Charles Schoenwetter
**Subject:** Hoyt Loans

CJ, with the permission of Steven Hoyt, Crown Bank also confirms that it continues to hold physical possession of the certificates for two IRET Properties limited partnership units that secure loan No. 4070397.  The certificates held by Crown Bank are No. 1633 for 29,152.287 units and No. 1628 for 297,858 units.

Thank you.

**Kevin M. Busch**
*Attorney at Law*
**Moss & Barnett**
*A Professional Association*
Ph: 612-877-5292  Fax: 612-877-5999
BuschK@Moss-Barnett.com
90 South Seventh Street, Suite 4800  | Minneapolis, MN 55402
www.moss-barnett.com



**From:** Busch, Kevin M. [mailto:BuschK@moss-barnett.com]
**Sent:** Thursday, July 14, 2011 12:56 PM
**To:** Charles Schoenwetter
**Subject:** Hoyt Loan

    CJ, I have sent you two emails providing the information that Crown Bank can provide regarding this loan.  I do not intend to respond further.

    Thank you.


**Kevin M. Busch**
*Attorney at Law*
**Moss & Barnett**
*A Professional Association*
Ph: 612-877-5292  Fax: 612-877-5999
BuschK@Moss-Barnett.com
90 South Seventh Street, Suite 4800  | Minneapolis, MN 55402
www.moss-barnett.com



# *Bowman and Brooke* LLP

### *Attorneys at Law*

150 South Fifth Street, Suite 3000
Minneapolis, MN 55402
Phone: 612.339.8682
Fax: 612.672.3200
www.bowmanandbrooke.com

Charles (CJ) Schoenwetter
Direct: 612.656.4037
Email: cj.schoenwetter@bowmanandbrooke.com

July 14, 2011

**VIA FACSIMILE 612-338-7797
AND U.S. MAIL**

Anthony J. Navarro
Manager
StoneArch Fund IV, LLC
275 Market Street, Suite 439
Minneapolis, MN 55405

Re:   Steven B. Hoyt Loan #104070397 (hereinafter, the "Hoyt Loan")

Dear Mr. Navarro:

Please accept this correspondence as a follow-up to my earlier correspondence of July 8 and July 12, 2011.

I appreciate the fact that you and I spoke earlier this week. However, at that time you were unable to respond with specific factual information to Beal Bank's reasonable requests concerning basic information about the above-referenced Hoyt Loan and claimed that Steve Hoyt would have the answers to Beal Bank's questions. You also indicated that Steve Hoyt was meeting with Crown Bank to make sure "they each have everything" and "everything is intact."

Since that time, I have spoken with Crown Bank's legal counsel, Kevin Busch. He informs me that: (1) Stone Arch Fund IV, LLC ("StoneArch IV") is the Lead Lender of the Hoyt Loan; and (2) StoneArch IV is the servicer of the Hoyt Loan. Beal Bank takes no position regarding whether Kevin Busch's representations on behalf of Crown Bank are accurate.

I understand that Steve Hoyt has given express permission to Crown Bank to disclose whether Crown Bank holds the collateral securing the Hoyt Loan. Thank you. However, due to the unique circumstances that have unfolded, Beal Bank also wishes to confirm that Crown Bank has at all times held the collateral securing the Hoyt Loan and that StoneArch IV has *never* been in possession of such collateral. I appreciate your prompt and direct response to this very specific inquiry.

There are also other significant issues that have just recently been brought to Beal Bank's attention regarding the Hoyt Loan, the servicing of the Hoyt Loan, and the documents surrounding the ongoing collection of payments from Steven Hoyt in connection with the Hoyt Loan, etc., to which Beal Bank, as a 50% participant, needs immediate responses.

I appreciate the fact StoneArch IV sent a partial copy of the Hoyt Loan File. However, it was incomplete in a number of material respects. For example, and not by way of limitation, the forty (40) pages of materials StoneArch IV provided does not provide a complete copy of the "Loan Purchase and Sale Agreement" because it omitted: (1) <u>Exhibit F</u>: Allonge to Secured Promissory Note; and (2) <u>Exhibit G</u>: Assignment of Note, Pledge & Participation Agreements. I

**MINNEAPOLIS**       PHOENIX          DETROIT          SAN

LOS ANGELES          RICHMOND          COLUMBIA          DALLAS

**EXHIBIT
I**

Anthony J. Navarro
July 14, 2011
Page 2

will not go into further detail about the numerous other missing portions of the Hoyt Loan materials that have now been requested multiple times by Beal Bank.

I respectfully request that StoneArch IV provide immediate, unfettered and total access to all documents concerning the Hoyt Loan.

Please provide StoneArch IV's immediate written authorization for Beal Bank to conduct a complete, unfettered examination and copying of all documentation in Crown Bank's possession to the fullest extent outlined in Paragraph Four of the February 28, 2007 Participation Agreement. A copy of that Participation Agreement was attached as Exhibit 1 to the Loan Purchase and Sale Agreement among StoneArch Fund IV, Crown Bank, North American Banking Company and Citizens State Bank, which you sent to me earlier today. The terms of Paragraph Four are as follows:

> 4. Documentation Review. Participant shall have the right to examine and make copies of the original Loan Documents, the records of Lead Bank evidencing the payment history of the loan, receipt of payments from Participant for participation interests, and payments by Lead Bank to Participant on participation interests, and documents provided to Lead Bank by or on behalf of Borrower or any guarantor relating to the Loan, at any reasonable time during Lead Bank's normal business hours. Lead Bank shall provide Participant with copies of financial statements and all other records and reports submitted by Borrower and any guarantor as requested by Participant.

**If StoneArch IV takes the position that Crown Bank does not require its permission in order to have access to documents and information in Crown Bank's possession and/or if StoneArch IV takes the position that it is not servicing the Hoyt Loan, then kindly state that expressly in a letter directed to my attention with a copy sent to Kevin Busch.**

Please respond immediately to this request. Beal Bank reserves all rights and remedies at its disposal—although it is hopeful that its simple requests, as a participant in the Hoyt Loan, will be honored.

Regards,

BOWMAN AND BROOKE LLP

Charles (C.) Schoenwetter

cc:     Kevin Busch, Esq.

1406793-EA 1

**From:** Steve Hoyt [mailto:SteveH@hoytproperties.com]
**Sent:** Monday, July 18, 2011 12:52 PM
**To:** Mike Alvarez
**Subject:** Beal Bank

Mike – I am following up regarding our last communication regarding resolution of the Participation Interest Beal claims it owns under the Crown Bank/Hoyt line of credit.  Since that time I have filed personal bankruptcy.  It is unclear who is representing Beal, as I was dealing with Renee Dotson and Jerry Miranowski (Faegre & Benson), but lately the Bowman & Brooke firm and the Fabyanske firm have made appearances.  In any event, this matter is about to become contentious.  If Beal Bank wishes to consummate a resolution along the general lines as proposed a number of months ago, I am confident it could be accomplished and Beal could be removed from future involvement in my bankruptcy.

Please let me know if you have any thoughts on this matter.

Steven Hoyt
**HOYT PROPERTIES, INC.**
Chief Executive Officer

International Market Square
275 Market Street
Suite 439
Minneapolis, MN  55405

TEL  612.338.3199
FAX  612.338.7797

SteveH@hoytproperties.com

**From:** Steve Hoyt [mailto:SteveH@hoytproperties.com]
**Sent:** Tuesday, July 19, 2011 8:20 AM
**To:** Charles Schoenwetter
**Cc:** Michael L. Meyer; Anthony Navarro
**Subject:** FW: Message from KMBT_C452

CJ – I am following up on your July 14 letter on behalf of Stone Arch IV.

Attached are the Exhibits inadvertently not sent as part of the 40 pages we provided last week.

Crown Bank has always been in possession of the Investors Real Estate Operating Partnership Units, evidenced by Certificates.

Your other requests seem overly broad and inappropriate in many respects. I cannot speak for Crown Bank, which is no longer the Lead Bank. As to your other request for "unfettered" access to the Hoyt loan file, please specifically define what documents you are interested in, and we will respond.

As you may know, I have always taken the position that Beal Bank's purported purchase of the Participation Interest was void *ab initio* per the terms of the Participation Agreement, which were presumably reviewed by Beal Bank prior to its "purchase."

Finally, it appears that your requests regarding the "Hoyt Loan File" and other matters relating to "Hoyt" fall under the purview of my bankruptcy filing and fall under the jurisdiction of the Bankruptcy Court. Therefore, I ask that further communication be directed to Michael Meyer. If you need his contact information, please advise.

Steven Hoyt
**HOYT PROPERTIES, INC.**
Chief Executive Officer

TEL  612.338.3199
FAX  612.338.7797

SteveH@hoytproperties.com

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

In Re:

STEVEN BRUCE HOYT,                                        Case No. 11-43816
                                                         Chapter 11

       Debtor.

### UNSWORN CERTIFICATE OF SERVICE

    I, Jeffrey W. Jones, declare under penalty of perjury that on July 27, 2011, that I caused the following documents:

    Notice of Hearing and Verified Motion for Order Directing Rule 2004 Examinations; and

    Proposed Order Directing Rule 2004 Examinations.

to be electronically filed with the Clerk of Court through the Electronic Case Filing System ("ECF") and that ECF will send an e-notice of the electronic filing; and by delivering by U.S. at its registered office on the following parties:

    StoneArch Fund IV, LLC
    275 Market Street #439
    Minneapolis, MN 55405

    and

    Crown Bank
    6600 France Avenue South, # 125
    Edina MN 55434

    Kevin M. Busch, Esq.,
    Moss & Barnett
    90 South Seventh Street, Suite 4800
    Minneapolis, MN 55402

                      /s/  Jeffrey W. Jones
                      Jeffrey W. Jones

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In Re:

STEVEN BRUCE HOYT,                                    Case No. 11-43816
                                                      Chapter 11

                        Debtor.

**ORDER FOR 2004 EXAMINATIONS**

This case is before the court on the motion of the Beal Bank of Nevada to allow it to

conduct examinations pursuant to Federal Rule of Bankruptcy Procedure 2004.

Based on the files and records,

IT IS ORDERED:  Beal Bank may issue a subpoena to Crown Bank and StoneArch Fund

IV, LLC pursuant to Federal Rule of Bankruptcy Procedure 2004 and 9016.

Dated:  August ___, 2011            _____

                                    UNITED STATES BANKRUPTCY JUDGE